Robert W. Roddis (16936)
Email: bobroddis@gmail.com
ATTORNEY FOR PLAINTIFFS
424 Madison
Grosse Pointe Farms, MI 48236
(313) 319-5045

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Rebecca K. Wilson, Dennis Houtz, James Dunn, Robert Wong, Carney Look Wong, Kenneth Wong, Mike Hampshire, Lions Fan, LLC, Linda Saenz, Abby Creek Investment, LLC, Pascal Vohradnik, Simone Vohradnik, 13607 Virgil St., LLC, Joanne Beldotti, Ramona Lorraine Solano-Owen, Greiner 11831, LLC, Coyle 12071, LLC , Sarsfield 12460, LLC, Eva Thode, Layne Lundstrom, Audrey Lundstrom, Invicta Legato Investments, LLC, Paul Valenti, Sherry Valenti, Re Investor 702, LLC and various John Does <br><br> Plaintiffs, <br><br> vs. <br><br> BuyPD, LLC, 5 Choices, LLC, American Cash Fund, LLC, DLS Properties, LLC, EZ Street Properties, LLC, FrontSide Properties, LLC, Green Apple Homes, LLC, Insiders Cash, LLC, Malibu Breeze Properties, LLC, Max Ultra, LLC, Patriot Homes, LLC, Property Direct, LLC, Ready Prop, Red Apple Homes, LLC, Red List Homes, LLC, Scree 44, LLC, Screaming Eagle Properties, LLC, Silver Tie Homes, LLC, Insiders Financial Education, LLC, Yancey Events LLC, Yancey LLC, John Graham Inc., Income Property USA, LLC, Interactive Homes, LLC, Improvement Homes, LLC, and Expansion Properties, LLC, Veil Corporate, LLC, Bud Lethbridge, Scott Yancey, Dean Grazioisi, Ryan Poelman, Blair Poelman, Guardian Law, LLC, American Legal and Escrow, LLC, Invictus, PLLC, Property Education, LLC and various John Does, <br><br> Defendants. | **COMPLAINT** <br><br> **JURY DEMANDED** |

For their Complaint against the Defendants, the Plaintiffs Rebecca K. Wilson, Dennis Houtz, James Dunn, Robert Wong, Carney Look Wong, Kenneth Wong, Mike Hampshire, Lions Fan, LLC, Linda Saenz, Abby Creek Investment, LLC Pascal Vohradnik, Simone Vohradnik, 13607 Virgil St., LLC, Joanne Beldotti, Ramona Lorraine Solano-Owen, Greiner 11831, LLC, Coyle 12071, LLC, Sarsfield 12460, LLC, Eva Thode, Layne Lundstrom, Audrey Lundstrom, Invicta Legato Investments, LLC, Paul Valenti, Sherry Valenti and ReInvestor 702, LLC (collectively "Plaintiffs"), through counsel, state as follows:

## THE PRIOR ACTION -

1.  A prior and related action and Complaint was originally filed in the United State District Court for the Eastern District of Michigan on February 23, 2016, Case Number 2:16-cv-10659-RHC-MKM (Dk. 1).  The Plaintiffs were Rebecca K. Wilson, Dennis Houtz, James Dunn, Robert Wong, Kenneth Wong, Mike Hampshire, Lions Fan, LLC Linda Saenz and Abby Creek Investment, LLC.  The Defendants were 5 Choices, LLC, American Cash Funding, LLC, BuyPD, LLC, DLS Properties, LLC, EZ Street Properties, LLC, FrontSide Properties, LLC, Green Apple Homes, LLC, Insiders Cash, LLC, Malibu Breeze Properties, LLC, Max Ultra, LLC, Patriot Homes, LLC, Property Direct, LLC, Ready Prop, Red List Homes, LLC, Screaming Eagle Properties, LLC, Silver Tie Homes, LLC, Investors Financial Education, LLC, Yancey Events LLC, and various John Does.  The substance of the case was that the Defendants together had formed a RICO enterprise and conspiracy which had, *inter alia*, defrauded Plaintiffs and many others.

2.  Plaintiffs filed a First Amended complaint (Dk. 9) on April 24, 2016 which added several parties.  The Plaintiffs were Rebecca K. Wilson, Dennis Houtz, James Dunn, Robert Wong,

Kenneth Wong, Mike Hampshire, Lions Fan, LLC Linda Saenz, Abby Creek Investment, LLC,

Pascal Vohradnik, Simone Vohradnik, 13607 Virgil St., LLC, Joanne Beldotti, Ramona Lorraine

Solano-Owen, Greiner 11831, LLC, Coyle 12071, LLC and Sarsfield 12460, LLC, and various

John Does.  The Defendants were 5 Choices, LLC, American Cash Funding, BuyPD, LLC, DLS

Properties, LLC, EZ Street Properties, LLC, FrontSide Properties, LLC, Green Apple Homes,

LLC, Insiders Cash, LLC, Malibu Breeze Properties, LLC, Max Ultra, LLC, Patriot Homes,

LLC, Property Direct, LLC, Ready Prop, Red Apple Homes, LLC, Red List Homes, LLC, Scree

44, LLC, Screaming Eagle Properties, LLC, Silver Tie Homes, LLC, Investors Financial

Education, LLC, Insiders Financial Education, LLC, Yancey Events LLC, Yancey LLC and

various John Does,

3.  Another related action and Complaint was originally filed in the United State District

Court for the Eastern District of Michigan on October 8, 2016, Case Number 2:16-cv-13601-

JCO-RSW.  The Plaintiffs named in the Complaint (Dk. 1) were Eva Thode, Layne Lundstrom,

Audrey Lundstrom, and Invicta Legato Investments, LLC, and the Defendants were BuyPD,

LLC, Insiders Cash, LLC, John Graham Inc., Income Property USA, LLC, Interactive Homes,

LLC, Improvement Homes, LLC, Green Apple Homes, LLC, 5 Choices, LLC, Expansion

Properties, LLC and Yancey LLC

4.  Prior to November 8, 2016, the second case, Case Number 2:16-cv-13601 was assigned to

Judge Robert Cleland who had previously been assigned Case Number 2:16-cv-10659.  At a

Status Conference held on November 2, 2016, Judge Cleland orally directed Plaintiffs' counsel

to file no additional claims or cases on behalf of any new or additional Plaintiffs against the

Defendants in the Eastern District of Michgan until the active claims had been resolved.  Judge

Cleland also entered an Order of Consolidation (Dk. 36) on November 8, 2016 which stated in

part:

> The court held a status conference off the record on November 2, 2016 in which counsel participated. While several motions to dismiss alleging mandatory arbitration and choice of venue provisions were pending in this case, (Dkts. ## 14, 15, 26, 28), Judge Cleland accepted reassignment of a companion case alleging essentially the same facts and legal theories against largely the same Defendants on behalf of additional Plaintiffs who are represented by the same counsel who represent Plaintiffs in the instant case. See Thode v. Insiders Cash, LLC, No. 16-13601 (E.D. Mich.).
>
> In the interests of both judicial economy and minimizing the risk of inconsistent rulings that could stem from adjudicating motions to dismiss filed in the two cases individually, the court will direct Plaintiff to file a consolidated complaint which combines the claims of the two companion cases.

5.  On November 18, 2016, Plaintiffs filed their Second Amended Complaint and Jury

Demand (Dk 37).  The Plaintiffs were Rebecca K. Wilson, Dennis Houtz,  James Dunn, Robert

Wong, Kenneth  Wong, Mike Hampshire, Lions Fan, LLC  Linda Saenz, Abby Creek

Investment, LLC,  Pascal Vohradnik, Simone Vohradnik,  13607 Virgil St., LLC, Joanne

Beldotti,  Ramona Lorraine Solano-Owen,  Greiner 11831, LLC, Coyle 12071, LLC , Sarsfield

12460,  LLC, Eva Thode, Layne Lundstrom, Audrey Lundstrom,  and Invicta Legato

Investments, LLC  and various John Does.

The Defendants were 5 Choices, LLC, American Cash Funding,  BuyPD, LLC, DLS

Properties, LLC,  EZ Street Properties, LLC, FrontSide Properties, LLC,  Green Apple Homes,

LLC, Insiders Cash, LLC,  Malibu Breeze Properties, LLC, Max Ultra, LLC,  Patriot Homes,

LLC, Property Direct, LLC,  Ready Prop, Red Apple Homes, LLC, Red List Homes, LLC,

Scree 44, LLC, Screaming Eagle Properties, LLC,  Silver Tie Homes, LLC, Investors Financial

Education, LLC, Insiders Financial  Education, LLC, Yancey Events LLC, Yancey LLC  John

4

Graham Inc., Income Property USA, LLC,  Interactive Homes, LLC, Improvement Homes, LLC, and Expansion Properties, LLC and various John Does.

6.  The trial court then dismissed some of Plaintiffs' various claims without prejudice and some with prejudice.  The judgment of dismissal was entered July 6, 2017 (Dk. 62).

7.  On August 3, 2017, Plaintiffs filed with the trial court their Motions to Alter or Amend Judgment and for Leave to File an Amended Complaint (Dk. 64).  The proposed Amended Complaint contained the original parties and additional parties.  The Plaintiffs were Rebecca K. Wilson, Dennis Houtz, James Dunn, Robert Wong, Kenneth Wong, Mike Hampshire, Lions Fan, LLC Linda Saenz, Abby Creek Investment, LLC, Pascal Vohradnik, Simone Vohradnik, 13607 Virgil St., LLC, Joanne Beldotti, Ramona Lorraine Solano-Owen, Greiner 11831, LLC, Coyle 12071, LLC , Sarsfield 12460, LLC, Eva Thode, Layne Lundstrom, Audrey Lundstrom, and Invicta Legato Investments, LLC and various John Does.

8.  The proposed Defendants for the proposed Amended Complaint consisted of 5 Choices, LLC, American Cash Funding, BuyPD, LLC, DLS Properties, LLC, EZ Street Properties, LLC, FrontSide Properties, LLC, Green Apple Homes, LLC, Insiders Cash, LLC, Malibu Breeze Properties, LLC, Max Ultra, LLC, Patriot Homes, LLC, Property Direct, LLC, Ready Prop, Red Apple Homes, LLC, Red List Homes, LLC, Scree 44, LLC, Screaming Eagle Properties, LLC, Silver Tie Homes, LLC, Insiders Financial Education, LLC, Yancey Events LLC, Yancey LLC, John Graham Inc., Income Property USA, LLC, Interactive Homes, LLC, Improvement Homes, LLC, and Expansion Properties, LLC, Veil Corporate, LLC, Bud Lethbridge, Scott Yancey, Dean Grazioisi, Ryan Poelman, Blair Poelman, Guardian Law, LLC, American Legal and Escrow, LLC, Invictus, PLLC Kory Thurston and various John Does.

9.  On March 30, 2018, the trial court denied Plaintiffs "Motion to Alter or Amend Judgment and Motion for Leave to File an Amended Complaint" (Dk. 64).  The trial court also ruled:

> This, however, is the end. This case, in this court, is over. Plaintiffs are of course free to appeal the court's decisions, but shall make no further attempts to relitigate the case before this judge.

> *******

> To the extent clarification was needed as to its July 6, 2017 order (Dkt. # 61), IT IS FURTHER ORDERED that the court's opinion is CLARIFIED that the dismissals pursuant to the forum selection clauses are without prejudice to Plaintiffs' rights to bring in the proper forum, but with prejudice to any attempt to re-litigate them in this court. (Dkt. #70).

10.  Plaintiffs filed a timely appeal with the 6th Circuit Court of Appeals.

11.  On June 27, 2019, the 6th Circuit Court of Appeals issued its amended opinion on the appeal (Exhibit A) which stated in part:

> Rebecca K. Wilson and twenty other Plaintiffs appeal the district court's dismissal of Plaintiffs' claims against 5 Choices, LLC and twenty-five other Defendants. Plaintiffs argue on appeal that the district court erred in dismissing their claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and erred in denying Plaintiffs leave to file a third amended complaint.

> For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment, and **REMAND** for further proceedings.

> Plaintiffs are fourteen individuals and seven corporate entities associated with some of those  individuals, who allege that Defendants, consisting  of  twenty-six corporate  entities, defrauded Plaintiffs and other investors with a complex scheme in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and state law— although the nature and scope of the state-law claims are never clearly defined.

> Although this case involves twenty-one Plaintiffs making claims against twenty-six Defendants and therefore involves numerous complicated sets of facts, the facts as relevant to this appeal, which relates largely to dismissal of claims due to the existence of forum-selection and arbitration clauses in the relevant contracts,

are more straightforward. Plaintiffs' claims concern actions that one or more Defendants took individually, as well as the actions Defendants undertook as a single enterprise or conspiracy, which Plaintiffs refer to as the "Buying Summit Fraudulent Enterprise." Plaintiffs allege claims relating to damages in connection with contracts they made with one or more Defendants in the course of being deceived by the Enterprise.

Plaintiffs' arguments on appeal concern the dismissal of their claims against the four types of defendants in this case (*i.e.*, Property Defendants, Education Defendants, Lending Defendants, and JGI), and the refusal of the district court to permit Plaintiffs to file a third amended complaint. We will discuss the claims concerning dismissal, followed by the denial of leave to file a third amended complaint.

********

In other words, to hold that a forum-selection clause is not enforceable due to fraud, there must be allegations of fraud that are specific to the inclusion of the forum-selection clause. This is because there is generally no reason to doubt that the forum designated in the forum-selection clause can be trusted to decide in the first instance whether the contract as a whole is valid and enforceable. *Cf. Preston v. Ferrer*, 552 U.S. 346, 353 (2008) ("[A]ttacks on the validity of an entire contract, as distinct from attacks aimed at [an] arbitration clause, are within the arbitrator's ken."). In this case, Plaintiffs have made no allegations of fraud specific to the forum-selection clauses.

Further, although Plaintiffs allege that Defendants had and breached a fiduciary duty to Plaintiffs, none of these allegations are specific to the forum-selection clauses. Just as there is no reason to doubt the forum's ability to decide in the first instance whether the contracts at issue in this case are invalid or unenforceable as a result of fraud, *cf. Preston*, 552 U.S. at 353, neither is there reason to doubt the forum's ability to decide whether they are invalid because Defendants breached a fiduciary duty to Plaintiffs. Because Plaintiffs have made no arguments suggesting that the forum-selection clauses (rather than the contracts in their entirety) were the product of fraud or other misconduct, the district court did not err in dismissing Plaintiffs' claims to allow the forum designated in the forum-selection clauses to address the validity and enforceability of the contracts.

*******

It may well be that this case is one which "[f]rom a practical standpoint . . . should be litigated as one case in one court in one [jurisdiction]." *See Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 443 (7th Cir. 2012). However, that does not imply that all of Plaintiffs' claims should be litigated in the Eastern District of

Michigan. If one forum is proper, it makes more sense for that forum to be the forum designated in Plaintiffs' contracts with Property Defendants (*i.e.*, the courts of Utah). The district court's dismissal of Plaintiffs' claims was without prejudice as to districts other than the Eastern District of Michigan, and Plaintiffs remain free to bring their claims in the courts of Utah. Just as the ultimate Utah forum will be able to decide whether the contracts are valid or not, that forum will be able to decide whether enforcing the arbitration clauses would prevent Plaintiffs from "effectively . . . vindicat[ing] [their] statutory cause of action." *Mitsubishi Motors*, 473 U.S. at 637. Thus, the risk of multiple fora does not require this Court to disregard the forum-selection clauses in Plaintiffs' contracts with Property Defendants, and the district court did not err in rejecting this argument.

*******

Although Plaintiffs may be correct that all Defendants would be jointly and severally liable for the actions of all other Defendants in connection with this alleged conspiracy, *see Fleischhauer*, 879 F.2d at 1301, the potential liability in this case arises entirely out of the contracts that Plaintiffs made with Defendants. In this sense, "the alleged conduct of the non-[privity Defendants] is so closely related to the contractual relationship[s] that the forum selection clause[s] appl[y] to all [D]efendants." *See Manetti-Farrow, Inc.*, 858 F.2d at 514 n.5. This being the case, Plaintiffs should not be allowed to escape the enforceable forum-selection clauses they had with the privity Defendants merely by instead suing those Defendants' non-privity affiliates to recover on the very contracts containing the forum-selection clauses. *See Adams*, 702 F.3d at 440. Dismissal of Plaintiffs' claims against the non-privity Property Defendants was therefore proper.8 Thus, we affirm the district court's dismissal without prejudice of Plaintiffs' claims against Property Defendants.

********

**Next, Plaintiffs' objection that enforcement of this arbitration clause would prevent them from vindicating their rights under RICO because it would necessitate multiple fora, as discussed above, may have some validity** [emphasis added].  Accordingly, Plaintiffs are free to bring their claims in Utah courts, which may decide in the first instance whether or not to enforce the arbitration clauses due to the concerns of litigating these claims in multiple fora.

*********

Plaintiffs argue that the district court should have allowed them to amend their complaint, arguing that their proposed third amended complaint would have "alleviate[d] the district court's concerns about 'shotgun pleadings' and the failure to identify which Defendant allegedly did what." (Appellants' Br. 53.) As

8

discussed, we affirm the district court due to the forum-selection and arbitration clauses, not on the grounds that Plaintiffs failed to state a claim on which relief can be granted. Because Plaintiffs' proposed third amended complaint would not change any of the analysis with respect to the enforceability of the forum-selection or arbitration clauses, we affirm the district court's denial of Plaintiffs' motion to amend their complaint.

**CONCLUSION**  For the reasons stated above, we **AFFIRM** the district court judgment to the extent it denied Plaintiffs' motion to file a third amended complaint. We also **AFFIRM** the dismissal without prejudice of all of Plaintiffs' claims, with the exception of Plaintiff Eva Thode's claims arising out of her assignment contracts with Defendant Income Property USA. With respect to these latter claims, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion. Finally, to the extent the district court dismissed any of Plaintiffs' claims with prejudice as to any jurisdictions other than the Eastern District of Michigan, we **VACATE** its orders doing so and **REMAND** with instructions that the district court dismiss these claims without prejudice.

12.  On August 9, 2019, the parties agreed to the following terms in a Stipulated Order of

Dismissal in the trial court which was entered by the trial court on August 9, 2019:

**STIPULATED ORDER OF DISMISSAL:**  This matter is before the Court upon stipulation of the parties, and the Court being fully advised in the premises;

It is hereby ORDERED that the Status Conference in this action scheduled for August 12, 2019 is cancelled;

It is further ORDERED that Plaintiff Eva Thode's claims against all Defendants are DISMISSED WITH PREJUDICE AS TO THE EASTERN DISTRICT OF MICHIGAN and WITHOUT PREJUDICE AS TO THE APPROPRIATE VENUE;

It is further ORDERED that to the extent this Court has dismissed any of the Plaintiffs' claims with prejudice as to any jurisdictions other than the Eastern District of Michigan, any such orders are hereby VACATED and those claims are instead DISMISSED WITHOUT PREJUDICE AS TO THE APPROPRIATE VENUE.

This Order resolves all pending claims in this district and closes the case.

Dated: August 9, 2019 (Exhibit B)

13.  Plaintiffs are aware of the Stipulated Preliminary Injunction in Case No. 2:19-cv-00867

which states in part:

> **IT IS FURTHER ORDERED** that, except by leave of this Court, Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of the Defendants, including, but not limited to:
>
> B.  Commencing, prosecuting , or continuing a judicial , administrative, or other action or proceeding against the Corporate Defendants, including the issuance or employment of process against the Corporate Defendants, except that such actions may be commenced if necessary to toll any applicable statute of limitations

Plaintiffs are filing this action at this time *inter alia* to toll any applicable statute of limitations as

permitted by the injunctive order.

## PARTIES, JURISDICTION AND VENUE

14.  Plaintiff Rebecca K. Wilson resides in Grosse Pointe Park, Michigan and attended

Defendants' introductory and "training sessions" in southern Oakland County, Michigan relying

upon a false informercial shown on Detroit area television and several fraudulent emails sent out

by Defendant Dean Graziosi as described *infra* in further detail.  At such a training session, the

presenters, *inter alia,* were or agents of Defendant Veil Corporate, LLC, ("Veil") a Utah limited

liability company and Defendant Guardian Law, a Utah law firm, who provided legal advice to

the attendees, including Mrs. Wilson, advising them to engage the legal services of Veil and

Guardian Law to create a limited liability company to which properties purchased at a Buying

Summit would be conveyed.

Based upon such advice, she purchased a package to attend the "Buying Summit" for $39,997.00 from an unknown entity and legal services for the creation of a single LLC for $495.00 from Veil and Guardian Law at such a training session located in southern Oakland County, Michigan.  Further, she had received an introductory email from Defendant Dean Grazioisi promising access to purchasing real estate properties for "pennies on the dollar" while residing in Grosse Pointe Park, a fact which was known at the time by Defendants.  Her claims are described *infra.*

15.  Plaintiff Dennis Houtz resides in Pennsylvania.  His claims are described *infra.*

16.  Plaintiff Robert Wong resides in New York, New York and purchased a Buying Summit package and legal services from Veil and Guardian Law with his brother Plaintiff Kenneth Wong.

As the result of the allegedly expert advice provided to Robert Wong by Defendants, his wife, Plaintiff Carney Look Wong purchased investment rental properties in Detroit, Michigan and Anderson Indiana.  Their claims are described *infra.*

17.  Plaintiff Kenneth Wong resides in New York, New York and purchased *inter alia,* a Buying Summit package, legal services from Veil and Guardian Law and a residential property located in Eastpointe, Michigan.  His claims are described *infra.*

18.  Plaintiff Mike Hampshire resides in Texas and purchased *inter alia,* a Buying Summit package and legal services from Defendants Veil and Guardian Law.  He was advised by Veil and Guardian Law to create a limited liability company to be the grantee of properties he might purchase at the Buying Summit.  Based upon such advice, Plaintiff Lions Fan, LLC was created and registered in the State of Texas and which purchased eleven investment rental

properties located in Detroit, Michigan, four properties located in Eastpointe, Michigan, three properties located in Warren, Michigan, one property located in Harper Woods, Michigan and one property located in Taylor, Michigan.  The sole manager and member of Lions Fan, LLC is Mike Hampshire and thus Plaintiff Lions Fan, LLC is a resident of the State of Texas.  Their claims claims are described *infra.*

19.  Plaintiff Linda Saenz resides in Texas and purchased *inter alia,* a Buying Summit package, legal services from Veil and Guardian Law and an investment rental property located in Warren, Michigan which was conveyed by various Defendants based upon legal advice provided by Veil and Guardian Law to her wholly owned limited liability company, Plaintiff Abby Creek Investment LLC., a limited liability company organized and existing under the laws of the State of Texas.  Linda Saenz is the sole manager and member of Abby Creek Investment LLC and its residence is thus the State of Texas.  Their claims are described *infra.*

20.  Plaintiff James Dunn resides in South Carolina Georgia and purchased from Defendants, *inter alia,* a Buying Summit package, legal services from Veil and Guardian Law and an investment rental property located in Warren, Michigan and two investment rental properties located in the State of Ohio.  His claims are described *infra.*

21.  Pascal Vohradnik and Simone Vohradnik, reside in the State of New York and purchased *inter alia,* a Buying Summit package, legal services from Veil and Guardian Law and an investment rental property located in Detroit, Michigan which was conveyed by Defendants based upon legal advice provided by Veil and Guardian Law to their wholly owned limited liability company, 13607 Virgil St., LLC, a limited liability company organized and existing under the laws of the State of Utah.  Said investment property was conveyed to the mortgagee in

12

lieu of foreclosure on July 6, 2017 and 13607 Virgil St., LLC was dissolved by the State of Utah

on October 29, 2018.  All of its claims and other properties have been assigned to Pascal

Vohradnik and Simone Vohradnik.  Pascal Vohradnik was also induced by Defendants to

purchase from them two investment rental properties located in East St. Louis, Illinois which

were conveyed to his Self-Directed IRA.   Their claims are described *infra.*

22.  Plaintiff Joanne Beldotti resides in Connecticut and purchased *inter alia*, a Buying

Summit package and two investment rental properties which are located in Warren, Michigan

and St. Louis, Missouri.  Her claims are described *infra.*

23.  Plaintiff Ramona Lorraine Solano-Owen ("Owen"), resides in Hawaii, and purchased

from Defendants, *inter alia,* a Buying Summit package, legal services from Veil and Guardian

Law and two investment rental properties located in Detroit, Michigan and one investment rental

property located in Warren, Michigan and which were conveyed by Defendants based upon legal

advice provided by Veil and Guardian Law to her three wholly owned limited liability

companies, Greiner 11831, LLC, Plaintiff Coyle 12071, LLC and Sarsfield 12460, LLC which

are limited liability companies organized and existing under the laws of the State of Utah.  Their

claims are described infra. Plaintiffs Greiner 11831, LLC and Sarsfield 12460, LLC hold, own

and/or control no assets and their registrations in Utah have expired.  Plaintiff Owen was the sole

manager and member of Greiner 11831, LLC, Coyle 12071, LLC and Sarsfield 12460, LLC and

each entity is thus a resident of the State of Hawaii.

24.  Plaintiff Eva Thode resides in Myrtle Beach, South Carolina and purchased, *inter

alia,* a Buying Summit package legal services from Veil and Guardian Law, numerous

investment rental properties from various Defendants which were conveyed to her Self-Directed

IRA.  She also purchased two non-recourse loans from Defendant Income Property USA, LLC secured by investment rental properties.  Her claims are described *infra*.

25.  Plaintiffs Layne Lundstrom and Audrey Lundstrom reside in Connecticut.  They purchased a Buying Summit package and legal services from Veil and Guardian Law.

26.  Plaintiff Invicta Legato Investments, LLC is a Utah limited liability company owned and controlled by Layne and Audrey Lundstrom who are its sole managers and its residence is therefore Connecticut.  Its creation and registration in Utah is due solely to allegedly expert advice provided to the Lundstroms by Veil and Guardian Law for a fee.  The Lundstroms employed Invicta Legato Investments, LLC for the purchase of a home located in Illinois through the Buying Summit.

27.  Plaintiffs Paul Valenti and Sherry Valenti reside in Colorado.  They purchased, inter alia, a Buying Summit package.  Pursuant to advice received at and through the Buying Summit, Paul Valenti created an Individual Retirement Account and used it to purchase properties at the through the Buying Summit.  Paul and Sherry Valenti also were induced by allegedly expert advice at the through the Buying Summit to create a Utah LLC, Re Investor 702, LLC and employed that entity to purchase real estate at the through the Buying Summit.

28.  Defendant 5 Choices LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  A web search at Utah.gov indicates that its Registered agent is "Income Property USA" and its member is "Income Property USA".  Its status is listed as "Expired as of 11/27/2017 due to "Failure to File Renewal".

As part of the Buying Summit Fraudulent Enterprise, it purchased and sold real property within Michigan and other states and is an affiliate of all of the other Defendants in this action (except perhaps for John Graham, Inc.)  Only Plaintiffs Carney Look Wong, Eva Thode, and Lions Fan, LLC are in contractual privity with Defendant 5 Choices LLC.  None of the other Plaintiffs are in contractual privity with Defendant 5 Choices, LLC.

29.  Defendant BuyPD, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Its Registered Agent in 2017 was Defendant Blair Jackson of the Invictus Law firm and its members are Ryan Poelman and Titan Training Group LLC.  Ryan Poelman is the Registered Agent and Member of Titan Training Group, LLC.  The Registered agent is now Defendant Veil Corporate, LLC.  BuyPD is an affiliate of all of the other Defendants in this action (except perhaps John Graham Inc.) and is an active and controlling member of the Buying Summit Fraudulent Enterprise.  It actively operates many of the other Defendant entities who conduct substantial business.  None of the Plaintiffs are in contractual privity with Defendant BuyPD, LLC.

30.  Defendant Green Apple Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Its Registered Agent is "BuyPD" and its Manager is "BuyPD".  Its registration in Utah expired on August 30, 2017.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property to victim of the fraudulent scheme and is an affiliate of all of the other Defendants in this action (except perhaps for John Graham, Inc.).  Only Plaintiffs Eva Thode and Lions Fan, LLC are in contractual privity with Defendant Green Apple Homes, LLC.

31.  Defendant Insider's Cash, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  In 2017, its Registered Agent was attorney William Knowlton of Defendant Invictus Law firm and its Member is "BuyPD".  On June 13, 2018, its Registered Agent was changed to Defendant Veil Corporate, LLC. Prior to the filing date of June 7, 2013, Blair Poelman was the member and Kristen Haskell was the Registered Agent of Insider's Cash.  After the filing date of June 7, 2013, Kristen Haskell was the Registered agent and "BuyPD" was the member.  As of the filing date of January 28, 2014, Blair Poelman became the Registered Agent.  As of the filing date of March 28, 2016, William Knowlton of the Invictus Law firm became Registered Agent.

As part of the Buying Summit Fraudulent Enterprise, Insider's Cash, LLC purportedly "lends" purchase money to victims of the scheme to facilitate the purchase of real property within this judicial district and in other areas and at the time this action was filed, it held hundreds of mortgages attached to real properties located within this judicial district.  However, it is controlled by the same individuals who control the sales entities thereby making such "loans" a sham transaction and the central and perhaps most important aspect of the Defendants' fraudulent scheme.

32.  Defendant Yancey, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  The State of Utah lists its filing status as "delinquent" and lists its Registered Agent as "Invictus Law, PLLC" and member as "Shawn Finnegan".  It is the alleged entity identified on the written contractual agreements with Plaintiffs Thode, Lundstrom and Beldotti as the party from whom those Plaintiffs purchased "training" and Buying Summit packages and to whom consideration was

16

paid.  None of the other Plaintiffs are in contractual privity with Defendant Yancey, LLC At

local "training" sessions, the presenters on behalf of Yancey LLC were an agent or agents of

Veil Corporate, LLC, ("Veil") a Utah limited liability company and Guardian Law, a Utah law

firm, who provided legal advice to the attendees advising them to engage the legal services of

Veil and Guardian Law to create a limited liability company to which properties purchased at a

Buying Summit would be conveyed.  There is no reason to believe that Yancey, LLC ever

employed agents or employees who participated in providing any services to or for the parties

with whom it contracted.

  33.  Defendant Property Education, LLC is a limited liability company organized and

existing under the laws of the State of Utah with its registered office located in the State of Utah.

The State of Utah lists its filing status as "Expired" as of 06/26/2018 due failure to file and lists its

Registered Agent as "Invictus Law, PLLC" and manager as "Shawn Finnegan".  It is the alleged

entity identified on the written contractual agreements with Plaintiffs Paul and Sherry Valenti

and Re Investor 702, LLC as the party from whom those Plaintiffs purchased "training" and

Buying Summit packages and to whom consideration was paid.

  34.  Defendant Yancey, LLC conducted business across the United States acting as a

sales agent for all of the other Defendants in this action.  It has acted in Michigan as such a sales

agent for the other Defendants as recently as April, 2016 and November, 2016. Exhibits C and D.

It has also acted in Michigan as a sales agent for the other Defendants in April, 2017.

  35.  Defendant John Graham Inc. is a Michigan corporation with its home office located

in Shelby Township, Michigan.  As participant in and member of the Buying Summit Fraudulent

Enterprise, it purchases rental properties Michigan and in the State of Illinois at distressed prices

and then conveys those properties to the other Defendants to be resold to victims of the Buying Summit Fraudulent Enterprise at prices far in excess of Fair Market Value of which at all times it has personal knowledge of said scheme.  It has knowledge that these properties will be ultimately be sold to victims of the fraudulent scheme at inflated prices.  It has also purchased properties in Michigan at discount prices and soon thereafter sold them for far in excess of Fair Market Value to final buyers of the Buying Summit Fraudulent Enterprise and therefore has knowledge of the nature of the fraudulent scheme in which it participates.

36.  Expansion Properties, LLC is a Utah limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. Its Registered Agent is Defendant Blair Jackson and it Manager is listed as "Income Property USA".  As part of the Buying Summit Fraudulent Enterprise, it purchased and sold real property within Michigan and is an affiliate of all of the other Defendants in this action (except perhaps for John Graham Inc.).  Only Plaintiff Eva Thode is in contractual privity with Expansion Properties, LLC.

37.  Defendant Improvement Homes, LLC is an Illinois limited liability company organized and existing under the laws of the State of Illinois but whose managers are Robert Lewis and Steve Liechty in Utah, central players in the Buying Summit Fraudulent Enterprise.  It is listed as TERMINATED on Friday, 18 January 2019. As part of the Buying Summit Fraudulent Enterprise, it buys and sells properties located in the State of Illinois often from Defendant John Graham Inc. in transactions which are employing sham "loans" from Defendant Insider's Cash, LLC.  Only Plaintiff Eva Thode is in contractual privity with Improvement Homes, LLC.

38.  Interactive Homes, LLC is an Illinois limited liability company organized and existing under the laws of the State of Illinois but whose manager is BuyPD, LLC in Utah, central player in the Buying Summit Fraudulent Enterprise.  It is listed as NGS on Saturday, 1 June 2019.  As part of the Buying Summit Fraudulent Enterprise, Interactive Homes, LLC buys and sells properties located in the State of Illinois and Defendants Insider's Cash, LLC and Yancey, LLC act as its agents.  Only Plaintiff Eva Thode is in contractual privity with Interactive Homes, LLC.

39.  Defendant American Cash Funding, LLC. does not exist.  "American Cash Funding" was formerly a "DBA" of "American Cash Fund, LLC" existing under the laws of the State of Utah with its registered office located in the State of Utah.  Pursuant to Utah statutes, an LLC is not permitted to use the term "LLC" in the title of a DBA.  The Registered Agent and Member of American Cash Fund, LLC are Defendant Robert Lewis.  Only Plaintiffs Houtz, Hampshire, Lions Fan, LLC, Saenz and Abby Creek Investment, LLC, executed loan agreements with "American Cash Funding, LLC".  EXPIRED *4/30/2018*

40.  Defendant DLS Properties, LLC was a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. The State of Utah describes its status as "expired" as of 5/26/14 due to "failure to file".  Its Registered Agent was Defendant "ReadyProp" and its manager was Robert Lewis.  Only Plaintiff Carney Look Wong is in contractual privity with DLS Properties, LLC.

41.  Defendant EZ Street Properties, LLC is limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. Its Registered Agent and Member are listed as "BuyPD".  Its status is "delinquent" as of 3/13/17.

As part of the Buying Summit Fraudulent Enterprise, it purchased and sold real property in Michigan and is an affiliate of all of the other Defendants in this action.  Only Plaintiff Lions Fan, LLC is in contractual privity with EZ Street Properties, LLC.

42.  Defendant Frontside Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. Its registration in Utah expired on August 30, 2017.  Its Manager and Registered Agent are "ReadyProp".  As part of the Buying Summit Fraudulent Enterprise, it purchased and sold real property within Micighian and it is an affiliate of all of the other Defendants in this action.  Only Plaintiffs Lions Fan, LLC, Houtz and Pascal Vohradnik are in contractual privity with Frontside Properties, LLC.

43.  Defendant Malibu Breeze Properties LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Its Member and Registered Agent is listed as "Ready Prop".  It is listed as expired February 26, 2018. As part of the Buying Summit Fraudulent Enterprise, it purchased and sold real property within this judicial district and is an affiliate of all of the other Defendants in this action.  Only Plaintiff Lions Fan, LLC is in contractual privity with Malibu Breeze Properties LLC.

44.  Defendant Max Ultra, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Its Registered Agent and Member is listed as "Property Direct".  Its Utah registration expired October 30, 2017. As part of the Buying Summit Fraudulent Enterprise, it purchased and sold

real property within Michigan and is an affiliate of all of the other Defendants in this action. Only Plaintiff Houtz is in contractual privity with Max Ultra, LLC.

45.  Defendant Patriot Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Its Registered Agent and Member is listed as "Ready Prop".  Its Utah registration is listed as expired October 30, 2017. As part of the Buying Summit Fraudulent Enterprise, it purchased and sold real property within Michigan and is an affiliate of all of the other Defendants in this action.  Only Plaintiffs Lions Fan, LLC, Dunn and Sarsfield 12460, LLC are in contractual privity with Patriot Homes, LLC.

46.  Defendant Property Direct, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Its Registered Agent and Member are listed as "BuyPD".  Its registration in Utah was voluntarily dissolved on June one, 2017.  Purchasers of properties at the Buying Summit were often provided documentation stating that they have purchased their properties from "Property Direct".  Despite repeated promises of Defendants' agents before and at the Buying Summit that all properties offered for sale have been fully "re-habbed" and are tenanted, Property Direct fraudulent induced many Plaintiffs to execute a Release in exchange for Defendants pre-existing duty to provide fully "re-habbed" and tenanted properties and said purported releases are unenforceable.

47. Defendant Ready Prop was a Utah "DBA" of Core Capital Property, LLC and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Its registration in Utah expired due to failure to file on January 29th, 2019.   The Registered Agent and Member of Core Capital Property, LLC is listed as "BuyPD".  As of 1/7/2013, Rob Lewis

became a member of Core Capital Property, LLC.  As 6/7/2013, BuyPD became Registered Agent
and member of Ready Prop.

48.   Defendant Red List Homes, LLC is a limited liability company organized and
existing under the laws of the State of Utah with its registered office located in the State of Utah.
Its Registered Agent is listed in Utah as "Property "Direct" and its Manager as Ryan Poelman.
It's registration in Utah expired due to failure to file March 28th 2018.  As part of the Buying
Summit Fraudulent Enterprise, it purchased and sold real property within Michigan and is an
affiliate of all of the other Defendants in this action.  Only Plaintiff Dunn is in contractual privity
with Red List Homes, LLC.

49.   Defendant Red Apple Homes, LLC is a limited liability company organized and
existing under the laws of the State of Utah with its registered office located in the State of Utah.
Its Registered Agent and Member are listed in Utah as "Ready Prop".  Its Utah registration expired
due to failure to file January 30, 2018. As part of the Buying Summit Fraudulent Enterprise, it
purchased and sold real property within Michigan and is an affiliate of all of the other Defendants
in this action.  Only Plaintiff Coyle 12071, LLC is in contractual privity with Red Apple Homes,
LLC.

50.   Defendant Scree 44, LLC is a limited liability company organized and existing under
the laws of the State of Utah with its registered office located in the State of Utah.  Property Direct,
LLC is listed in Utah as its Registered Agent and Blair Poelman is listed as Manager.  Its Utah
registration expired dur to failure to file October 30, 2017. As part of the Buying Summit
Fraudulent Enterprise, it purchased and sold real property within Michigan and is an affiliate of all

of the other Defendants in this action.  Only Plaintiff Greiner 11831, LLC is in contractual privity

with Scree 44, LLC.

51.  Defendant Screaming Eagle Properties, LLC was a limited liability company organized

and existing under the laws of the State of Utah with its registered office located in the State of

Utah.  Its status is listed as "expired as of 09/29/2015 due to "failure to file renewal".  As part of

the Buying Summit Fraudulent Enterprise, it purchased and sold real property within Michigan

and is an affiliate of all of the other Defendants in this action.  Only Plaintiffs Robert Wong,

Kenneth Wong, Lions Fan, LLC and Abby Creek Investment, LLC are in contractual privity with

Screaming Eagle Properties, LLC.

52.  Defendant Silver Tie Homes LLC is a limited liability company organized and existing

under the laws of the State of Utah with its registered office located in the State of Utah.  Its

Registered Agent and Member are listed in Utah as "Ready Prop".  Its Utah registration expired

due to failure to file on November 27th, 2017.  As part of the Buying Summit Fraudulent

Enterprise, it purchased and sold real property within this judicial district and is an affiliate of all

of the other Defendants in this action.  Only Plaintiff Lions Fan, LLC is in contractual privity with

Silver Tie Homes LLC.

53.  Defendant Insider's Financial Education, LLC is the alleged entity identified on each

of the written contractual agreements of Plaintiffs Wilson, Houtz, Saenz, Dunn, Vohradnik and

Hampshire as the party from whom each said Plaintiff purchased "training" and Buying Summit

packages and to whom substantial consideration was paid.  Plaintiffs had long been unable to

identify the "corporate" or organizational registration or existence of Insider's Financial

Education, LLC despite requesting such information from Defendants' attorney William

23

Knowlton of the Invictus law firm in May, 2015.  Agents of Defendant BuyPD, LLC have

negotiated complaints made by purchasers of "training" and Buying Summit packages on behalf

of "Insider's Financial Education, LLC".  There is no such entity as "Insider's Financial Education,

LLC".  There was formerly a Nevada firm called "The Evolution Group, LLC" organized in

Nevada in October, 2007.  On or about May 12, 2009, the firm obtained authority to transact

business in the State of Utah.  In July, 2011, The Evolution Group, LLC filed to obtain a

dba/assumed name of "Insider's Financial Education" in the State of Utah.  However, Utah does

not allow the use of the word "LLC" in a dba/assumed name. On June 22, 2012, The Evolution

Group, LLC filed Articles of Dissolution in the State of Nevada, terminating the company's

existence. Its Utah registration expired on June 26, 2012. However, it did not file an official Letter

of Cancellation of Assumed Name with the State of Utah until October 30, 2013.  Because the

entity had been dissolved prior to entering into the contractual agreements with Plaintiffs Wilson,

Houtz, Saenz, Dunn, Vohradnik and Hampshire, it is not in a position to enforce what it purports

to be mandatory arbitration clauses contained within those contracts.

Regardless, all Defendants as members and participants of the enterprise, conspiracy and

fraudulent scheme are each 100% liable for all losses and damages incurred by each Plaintiff from

the wrongful acts of the enterprise and conspiracy.

54.  Defendant "Yancey Events, LLC" does not exist but is the purported entity identified

on each of the written contractual agreements of Plaintiffs Robert Wong, Kenneth Wong and

Lori Owen as the party from whom each said Plaintiff purchased "training" and Buying Summit

packages and to whom substantial consideration was paid.  Because it does not and has never

existed, it is not in a position to enforce what it purports to be mandatory arbitration clauses contained within those contracts.

55.  Guardian Law, LLC is a Utah based law firm which, inter alia, drafts all of the deeds which convey properties located in all states at issue except those in the State of Alabama to victims of the Buying Summit Fraudulent Scheme.  It is also identified at the Buying Summit as a "Strategic Partner" of the parties who put on the Buying Summit and it has represented numerous individual Plaintiffs by aiding them in creating and registering a new LLC, usually in the State of Utah.  Such representation is an unethical dual representation because the primary clients in each such transaction are the members of the fraudulent enterprise and

56.  Invictus Law PLLC is a Utah based law which, inter alia, has represented victims of the Buying Summit regarding Michigan properties while simultaneously representing the participants of the Buying Summit Fraudulent Scheme without any disclosure of this unethical dual representation.  This behavior is described in more detail *infra*.

57.  American Legal and Escrow, LLC is a Nevada based law firm which, inter alia, has induced Buying Summit victims to grant it power of attorney in order to sign on behalf of the victim the contractual documents between the victims and the fraudulent scheme, including a personal guaranty about which the victim knew nothing and where said loan obligation was purportedly secured by property located in this judicial district.

58.  Veil Corporate, LLC is a Utah limited liability company purportedly engaged in providing legal services in association with Guardian Law regarding setting up limited liability companies so that such an entity will be available to convey properties purchased at the Buying Summit.  Bud Lethbridge is the owner of Veil Corporate, LLC and provides a fraudulent five

hour lecture at the Buying Summit to induce victims to purchase the Veil "asset protection" package for $6,495.00.  As he explains in his lectures, purchasers of the package are entitled to a detailed one-on-one interview with an attorney from Defendant Guardian Law.

59.  Scott Yancey is a minor cable TV personality who markets under his name numerous fraudulent advertisements for the Buying Summit.  He also appears at workshops and the Buying Summit to endorse and vouch for the honesty and integrity of the Buying Summit Fraudulent Scheme.

60.  Dean Graziosi is also a minor cable TV personality who markets under his name numerous fraudulent advertisements for the Buying Summit.  He also appears at workshops and the Buying Summit to endorse and vouch for the honesty and integrity of the Buying Summit Fraudulent Scheme.

61.  Ryan Poelman and Blair Poelman are members of many of the entities participating in the fraudulent scheme and, upon information and belief, the persons with primary ownership and control of the enterprise. Blair Poelman executed a majority of the deeds on behalf of the Property Selling Defendants which were sold to Plaintiffs.

62.  Pursuant to Fed. R. Civ. P. 20, these plaintiffs may join in this one action as plaintiffs because they assert a right to relief with respect to or arising out of the same series of transactions or occurrences and because questions of law or fact common to all plaintiffs will arise in the action.

63.  Venue is proper in this judicial district pursuant to 18 US.C. §1965 and 28 US.C. §1391 as one or more of the defendants have agents, transact their affairs and conduct and have conducted their fraudulent scheme within this judicial district.  Further, many of the contractual agreements between the parties state that disputes must be resolved in courts within the State of Utah.

64.  Pursuant to 28 US.C. §1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from the defendants' violations of the United States Code, including, inter alia, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 US.C. §1961, et. seq.

65.  At all times relevant to this Complaint, each of the Defendants was and is a "person" as that term is defined in 18 US.C. §1961 and used in 18 US.C. §1962.

66.  This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 US.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged this case.  Further, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between all of the Plaintiffs and all of the Defendants.

67.  This Court has personal jurisdiction over each of the Defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) as each regularly transacts business in Utah or has minimum contacts with Utah, through their involvement with, management of, or receipt of funds from the Buying Summit Fraudulent Enterprise.

**GENERAL ALLEGATIONS**

68.  Based upon the Defendants' fraudulent misrepresentations and other illegal actions in connection with Defendants' fraudulent schemes as further described herein while operating in a number of states, including the States of Michigan, Missouri, Alabama, Florida, Ohio, Indiana, Illinois and Wisconsin, Plaintiffs bring this action against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et. seq., and other federal

and state laws. Defendants engaged in such violations directly and as co-conspirators.  The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

69.  These Defendants (together with additional entities and persons whose identity and function will be obtained and disclosed through discovery) comprise an enterprise (hereafter referred to as the "Buying Summit Fraudulent Enterprise") which is demonstrated by their fraudulent activities as described herein.

70.  Defendants conducted the affairs of the Buying Summit Fraudulent Enterprise through a pattern of predicate acts indictable as mail fraud and wire fraud consisting of numerous and repeated use of interstate wires and the mails for the purpose of executing their fraudulent scheme in violation of §1962(c) as they facilitated Defendants' Buying Summit Fraudulent Scheme. Additional incidents of wire fraud include use of an electronic payment system for the payment of loan interest to Defendants by Plaintiffs.

71.  18 U.S.C. §1964(c), RICO provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation," as pertinent here, of 18 U.S.C. §1962(c), which makes it "unlawful for any person employed by or associated with" a qualifying enterprise "to conduct or participate….in the conduct of such enterprise's affairs through a pattern of racketeering activity," including "mail fraud" and/or "wire fraud"§1961(1)(B). Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice." §1341. The gravamen of the offense is the scheme to defraud, and any "'mailing….incident to an essential part

of the scheme'……satisfies the mailing element." The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud.

72. "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section" 18 U.S.C. §1962(d).

73. Anyone who agrees or conspires to pursue the same criminal objective can be held liable for a RICO violation. *Salinas v. United States*, 522 U.S. 52, 63-64 (1997). "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. "Id. at 64. A conspirator must simply intend to further an endeavor which, if completed, would satisfy all elements of a civil RICO claim.  Id. at 65; see also *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) (one conspires to violate RICO by adopting the goal of furthering the enterprise, "even if the conspirator does not commit a predicate act"); *United States v. Godwin*, 765 F.3d 1306, 1324 (11th Cir. 2014); *United States v. Godwin*, 765 F.3d 1306, 1324 (11th Cir. 2014) ("[i]n proving the existence of a single RICO conspiracy, the government does not need to prove that each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all of the details of the conspiracy, or contemplated participating in the same related crime"); *United States v. Kamahele*, 748 F.3d 984, 1006 (10th Cir. 2014) (stating that "the Government does not need to prove that each defendant personally committed two predicate acts to prove a RICO conspiracy" and that "[t]he focus of this element is on the particular Defendant's agreement to participate in the objective of the enterprise to engage in a pattern of racketeering activity, and not on the particular Defendant's agreement to commit the individual acts").

74.   All of the Defendants purposefully and with knowledge of the objectives of the fraudulent scheme conspired to further an endeavor which was, in fact, completed and thereby satisfies all elements of a civil RICO claim which was and is the Buying Summit Fraudulent Scheme.

75.   Acting together, over at least the past four years and to the present day, the Defendants, employing their own attorneys to pose as representatives of the Plaintiff victims throughout the process, have engaged in a fraudulent multi-state real estate investment scheme as a vehicle employed to defraud unsuspecting and naïve investors of money by inducing them to purchase from these Defendants investment rental real estate properties sight unseen in states where the victims do not live which the victims had been led to believe were being offered at below-market prices but which were knowingly sold by Defendants to the Plaintiffs at prices significantly above market value as described in further detail, *infra*.

76.   The fraudulent scheme initially begins with mailings or email messages to potential victims from minor cable television celebrities including Defendants Dean Graziosi and Scott Yancey whose messages fraudulently induce Plaintiffs and others to attend "private pre-auction events" by, *inter alia*, express promises via email or United State Mail promising:

A.   When you attend my private pre-auction event I will show you:

How to buy property for as low as pennies on the dollar just like to large institutional investors!

How to get the best properties before the public has access to them!

How to purchase property at rock bottom prices before they are bid up by hundreds of other investors.  See attached as Exhibit E.

B.   Now more than ever, wouldn't you like to get the best properties before the public has access to them?  Purchase real estate at all-time low prices before they

are bid up by hundreds of investors?  Learn ho to general additional cash-flow month after month after month?

Topics to be discussed:

**Beginner and Experienced Opportunities:**  How do I get involved even though I've never made money in real estate?  What attracts accomplished individuals to this event?

**Pre-Approved Funding:**  Is there money to do deals? Find out how to get up to $750,000 in pre-approved real estate funding regardless of credit score.

**Monthly Cash-Flow:**  How do I get hold of pre-market and tax deed auction properties and turn them into cash or hold them for long-term monthly income?

**Reduced Risk:**  Is it possible to avoid the common road blocks and avoid the risks most real estate investors eventually face?

**Self Directed IRA/401K:**  Do you understand how to use your current retirement funds to build wealth in real estate?  Exhibit F.

C.  Purchase property at rock bottom prices before they are bid up by other investors! Exhibit G.

D.  **Monthly Cash-Flow:**  How do I get hold of pre-market and tax deed auction properties and turn them into cash or hold them for long-term monthly income? Exhibit C [April 2016 in Michigan]

77.  Each such email and/or mailing via United State Mail was an incidence of wire fraud pursuant to 18 U.S.C. §1341 or mail fraud pursuant to 18 U.S.C. §1343 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

78.  Recipients of these fraudulent messages are induced to attend a local dinner or luncheon where they are subject to many hours of promotional speakers who convince them to purchase a package of local multi-day "training" for several thousand dollars.

79.   Coextensive with the fraudulent oral promises of Defendants' agents at these local events were written materials making similar false promises:

A.  Rent Ready

We find low cost and distressed properties in great neighborhoods. We then perform any repairs or rehabbing needed. By the time we sell them to our clients they are either tenanted or rent ready. Our clients are then able to get great prices without the hassle of doing repairs themselves.  See Exhibit H [Brochure of Defendant Income Property USA, LLC]

B.  Buying Summit: 3-Day Asset Buying Retreat in Vegas

This 3-day retreat gives you the opportunity to buy homes from around the United States **at huge discounts** [emphasis added].  Transactions will be closed on site.  In addition, you'll be trained by some of the foremost expects in areas of real estate, tax liens, asset protection and self-directed IRAs.  See Exhibit I, Page 6 [Brochure of Defendant Yancey LLC].

C.  Congratulations on your decision to attend our upcoming real estate workshop. You now have access to our incredible resources and **professional assistance.**  See Exhibit J, [Brochure of Defendant Scott Yancey]

80.   Initially, Defendants fraudulently induced hundreds of naïve and unsophisticated investors, including these Plaintiffs, to purchase what is described as "training" in the purchasing rental real estate for investment purposes at discounted prices.  Once one had purchased attendance at a local "real estate workshop, such person is then promised "access to incredible resources and professional assistance" by Defendants' workshop presenters. See Exhibit K as an example. (Please note that without discovery, it is impossible to know by which entity the various presenters were actually employed.)  This promise of "professional assistance" and their actual use and employment of their own attorneys and law firms to provide legal advice and services to the Plaintiffs created a fiduciary duty owed by Defendants and those attorneys to both the attendees and Plaintiffs mandating full disclosure of the underlying fraud and the disadvantageous terms of

the contracts Plaintiffs would be induced to execute including the arbitration and forum selection clauses thereby making those contracts and clauses void.

81.  The primary purpose of these workshops was for the presenters to present themselves to the attendees as experts in the field of purchasing rental real estate for investment purposes at discounted prices so that the attendees would then purchase both A) a Buying Summit Package (Exhibit L) from the non-existent "Insider's Financial Education, LLC", Property Education, LLC, Yancey Events, LLC" or Yancey LLC and B) a purported "Asset Protection Package" from a Utah entity identified as "Veil Corporate, LLC".

82.    The presenters at Defendants' local workshops informed the attendees that:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b)  Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the staff at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

83.  Each individual Plaintiff purchased a Buying Summit package relying upon the material representations of Paragraph 68 and each paid anywhere from $15,000.00 to $39,997.00 for it.  The promised consideration they were to receive in return was access to purchase discounted investment rental real estate and specialized, individualized and personal advice, guidance and expertise from the staff at the Buying Summit in selecting and purchasing what they were told by Defendants' agents were discounted rental properties for investment purposes.

This created at least a broker/agency relationship and thus a fiduciary relationship between the Defendants and each individual Plaintiff who had a duty to disclose the nature of the fraudulent scheme and the contents of the various contracts they induced the Plaintiffs to execute.

84.   Further, Defendants' presenters and purported expert consultants at these local workshops provided what appeared to the Plaintiffs and other attendees to be expert legal advice that prior to attending the Buying Summit that they needed to create a limited liability company into which the properties and assets they would purchase at the Buying Summit would be conveyed.  Defendants' presenters recommended that this be performed through Defendant Veil Corporate, LLC ("Veil").

85.   All of the contracts wherein any of the individual Plaintiffs purchased a Buying Summit package also contained an area on the contract to select the purchase of "Asset Protection" from Veil.  Almost all of the individual Plaintiffs made such a purchase in addition to purchasing a Buying Summit package except for Plaintiffs Saenz and Owen.

86.  All purchasers of  "Asset Protection" from Veil were then directed to have person to person interaction via email and/or telephone with a person from "Guardian Law", a Utah law firm which is and has been the attorneys representing the Defendants.  In an email to attendees, Veil described Guardian Law as follows in an email to Workshop and Buying Summit attendees:

> What is Guardian Law?
>
> Guardian Law is the fulfillment law firm for Veil Corporate's asset protection clients.  Guardian Law offers attorneys and paralegals who are well versed in Veil Corporate's asset protection strategies.
> See Exhibit M

Said email is an incidence of wire fraud as it facilitates and perpetuates the fraudulent scheme.

87.  Plaintiffs Layne and Audrey Lundstrom received an email from Don Hooley of

Guardian Law dated October 23, 2014 which stated:

> Dear Layne Lundstrom,
>
> Welcome to Guardian Law, we are a fulfillment law firm to Veil Corporate. We
> are so excited to work with you. Veil Corporate has asked that Guardian Law
> assist you in the creation of your Limited Liability Company (LLC). We are
> excited to start this process and according to our records you have purchased a
> "Utah LLC". We need a little information from you to begin setting up your LLC.
> Once you have the information requested to complete all the steps below, simply
> reply to this email and we will get started.  Exhibit N

Said email is an incidence of wire fraud as it facilitates the fraudulent scheme.

88.  Prior to and contemporaneously with its interactions with the Lundstroms and other

Plaintiffs regarding the formation and registration of a limited liability company to which the

fraudulently marketed properties to be sold by Defendants were to be conveyed, Guardian Law

was the law firm representing the Defendants in many, if not most, of its activities regarding the

fraudulent scheme including without limitation, the drafting of the deeds from the initial

purchase of properties by the scheme participants through the final over-priced sale to the a

particular Plaintiff or victim.  Further, Guardian Law prepared every set of closing documents for

every transaction with is the subject of this action for a substantial fee paid by each Plaintiff

victim and thus had full knowledge of every aspect of the fraudulent scheme being inflicted upon

its paying clients.

89.  Because of their professional activities in providing legal services for Plaintiffs at

this stage of the fraudulent scheme, both Defendants Veil and Guardian Law had a fiduciary duty

to disclose to their clients, the Plaintiffs, the full extent and nature of the fraudulent scheme

including the multiplicity of contradictory forum selection and arbitration clauses.  Failure to

disclose these matters makes all the following agreements between Plaintiffs and the scheme participants void or voidable, including the arbitration clauses.

90.  These purported Workshop Entities, Insider's Financial Education, LLC, Yancey Events, LLC and Yancey LLC appear to perform a distinct and specialized role within the fraudulent enterprise, which was to attract and sign up potential victims for the scheme with false promises and to create a relationship of trust as set forth *supra*.  Further, the presenters and their employers were in effect sales agents for both Veil and Guardian Law.  Further, without discovery, Plaintiffs are unable to know the entity which officially employed these presenters.

91.  The bargained-for-consideration which Plaintiffs and thousands of other victims who purchased these "training" and "Buying Summit" packages for tens of thousands of dollars were entitled to receive was expert guidance from the allegedly expert consultants who were to help them for a fee determine the appropriate properties to purchase at steep discounts before the public had notice of them as set forth in *supra.*

92.  Prior to or at the Buying Summit, attendees were provided by Defendants with a knapsack labeled "The Buying Summit" which contained, *inter alia*, a copy of "The Buying Summit Workbook" (portions of which are attached as Exhibit O) which contained statements that reinforced and reiterated the prior fraudulent misrepresentations of the Defendants.  On page 27 of a Buying Summit Workbook, Paragraph 15 reinforced the fraudulent misrepresentation that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned:

> **15.  What resources to you use to complete the due-diligence?**  We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

93.  On page 19 of the Buying Summit Workshop provided to Plaintiff Wilson, Guardian

Law was represented to the attendees as a "Strategic Partner" inducing Plaintiffs to believe that

Guardian Law was working for them.  See Exhibit P.  On the same page, there is written:

> Our real estate team specializes in rental income investment properties:
> Finding Wholesale Properties
> Rehabbing for Occupancy
> Marketing & Tenanting
> Securing Property Management

94.  Plaintiffs and hundreds of other victims who attended various editions of the Buying

Summit were again subjected at the Buying Summit to rounds and rounds of motivational speakers

extolling the real estate bargains that could be purchased from their agents in the adjacent area of

the event facility.

95.  Because each initial fraudulent sales pitch and the "training" sessions performed across

the nation, and the Buying Summit events were all replicated in virtually identical form over and

over and over, a conspiracy among the participants to violate RICO may be inferred from

circumstantial evidence which may reasonably be interpreted as participation in the common plan.

96.  Specifically, Plaintiffs were instructed at the Buying Summit by Defendant Kory

Thurston whose actual employer is unknown.

97.  Plaintiffs have located two sets of official Buying Summit DVDs which contain audio

and video of two distinct and complete Buying Summit events so that Plaintiffs need no longer

rely solely upon their memories to present evidence of the Defendants' wrongful deeds.

98.  On one official Buying Summit DVD, Kory Thurston announced to the attendees

that:

> They [Property Direct] go out and they spend the time fixing, renting, getting property management together that's the whole idea and they put turnkey investments together so that we have positive cash flow.

This is the same role played by Defendant John Graham, Inc. within the fraudulent enterprise and the conspiracy.

99.  On one official Buying Summit DVD, Kory Thurston announced to the attendees that each attendee will be having a personal consultation with an allegedly expert consultant from Property Direct:

> They [Property Direct] literally have teams all around the nation going through and doing the due diligence and getting these things ready through the rehab and the fixing and the property management.
>
> ********
>
> And they have them all around the country like I said and we have a few of them this weekend to sit with you and have a personal consultation with them. We've brought a great staff out here.

100.  Towards the beginning of the Buying Summit event that was recorded on one of the official Buying Summit DVD sets, Defendants' attorney, Blair Jackson of Invictus Law appeared on the stage and was introduced by Kory Thurston as being associated with Guardian Law, one of the "Strategic Partners" of the Buying Summit.  Kory Thurston then stated to the attendees:

> How many of you would like to have a relationship with some type of real estate attorney? We have that here for you this weekend. That law firm is called Guardian Law, representing Guardian Law, this is Blair Jackson, he'll have some others over at the booth. They'll be here all weekend. Make sure, especially if you get involved in Tax Liens or anything this weekend, that you stop by and introduce yourself to Guardian Law and if you have questions, obviously they're here for you this weekend. Let's give Blair and his team a big round of applause. Woooo! Thanks Blair.

38

This further induced the Plaintiffs and other attendees to presume the truthfulness of the promises and the legitimacy of the Buying Summit process because licensed attorneys "working for you" have vouched for it.

101. On one of the official Buying Summit DVDs, an attendee asked a question of presenters and Defendants Dean Graziosi and Ryan Poelman about purchasing additional properties as "alumni" of the Buying Summit. He is told that the only way to have access to purchase the Property Direct properties that are vetted and rehabbed and rented and ready to go when not at the Buying Summit is by having been a part of the Buying Summit alumni group:

Disk 5 @41:40 Question: As alumni of your organization, in the future can we contact your organization to buy houses out of your inventory which have been vetted?

Dean Graziosi: Absolutely. Once you are alumni, and Ryan can say this better, you have the opportunity to get all the deals as they come in. Literally, the only way to get to the Property Direct properties that are vetted and rehabbed and rented and ready to go is by being a part of this alumni group.

Question: Do I do this by going on your internet…?

Dean Graziosi: Not on my site. It would be on Ryan's, on Property Direct, correct?

Ryan Poelman: Yep. So again, meet with the guy, your consultant and help him understand exactly what you are looking for. You know, if you have $50,000 or five million dollars, and how you put it to work. And then these guys will actually coordinate with you and say, OK, you only want to be in New York, you only want to be in Florida or you only want to be in Illinois, or wherever it is and as we have the properties that meet that criteria for you, we'll present them to you and put them in front of you and if they make sense, then you can pull the trigger.

Q: How do I contact you? Whichever member handles this, is there a dotcom?

Ryan Poelman: It's ReadyProp.com but also you got somebody assigned to you that's in your section that came and gave you an appointment card, and when you meet…

Q: The guy I talk to later on, Lars?

Ryan Poelman: Yeah.

Dean Graziosi:  You tell him what you want and he'll reach out to you as soon as the deal comes in that you are looking for.

102.  While meeting with Defendants' purported expert consultants (described by Kory Thurston as employed by Defendant Property Direct, LLC) at the Buying Summit, homes for sale were displayed on internet monitors and generally contained a photograph of the home and a "suggested retail price" for the home.

103.  The "suggested retail price" for each such home would invariably far exceed the true cash value of such home and the balance due on any "loan" provided by American Cash Fund, LLC or Insider's Cash, LLC, a fact well known in advance by all Defendants and which was, in fact, an essential aspect of their scheme to defraud.  An example of these internet displays is attached as Exhibit Q.

104.  Each such internet display as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

105.  Virtually all of the homes offered for sale by the various Defendants at the Buying Summit and otherwise had invariably been recently purchased prior to resale to Plaintiffs by agents of the Defendants at below market prices and/or at distress sale prices, often by Defendant John Graham Inc. acting on behalf of the fraudulent enterprise and conspiracy as one of the teams locating such discount properties (see paragraph 87 *supra*) a fact well known in advance by all Defendants and which was, in fact, an essential aspect of their scheme to defraud.

106.  Plaintiffs and the others victims were encouraged by Defendants' allegedly expert consultants to purchase homes in states where they did not live so that they would be unlikely to

view or inspect the purchased property in advance or soon thereafter thus remain unaware of its actual condition and value for the longest possible time.  This tactic was an essential aspect of the Defendants' scheme to defraud.

107.  As a further aspect of the Defendants' scheme to defraud, Plaintiffs and the other victims were induced to purchase these overpriced homes with "loans" from Defendant Insiders Cash, LLC and American Cash Fund, LLC who had this distinct role within the fraudulent enterprise and conspiracy.

108.  In a typical case, Defendants' sales agents would promote via their internet monitors at the Buying Summit the purchase of a home as having a "Suggested Retail Price" of  (for example) $68,000.00 but which could be purchased from one of the property sales defendants for the alleged bargain price of $60,000.00.  Such a home would have an actual true cash value of between $25,000 to $35,000 while a participant in the fraudulent scheme would have recently purchased the home for between $20,000.00 to $30,000.00.  The Buying Summit attendee/victim would then be induced to put $13,000.00 to $19,000.00 down on the purchase of the home with the balance (plus "closing costs" of $2,050.00 and a ten percent "origination fee") being financed with a purported "bridge loan" from Defendants' alter ego/associates Defendants Insiders Cash, LLC.  The sales entities and the lending entity both have distinct roles in the fraudulent enterprise and were acting in concert with the allegedly expert consultants employed by Defendant Property Direct, LLC.

109.  Plaintiffs and the other victims were also induced to enter into these loan agreements as the proximate result of false statements made by Defendants' sales agents that these loans could

be easily re-financed at much lower rates with local banks once the victims had returned home from the Buying Summit.

110.   As an essential aspect of the scheme to defraud, Defendants' victims, including Plaintiffs, were told by Defendant Kory Thurston at the Buying Summit that these loans from American Cash Fund, LLC and Insider's Cash, LLC were "bridge loans" which could be easily refinanced at much lower interest rates if the borrower waited six months to seeking refinancing after completing the home purchase transactions with Defendants.

111.   As part of the Defendants' scheme to defraud, Defendants' victims, including Plaintiffs, were told by Kory Thurston at the Buying Summit that these "bridge loans" could be easily refinanced at much lower interest rates by waiting six months after completing the home purchase transactions with the various Defendants so that there would be a sufficient interval between each victim's purchase of a home from Defendants and the time they would discover that the homes could not be refinanced (or even sold) at all because their value was significantly lower than the outstanding balance on each "bridge loan" which would then remain owing to Defendants American Cash Fund, LLC and  Insiders Cash, LLC.

112.  This behavior has been admitted to by Defendants.  The Defendants had previously posted a "youtube" video online entitled "Alex Nickle February 20th, 2015 Client Success" from Defendant "Income Property USA"[1], which could formerly be found online at:

https://www.youtube.com/watch?v=mvwgUIjaKRQ.

---

[1]   After Plaintiffs made specific reference to the video in its motion response of May 31, 2016 in Case Number 2:16-cv-10659-RHC-MKM Defendants deleted the video.  Further, the video does not reference Property Direct, LLC the purported employer of the allegedly expert consultants.

In the video, Defendants' agent Nickle explains how he "builds a relationship of trust" with recalcitrant and suspicious Buying Summit attendees and states:

> Hey, this is Alex Nickle, your property specialist. I just have a little story about some of my clients this past summit, or a couple of summits ago actually. They came into the thing very skeptical being that they had never done real estate before. They wanted a change in their life but they didn't know what avenue or what vehicle they should take. So they took a jump, a leap of faith and started doing these trainings with us and understanding how to invest. And when they got to the summit they were the type of clients that were arms folded, kind of I don't want to talk to anybody, I don't want to get to know anybody. Luckily, they were able to loosen up a bit, meet our staff, understand that we are here for them and their best interest. So I was able to sit down with them, go over a consultation for about an hour and half, and in that consultation we were able to **build a relationship of trust** and they'll understand that I know what I'm talking about and we were able to do two properties, two pieces of land and a trust deed to help start that path down to their goals [Emphasis added]. If you're lookin' for the same success in real estate, I'd love to hear from you. Please give me a call at the number below.  See screen shot, Exhibit R

113.   The Plaintiffs and all victims of the fraudulent scheme uniformly claim that inducements of Alex Nickle are identical to those which they encountered at the through the Buying Summit from the allegedly expert consultants.

114.   Each Plaintiff believed in and relied upon what to them appeared to be a relationship of trust established with their purported exported consultants in a manner such as that described by Alex Nickle, *supra.* This video merely reaffirms that a fiduciary relationship had been created between the Defendants and the Plaintiffs and other attendees which imposed a duty of full disclosure upon the Defendants regarding the nature of the scheme and the contents of the contracts the Plaintiffs were about to sign.

115.   Generally, after each Plaintiff and attendee had purchased properties at the Buying Summit, they were further lectured to at the Buying Summit by Defendant Bud Lethbridge who claimed to own and control Defendant Veil Corporate, LLC.  He told the attendees that in general

lawyers and accountants did not understand the concept of asset protection and that each purchaser

of property at the Buying Summit needed to purchase another and more expensive Veil Corporate

"asset protection package" which included the creation by Veil of an unlimited number of

corporate and business entities for life.  More importantly, he stated that if and when an attendee

became a client of Veil that they would then have an interview with one of the licensed attorneys

that worked with Veil to set up a series of limited liability companies in various states as

recommended by these attorneys.

116.  Plaintiffs soon became aware that these attorneys were employed by Guardian Law

and they were the attorneys who were to recommend the creation of various limited liability

companies which were to hold the various properties the Plainitffs and attendees had purchased at

or through the Buying Summit.

117.  Mr. Lethridge announced to the attendees that if they were a client of Veil and a client

of Property Direct that they would insure the proper titling in the proper limited liability company,

which including expert advice regarding the state of registration of such entities, of the various

properties the attendees had purchased at or through the Buying Summit.

118.  Plaintiffs who became clients of Veil generally received notification by email from

Veil about their personal interaction with an attorney from Guardian Law:

> After we have received your Questionnaire we will forward it on to **Guardian Law** which is the law firm that acts as the fulfillment company for Veil Corporate's clients. An attorney at Guardian Law will then create a unique and detailed Asset Protection Blueprint that outlines how to best protect your assets (this typically takes 2-3 week).  Your personalized Asset Protection Blueprint will then be emailed to you for your review.
>
> After you have reviewed your Blueprint, please call our office to set up a time to review your Blueprint with one of Guardian Law's attorneys – we want to be sure to answer any questions you might have.  In the weeks following your

consultation you will work closely with the attorneys and paralegals at Guardian
Law as they implement your asset protection structure.   See Exhibit S .3/17/15

119.   Each such email from Bud Lethbridge and Veil was an incidence of wire fraud
pursuant to 18 U.S.C. §1343 and was thus a predicate act of racketeering pursuant to 18 U.S.C.
§1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

120.   As the direct and proximate result of the fraudulent inducements of this email and
others like it, there was created a relationship of trust and a fiduciary relationship pursuant to
Michigan case law, Utah case law, Federal case law and the Restatement of Torts, Trusts and
Agency as follows:

a.   Defendants induced Plaintiffs to repose faith, confidence and trust in the
Defendants' expert judgment and advice regarding the purchase of their real estate programs prior
to the Buying Summit and the purchase of real property while attending the Buying Summit;

b.   The false statements of the Defendants induced Plaintiffs to relax the care and
vigilance they would ordinarily exercise in the purchase of real property;

c.   Defendants were under a duty to act for or give advice for the benefit of Plaintiffs
upon the matters which were within the scope of the relation between Defendants and Plaintiffs;

d.   Plaintiffs' confidence in the Defendants and in the Defendants' self-proclaimed
expert judgment and advice regarding the purchase of their real estate programs prior to the Buying
Summit and real property at the Buying Summit was betrayed by the Defendants

e.   In the relationship between Plaintiffs and the Defendants, there existed a
condition of superiority by the Defendants over Plaintiffs;

   f.  Both the bargained-for consideration of the agreements between Plaintiffs and the Defendants and the relationship between Plaintiffs and the Defendants placed the interests of Plaintiffs in finding discounted real property for them to purchase in the charge of the Defendants;

   g.  In the relationship between Plaintiffs and the Defendants, there existed not only the confidence of Plaintiffs in the expert judgment and advice of the Defendants regarding the purchase of real property, but there existed a dependence and a profound inequality of business intelligence and knowledge of the facts involved giving to the Defendants an advantage over Plaintiffs.

  121.  As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs such that Defendants owed Plaintiffs a fiduciary duty to disclose the terms of the various agreements the Plaintiffs were to sign.

  122.  Defendants together exploited this fiduciary relationship with the false and fraudulent promises and inducements as set forth in this Complaint in more detail.

  123.  At numerous Buying Summit events, Blair Jackson, attorney for Invictus Law, was presented to the attendees as someone from whom the attendees should seek advice and that he was associated with Guardian Law.

  124.  In every sale of property to Plaintiffs by the various specific Defendants, Guardian Law drafted the warranty deed to the selling entity and the warranty to Plaintiff with knowledge of the fraudulent mark-up process but without so informing the defrauded purchasers.

  125.  Despite owing Plaintiffs a fiduciary duty to provide them with expert guidance and advice regarding the purchase of discounted and distressed priced homes and after convincing them with rounds of rounds of promises that they would "take care of everything" and that they

have performed complete due diligence regarding these homes, Defendants beginning with the initial TV advertisements mailings and emails  and through their alleged expert consultants induced Plaintiffs and the other victims to execute the most one-sided sales contracts imaginable. These contracts contained clauses providing that the purchased homes came with no structural warranty or warranty of value whatsoever, that Plaintiffs and the other victims were allegedly "knowledgeable and sophisticated investors", capable of evaluating the merits and risks of the Property and specifically acknowledging that this was not a "consumer transaction", that all prior promises and inducements of Defendants were irrelevant and containing a clause purporting to require that all litigation regarding the contracts would be in the courts of the State of Utah (a state which had no relationship to either the location of the Buying Summit, the Plaintiffs' states of residence or the location of the properties they had purchased).  The following are some sample clauses from these sales contracts:

6. **PROPERTY IS SOLD IN "AS IS" CONDITION WITH NO BROKER:**
Buyer acknowledges and agrees that Seller has not made and hereby specifically disclaims any warranty, guaranty, or representation, oral or written, past, present, or future, of, as to, or concerning (i) the nature, square footage, features, condition of property including condition of mechanical equipment, built in appliances, and utilities, value, or quality of the geology, the presence of environmental hazards and the suitability thereof and the Property for any and all activities and uses which Buyer may elect to conduct thereon, (ii) the manner, construction, condition, quality, the state of repair or lack of repair of any of the Property, (iii) except for any warranties contained in the deed, the nature and extent of any right of way, lease, possession, lien, encumbrance, license, reservation, condition, or otherwise (iv) the compliance of the Property or its operation with any laws, rules, ordinances, or regulations of any government or other body, (v) the current or future performance of the Property, and, (vi) the income to be derived from the Property, Buyer hereby further acknowledges and agrees that Buyer is relying solely upon the inspection, examination, and evaluation of the Property by Buyer and that Buyer is purchasing the Property on an **"AS IS. WHERE IS"** and **"WITH ALL FAULTS"** basis and not on any information provided or to be provided by Seller. Buyer acknowledges he is buying land and any improvements thereon, if any, and

accepts all damages, condemnations, hazards, debris, governmental, environmental or health related issues thereon as of the execution date of this contract.

[From Paragraph 8]  Buyer agrees that it is purchasing the Property "AS IS" Buyer waives the opportunity to conduct an investigation to determine the presence of methamphetamine residue or byproducts on the Property. Buyer agrees that Seller will not be liable to Buyer or any third party, and Buyer hereby unconditionally releases Seller from any and all liability, based upon or related to the production of methamphetamine at any time on the Property- Buyer hereby represents and accepts that it is Buyer's responsibility to personally inspect and examine The Property and all improvements thereon. Buyer hereby acknowledges that unless otherwise set forth in writing elsewhere in this contract neither Seller nor Seller's representatives, if any, have made any representations concerning the present or past structural condition of the improvements. Buyer agrees that he will not hold Seller or its representatives responsible or liable for any present or future structural problems or damage to the foundation or slab of said property

20**. INDEMNIFICATION**: Buyer agrees to indemnify and hold harmless Seller and all affiliated companies and or sales agents from and against any and all losses, claims, demands, liabilities, costs, damages and expenses (including attorney's fees and costs) that Buyer may incur arising from the Seller's actions or failure to act on, respond to or comply with any (1) local, state or federal law, rule or ordinance affecting the Property; and (2) liabilities arising from said property from date of the contract, whether or not insured and the like. Buyer additionally agrees to indemnify and hold harmless Seller and all affiliated companies and or sales agents from any and all claims, costs, fees, liabilities, or loss incurred after title conveyance to the Buyer. Further, Buyer acknowledges that the Property may be subject to proceedings in law or equity to abate, correct, or otherwise comply with local, state or federal requirements regarding the Property and that this indemnity shall also apply in such instances.

21. **QUALIFIED INVESTOR**: Buyer acknowledges that he is a knowledgeable and sophisticated investor, capable of evaluating the merits and risks of the Property and specifically acknowledges that this is not a "consumer transaction" within the meaning of, or subject to, state or federal consumer protection laws.

22. **REPRESENTATIONS AND AGREEMENT OF PARTIES**: Seller makes no representations, express or implied, as to the fitness of the Property as of the Closing Date or that there will be no liens, assessments, or security interests against the Property. Buyer and Seller agree that no other representations have been made, verbal or otherwise, that are not outlined specifically in writing in this contract. Buyer acknowledges he is buying land and any existing improvements thereon, and is not buying a residential lease, rental agreement, or any other contract in relation to the Property. This contract contains the entire agreement of the parties. Both

parties agree that interactions regarding this contract will take place exclusively between the Buyer and the Seller.

23. **THERE ARE NO PRIOR AGREEMENTS, GUARANTEES OR WARRANTEES THAT ARE NOT SPECIFICALLY OUTLINED IN THIS CONTRACT:** This contract incorporates all prior agreements between the parties, contains the entire and final agreement of the parties, and cannot be changed except by their written consent. Neither party has relied upon any statement or representation made by the other party or any sales representative bringing the parties together.

27. **GOVERNING LAW AND JURISDICTION**: This contract shall be governed by the laws of the State of Utah. Jurisdiction shall lie exclusively with the courts within the State of Utah.

126.   Because the expert sales consultants owed Plaintiffs and the other victims of the scheme to defraud a fiduciary duty, they and their co-conspirators owed Plaintiffs the opportunity to purchase the properties the enterprise had purchased at discounted and distress sale prices but the enterprise instead absconded with this business opportunity.

127.   As part of their scheme to defraud, the allegedly expert consultants induced many Plaintiffs/Victims to unwittingly sign personal guarantees of their loans which were otherwise only owing to Defendant Insiders Cash, LLC or American Cash Fund, LLC by their limited liability companies.  Such personal guarantees induced by this fraud are unenforceable.  Further, none of these personal guarantees have a forum selection or arbitration clause.

128.   As a further part of their scheme to defraud, those Plaintiffs who were induced to use their IRA retirement savings to purchase homes at the Buying Summit to be held by in a "self-directed IRA" were also induced by Veil and Guardian Law to pay for the creation of a Utah limited liability company.  However, there is no role for a limited liability company when real estate is held in a self-directed IRA and none of the Plaintiffs who conveyed their purchased

properties into a self-directed IRA ever conveyed any property into the LLC which they were induced to create.

129.  As a further part of their scheme to defraud, those Plaintiffs who were induced to use their IRA retirement savings to purchase homes at the Buying Summit to be held in a "self-directed IRA" were also induced to purchase from Veil a service for the creation of an unlimited number of LLCs for in excess of $6,000.00 even though such LLCS held no assets and the homes they purchased at the Buying Summit were instead held in a self-directed IRA.

130.  Because the homes that were being purchased by the Plaintiffs at the Buying Summit were not in states where the Plaintiffs/victims lived, it was necessary to hire a property management company to oversee the properties.

131.  Once the Plaintiffs/victims/purchasers returned home from the Buying Summit, they would often discover from their property management company that a home they had purchased had serious physical defects including, for example, a bad roof or non-working furnace.

132.  When a property purchaser would complain about a physical defect or missing rents, Defendant Property Direct, LLC would generally offer to provide partial reimbursement to Plaintiffs/victims for the cost to repair these items, often in the range of $1,500.00 to $3,500.00. These reimbursements were a pre-existing duty of the Defendants but as an essential part of the scheme to defraud, Property Direct, LLC exploited the situation to trick Plaintiffs and other victims of the scheme into executing full releases of the entire fraudulent enterprise in documents that actually recited the pre-existing duty.

133.  The releases usually recited the Defendants' pre-existing duty to have provided rehabbed housing and a rent guarantee such as the example here:

We sincerely appreciate the business we have conducted with you as a client and desire to continue with a positive relationship.  That said, we do our best to provide unmatched customer service to our clients and hope you have experienced this in your interaction with us.

We recognize, however, there is a potential that additional unforeseen issues may arise from time to time related to the property you purchased.  In the event something does come up that should have been caught during the transfer process or while we navigated the issues addressed below, please rest assured we will do what is possible to address those issues with you in a timely manner and work [to] resolve them if they do arise. Exhibit T

134.   The vast number of releases executed by Defendants' victims demonstrates that Defendants and especially Property Direct, LLC was aware that the properties they sold had serious defects and bad tenants and used those features to trick their purchasers into signing releases in exchange for performing a pre-existing duty.  As such, there was no consideration to support any of these releases and they are unenforceable.

135.   The Plaintiffs/Victims who signed such a release were not aware at such time that the homes they had purchased: a) Had recently been purchased by the enterprise for its own account at a discounted or distress sale price; b) Were worth far less than what the victim had paid for it; c) Were worth far less that what the victim still owed on the purchase money loan and thus could be refinanced or resold.  Further, at such time, the Plaintiff/victim would be unaware that they were signing a General Release.  This procedure was a purposeful and pre-planned aspect of the Defendants' conspiracy and scheme to defraud.

Deleted

136.   Plaintiffs are entitled to rescission of all contracts between themselves and the Defendants and their agents and they are entitled to a refund of all money paid to Defendants in exchange for a return of all benefits received from Defendants.  As such, the various clauses in all

said agreements which include, without limitation, a requirement of binding arbitration, a provision of an alleged general release of a single defendant and/or all defendants, a requirement that litigation to be brought in the courts of the State of Utah, a personal guaranty; a provision providing that homes purchased from defendants were sold "as/is", and/or a provision providing that purchasers of homes from Defendants were sophisticated "Qualified Purchasers" are void *ab initio* and unenforceable.

137.  Plaintiffs are entitled to rescission and revocation of the entirety of each agreement containing these alleged provisions to arbitrate pursuant to 9 U.S.C. §2 *ab initio* due to Defendants' fraud thereby making these agreements unenforceable.

**EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY TO VIOLATE <u>18 U.S.C. §§ 1962</u> a), b) AND c) BY THE SO-CALLED LENDING <u>DEFENDANTS AMERICAN CASH FUND, LLC AND INSIDER'S CASH, LLC</u>**

138.  The following Defendants are hereby referred to as the "Lending Defendants" because they are the only Defendants known to have entered into purported loan agreements with purchasers of properties from or through the Buying Summit Fraudulent Enterprise including the Plaintiffs. These Defendants are:

> Insider's Cash, LLC
>
> American Cash Fund, LLC (operating under the illegal name of "American Cash Funding, LLC").

139.  These "Lending Defendants" are owned and controlled by the same persons or groups of persons who own and control most of the other Defendant entities.

140.  "American Cash Funding, LLC" does not exist.  "American Cash Funding" was formerly a "DBA" of "American Cash Fund, LLC" existing under the laws of the State of Utah

with its registered office located in the State of Utah. The Registered Agent and Member of

American Cash Fund, LLC is Defendant Rob Lewis.

141.  The vast majority of the sale Deeds to the Plaintiffs in this action were executed by

Defendants Blair Poelman or Rob Lewis as Manager or Member of the Property Selling

Defendant engaged in that particular sale.  See:

> Exhibit U - Screaming Eagle Properties, LLC deed signed by Blair Poelman as Manager;
> Exhibit V - EZ Street Properties, LLC deed signed by Blair Poelman as Manager;
>
> Exhibit W - Patriot Homes, LLC deed signed by Blair Poelman as Manager;
>
> Exhibit X - Silver Tie Homes, LLC deed signed by Blair Poelman as Manager;
>
> Exhibit Y - Malibu Breeze Properties, LLC deed signed by Blair Poelman as Manager;
>
> Exhibit Z - FrontSide Properties, LLC deed signed by Rob Lewis as Manager.

142.  Defendant Insider's Cash, LLC is a limited liability company organized and

existing under the laws of the State of Utah with its registered office located in the State of Utah.

Its Registered Agent is William Knowlton of the Invictus Law firm and its Member is "BuyPD".

Prior to the filing date of June 7, 2013, Blair Poelman was the member and Kristen Haskell was

the Registered Agent of Insider's Cash.  After the filing date of June 7, 2013, Kristen Haskell

was the Registered agent and "BuyPD" was the member.  As of the filing date of January 28,

2014, Blair Poelman became the Registered Agent.  As of the filing date of March 28, 2016,

William Knowlton of the Invictus Law firm became Registered Agent.

143.  Rob Lewis is also manager of Defendant Insider's Cash, LLC and Income Proprerty

USA, LLC.

144.  Attached as Exhibit AA is a Discharge of Mortgage executed by Blair Poelman as manager of American Cash Funding, LLC.

145.  Attached as Exhibit BB is a Discharge of Mortgage executed by Rob Lewis as manager of American Cash Funding, LLC.

146.  Attached as Exhibit CC is a Discharge of Mortgage executed by Rob Lewis as manager of Insider's Cash, LLC.

147.  Attached as Exhibit DD is an Assignment of a loan and mortgage sold by Insider's Cash, LL to a new victim of the Buying Summit by Rob Lewis, its manager.

148.  Attached as Exhibit EE is an Assignment of a loan and mortgage sold by Insider's Cash, LL Income Property USA, LLC prior to being sold to a new victim of the Buying Summit. The manager of Income Property USA LLC is Rob Lewis.

149.  The previous paragraphs demonstrate Defendants Rob Lewis and Blair Poelman acting together and conspiring with Insider's Cash, LLC, American Cash Fund, LLC, Income Property USA, LLC, the allegedly expert consultants from Property Direct, LLC and the various property sales entities to further and facilitate the fraudulent scheme.

150.  Because of the close interaction in these endeavors and conspiracy by these entities and individuals, it is not practicable to litigate various portions of Plaintiffs claims alternatively in arbitration and others in Utah and others in Michigan.

151.  Insider's Cash, LLC and American Cash Fund, LLC participated in the fraudulent scheme by purporting to make loans to purchasers of properties from its associated Property Selling Defendants to facilitate those purchases without a credit check on the borrowers or an appraisal of the properties for sums in excess of the fair market value of the property even after

the payment of a substantial down-payment by the victim/Plaintiff to the Property Selling Defendants.  The non-existence "loans" provided the fraudulent appearance to the purchaser that the property was worth substantially more than the amount of the loan while the unpaid loan balance which attached to such a low valued property precluded the victim from selling the property and paying off the loans without incurring a substantial loss and contrary to the express promises of these Defendants.

152.  Insider's Cash, LLC further participated and continues to participate in the fraudulent scheme by selling off to new victims of the fraudulent scheme the loans and mortgages originally made to Buying Summit property purchasers without notice to these purchasers that the balance of all of these loans are in excess of the fair market values of the properties which secure the loans while knowing that the loan purchasers have been repeatedly told by Defendants' agents, especially Kory Thurston, that the loans are in amounts of only 50% to 66% of the value of the properties which secure them.

153.  Insider's Cash, LLC and American Cash Fund, LLC further participated in the fraudulent scheme by charging a "loan origination fee" to the borrower for each loan made in the amount of approximately $3,000.00 to $4,000.00.  These charges are separately described infra in the various counts of each Plaintiff.  These charges are fraudulent because the loans are illusory and originate with a co-conspirator to be "paid" to a related co-conspirator and merely increase the loan balance in further excess of the value of the underlying property.  Further, it is fraudulent for the Lending Defendants to fail to disclose that they are related to and conspiring with the Property Sales Defendants.

154.  Insider's Cash, LLC and American Cash Fund, LLC, along with their owners and managers, further participated in the fraudulent scheme and agreed to further and facilitate the fraudulent scheme by agreeing that the alleged expert consultants from Property Direct, LLC who were to be provided to the Buying Summit attendees would employ displays of properties for sale using the internet and that such displays would invariably misrepresent the value of each such property.  It was intended by these Defendants and all of the Defendants that the property purchasers, including these Plaintiffs, would rely to their detriment upon these misrepresentations of value in making their purchases.

155.  Each such fraudulent display of misrepresented value was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and was thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

156.  Insider's Cash, LLC and American Cash Fund, LLC further participated in the fraudulent scheme by inducing borrowers to refinance their loans while tricking the borrowers into executing a full release of all members of the fraudulent scheme from any and all liability.  This was an intended outcome of the scheme because the purchasers had been expressly promised that the "loans" were in amounts of only 50% to 66% of the value of the properties.

157.  These Lending Defendant further conspired with Defendant BuyPD to sell loans and mortgages owed by Buying Summit victims, including these Plaintiffs, to new victims at face value without disclosure of the low values of the underlying properties.

158. On February 14, 2017, Lars Johnson of Defendant BuyPD sent out an email to a former Buying Summit victim promoting "Trust Deeds" for sale (see Exhibit FF):

The email is "From: info@buypd.co

Subj:  New Trust Deed Inventory Available

To view the Trust Deed inventory, **CLICK HERE.**

Clicking on "CLICK HERE" takes one to this web site:

https://creativewealth.com/trustdeeds/

At the time, clicking on that link took one to a page where the loan and mortgage on this property, among other properties were displayed. Defendants have since removed this material from the internet.

159. "Creative Wealth" appears to be as yet another entity created by the fraudulent enterprise to create confusion among its victims.

160.  Each such email was an incidence of wire fraud pursuant and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

161. A review of the printout from the Warren, Michigan assessor (Exhibit GG) for the Lozier properties discloses the following information:

The property is held by an IRA and the loan obligation (called "Trust Deeds" by the Defendants) is owed to Insider's Cash, LLC but is non-recourse. This means that the lender (or assignee of the lender) cannot bring suit against either the borrower or the borrower's IRA to collect the loan balance in event of default and may only foreclose to collect on the loan. Assignees who pay full face value for "Trust Deeds" from Insider's Cash are never informed that they cannot bring suit against the non-recourse borrower to collect on the loan or that the loan balance (and what they paid to purchase the loan) are invariably in excess of the value of the property.  The City of Warren, Michigan has assessed the True Cash Value of the instant property at $42,020.00 but "Creative Wealth" is trying to sell the loan for $65,573.00.

Defendant John Graham Inc. agreed to further and facilitate the fraudulent scheme by purchasing

the property for $41,100.00 on May 22, 2014. John Graham Inc. then sold the property to

Defendant EZ Street Properties, LLC for $56,500.00 on July 3, 2014 who quit claimed the

property to Defendant Green Apple Homes, LLC. Green Apple Homes, LLC then sold it to the

ultimate Buying Summit victim, the Terry White IRA for $75,850.00 on July 31, 2014.

162.   This participation in the fraudulent scheme by Defendants Insider's Cash, LLC,

American Cash Fund, LLC and their owners and managers thus includes making decisions on

behalf of the enterprise and of knowingly carrying them out and of conspiring with the other

Defendants to further and facilitate the scheme by agreeing that mail and wire fraud would be

employed to carry out the scheme.

**EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS
OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY
JOHN GRAHAM, INC.**

163.   The participation of John Graham Inc. ("JGI") in the fraudulent scheme and enterprise

includes in the first instance the finding, purchasing, rehabbing and selling to the Property Selling

Defendants the individual properties that would soon be resold to victims of the Buying Summit

at prices far in excess of fair market value.  Many of those sales are described in detail within the

various claims of the Plaintiffs, *infra,* and to which JGI has admitted in its motion responses.

164.   Further, JGI has also located, purchased and knowingly sold properties at prices in

excess of fair market value to victims at or through the Buying Summit who believed that they

were buying properties at "wholesale" prices, including but not limited to the following:

A.  JGI purchased a property located at 163 S. Francis Ave. Pontiac, Michigan on May 8,

2015 for $37,900 and subsequently sold it at or through the Buying Summit directly to Buying

Summit attendee Chamich Properties, LLC for $71,750.00 by warranty deed drafted by Defendant Guardian Law dated October 21, 2015 (Exhibit HH). The purchase price of $71,750.00 was augmented by closing costs in the amount of $3,823.00 and a loan origination fee of $5,298.00. The purchaser made a down payment and financed the balance of $62,400.00 pursuant to a purported purchase money loan from Insider's Cash, LLC. The loan agreement for $73, 000.00 and mortgage with Insider's Cash, LLC were executed allegedly on behalf of the purchaser by a representative of the law firm of Defendant American Legal and Escrow. The 2015 assessment for the property was S.E.V. $20,750 or True Cash Value of $41,500.00.

    B.  JGI purchased a property located at 26505 Brush, Madison Heights, Michigan on April 7, 2015 for $55,000.00 and subsequently sold it at or through the Buying Summit to GRM & LLM Properties, LCC for $84,851.00 on April 21, 2016 by warranty deed drafted by Defendant Guardian Law (Exhibit II).   A loan agreement for $73, 000.00 and mortgage with Insider's Cash were executed allegedly on behalf of the purchaser by a representative of the law firm of Defendant American Legal and Escrow.  On October 11, 2016, the loan agreement and mortgage were sold for $73,000.00 to a new victim of the fraudulent scheme by Insider's Cash pursuant to an "Assignment of Mortgage or Deed of Trust Agreement", Exhibit JJ signed by Rob Lewis its Manager to the Self-Directed IRAs of Charles and Melissa Swain.

    C.  On March 13, 2015, JGI purchased the property located at 19293 Garfield, Redford, MI for $40,500.00.  On April 7, 2016, it sold the property at or through the Buying Summit to American Estate and Trust fbo Jay Jenson IRA for $73,500.00.   The S.E.V. of the property for 2015 was $23,700 with True Cash Value being $47,400.00.

D.  On March 17, 2015, JGI purchased the property located at 8252 Orchard, Warren, MI for $14,500.00 from New Seasons Community Development.  On December 23, 2015, it sold the property at or through the Buying Summit to Green Egg Investors, LLC for $59,850.00.  The S.E.V of the property for 2015 was $17,770.00 with the True Cash Value being $35,540.00.

165.  These activities of JGI were performed by JGI as part of it agreed-upon role in the fraudulent scheme and conspiracy with full knowledge of the promises made to the victims of the scheme.

166.  This participation in the fraudulent scheme by JGI thus includes making decisions on behalf of the enterprise and of knowingly carrying them out.

### EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY DEFENDANT INCOME PROPERTY USA, LLC

167.  The member and Registered agent of Income Property USA, LLC is Core Capital Property, LLC whose member and Registered Agent is BuyPD.

168.  Purchasers of properties from or through the Buying Summit could and would previously go to "incomepropertyusa.com", a web site associated with Income Property USA, LLC to view the status of their various purchases and orders. That web site has become defunct recently.  See an example of the Income Property USA Dashboard, Exhibit KK.

169.  Income Property USA, LLC is or has been the Member of both Rock It Homes, LLC and 5 Choices, LLC (expired 2017).

170.  Income Property USA, LLC is or has been the Registered agent and manager of Expansion Properties, LLC.

171.  Income Property USA, LLC produced and employed fraudulent brochures

promoting the Buying Summit Fraudulent Scheme as follows:

> A.  Rent Ready
> We find low cost and distressed properties in great neighborhoods. We then
> perform any repairs or rehabbing needed. By the time we sell them to our clients
> they are either tenanted or rent ready. Our clients are then able to get great prices
> without the hassle of doing repairs themselves.  See Exhibit H

172.  Income Property USA, LLC is clearly a major participant in the fraudulent

enterprise and conspiracy.

## EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY DEFENDANT BUYPD, BLAIR POELMAN AND RYAN POELMAN

173.   "BuyPd" is the most famous "brand name" associated with the Buying Summit

Fraudulent Scheme.

174.  The Registered Agent of Defendant BuyPD is Blair Jackson of the Invictus Law firm

and its members are Ryan Poelman and Titan Training Group LLC.  On March 12, 2015, Blair

Jackson replaced Blair Poelman as Registered Agent and Ryan Poelman replaced Blair Poelman

as member.  The entity was formerly known as "Base Camp Ops, LLC", and it changed its name

on June 4, 2013 to "BuyPD, LLC" pursuant to the Articles of Amendment to Articles of

Organization, signed by Blair Poelman, Member.

175.  Blair Poelman was the Registered Agent and member of Defendant BuyPD until

June 7, 2013.

176.  BuyPD, LLC is the Registered Agent and Member of Core Capital Property, LLC.

177.  BuyPD, LLC is the Registered Agent and Manager of Defendant Green Apple

Homes, LLC.

178.  BuyPD, LLC is a member of Insider's Cash, LLC.

179.  BuyPD, LLC is Registered Agent and member of Defendant EZ Street Properties, LLC.

180.  BuyPD, LLC is a Manager of Defendant Interactive Homes, LLC.

181.  The attached brochure (Exhibit LL) described the relationship between BuyPD, the fraudulent scheme and Defendant Ryan Poelman:

WHAT IS BUYPD
Every year, 500 company names are assigned a rank and placed on a list, where they will act as the catalyst for accolades, celebrations, promotions, bonuses, revamps, pink slips and headaches.  Every year, 500 decisions are made to either do what it takes to move up, or to simply tap out. But for the 4-year old BuyPD, its founder, Ryan Poelman, and its employees, that decision has already been made, and doing what it takes to achieve greatness is simply a 9 to 5.

Founded in 2010 by Poelman, previous business partners, and a few family members, BuyPD connects knowledgeable buyers with vetted investment properties, with the core belief that "financial stability allows for personal freedom."  With this sentiment being touted and embraced by employees becoming one of Utah's top 4 rising companies in just 4 years (INC. 500), and the nation's 149th Fastest Growing Company (INC. 500).

In October 2014, Inc 500 stated, ""[BuyPD] Offers real estate investment opportunities in property, trust deeds, tax deeds, tax liens, and education to investors all over the world.".

With a 3-year growth of 2,606.4% and growing revenue of 79.8 million USD, the numbers speak, quite frankly, for themselves.
                              ******
BuyPD purchases properties after they have been thoroughly researched and evaluated for a property's overall value and performance.

After we have conducted all the necessary research, we validate the information with detailed documentation.  BuyPD also considers aspects that aren't normally on a house listing, such as, the amount of boarded up homes nearby or the nearest cities performance.  This process is just our preliminary process before actually looking for an investment property.
                              ********

BuyPD has in-house site acquisition managers that work closely with property managers, realtors, and contractors all around the country. They are trained to understand market trends in the hottest appreciating areas and they understand which areas to pull out of before hard depreciation hits. Our specialized team works closely with a legal team to ensure that all purchases and properties are bought, renovated, obtained, and sold following the highest compliance principles and ethics.

182.  On February 14, 2017, Lars Johnson of BuyPD sent out an email to a former

Buying Summit victim promoting "Trust Deeds" for sale from: info@buypd.co.  See

# Paragraph 151 infra.

183.  On December 24, 2013, Defendant BuyPD posted a YouTube video entitled "Buy

PD Office Tour - Follow CEO Blair Poelman as he takes you on a tour of the Buy PD offices".

It is one of the few YouTube videos associated with the Buying Summit Fraudulent Scheme

which has not been deleted as of August 3. 2017.  Attached is a screen shot of Blair Poelman

(right) introducing Lars Johnson (center) and Neil Curry (left).  Exhibit MM

On the video clip, Defendant Blair Poelman says in part:

> Hi. My name is Blair Poelman and I'm the CEO of BuyPD.  ***** Before we purchase any assets, we take every property through a comprehensive screening and due diligence process with our acquisition team.

Here, Blair Poelman is describing the specific role playing by Defendant John Graham, Inc., part

of the acquisition team, in furthering and facilitating the fraudulent scheme.  Blair Poelman

further states on the video:

> Let me introduce you to our property specialists who deal directly with our clients all over the world.  This is Lars Johnson and Neil Curry.  These two gentlemen lead the sales efforts here.  **They each have a team of property specialists that work with dozens of clients and assist them in selecting, purchasing and closing on properties on a daily basis.**  Their focus is to develop relationships with our

clients, insure their purchasing experience is positive, and find ways to help the client expand their portfolios through additional properties and/or diversifying into assets such as Trust Deeds and developed land. [Emphasis added].

184.  The BuyPD YouTube video of December 24, 2013 also contained a clip of an actual Buying Summit in which Defendant Kory Thurston appeared.

185.  This BuyPD YouTube video dated December 24, 2013 described *supra,* was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it furthered and facilitated Defendants' Buying Summit Fraudulent Scheme and conspiracy pursuant to the Defendants agreement to pursue the fraudulent scheme as Blair Poelman on behalf of BuyPD is fraudulently reassuring potential customers of the integrity of the company and the Buying Summit process..

186.  Defendants Blair Poelman, Ryan Poelman and BuyPD clearly have an agreement to pursue the Fraudulent Scheme and conspiracy

187.  This participation in the fraudulent scheme includes making decisions on behalf of the enterprise and of knowingly carrying them out.

### EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY DEFENDANT READY PROP

188.  .Defendant Ready Prop is or has been a Utah "DBA" of Core Capital Property, LLC. As of 1/7/2013, Rob Lewis became a member of Core Capital Property, LLC.  As 6/7/2013, BuyPD became Registered Agent and member of Ready Prop.  Core Capital Property, LLC does business as:

READY LIEN
INCOMEPROPERTYUSA.COM
READY DEED
READY PROP

189.  Ready Prop is or has been the Registered Agent and Manager of Defendant Frontside Properties, LLC.

190.  Ready Prop is or has been the Registered Agent and Member of Defendant Red Apple Homes, LLC,

191.  Ready Prop is or has been the Registered Agent and Member of Defendant Malibu Breeze Properties, LLC.

192.  Ready Prop is or has been the Registered Agent and Member of Defendant Patriot Homes, LLC.

193.  Ready Prop is has been the Registered Agent and Member of Defendant Silver Tie Homes, LLC.

194.  Ready Prop is or has been the Registered Agent and Member of Defendant Screaming Eagle Properties, LLC.

195.  When Plaintiff Linda Saenz purchased a property in Warren, Michigan at and through the Buying Summit, the Defendants' "Purchase Details" and "Property Purchase Completion Checklist" (Exhibit NN) indicated that the seller was "Ready Prop".  The checklist also contains instructions for wiring payment for purchases to Read Prop which would be incidence of wire fraud.

196.  Ready Prop is or has been a vehicle for the individuals who own and operate the fraudulent enterprise to further and facilitate the fraudulent scheme and conspiracy.

**EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OFTHE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY DEFENDANTS <u>BUD LETHBRIDGE, VEIL CORPORATE, LLC AND GUARDIAN LAW</u>**

197.  Towards the end of the Buying Summit, Plaintiffs and the other attendees were subjected to a five hour presentation by the purported owner of Defendant Veil Corporate, LLC, Bud Lethbridge.  Mr. Lethbridge was presented to the Plaintiffs and attendees as the foremost expert regarding asset protection and the creation of limited liability companies for the purpose of asset protection.  Bud Lethbridge urged everyone to purchase the Veil "asset protection" package for the price of $6,495.00 which would include a personal one-on-one interview with a licensed attorney for the purpose of creating additional limited liability companies into which the Plaintiffs and attendees would convey their newly purchased rental properties and other assets purchase at or through the Buying Summit.  The interaction with the attorneys from Guardian Law also concerned other legal matters.

198.  On the 2013 edition of the official Buying Summit DVD set, Mr. Lethbridge tells the attendees what occurs once they purchase his "asset protection" package:

> Number two, if you bought property here this weekend from Property Direct, ok, then, we talked about the fact that, how many properties should you have in your personal name?  None.  You should never buy property in your name ever again**. And so we want to make sure that property gets titled properly into an LLC,** ok. You don't have to worry about that.  **If you're my client and you're their client, meaning Property Direct, we basically match our client lists, so we go, ok, these are the people who are both their client and their property, let's make sure all those properties get titled correctly in an LLC.** We take care of it, ok. 2013 Disk 9 @ 19:00  [emphasis added]

Plaintiffs recall Mr. Lethbridge saying the same thing to them when they attended the Buying Summit.

199.  On the 2014 edition of the official Buying Summit DVD set, Mr. Lethbridge tells the attendees what occurs once they purchase his "asset protection" package:

> So with this blueprint, there's one other step. **You are actually going to have an interview with one of the licensed attorneys** that I talked about where you go

over this, and where "Why you doin' that" and "how come you're doin'" and this will actually say this is in this state and this is in that state and this one has 123 Elm Street and this one has XYZ company, you get the idea? It's all delineated in there and then **you'll have this interview one on one to go over that with the attorney.** OK. [emphasis added]

The next step, step number three is then implementing the strategy. Once you're cool, you understand what we're doing, why we're doing it, everybody's on board, then we start to actually build the structure, meaning we are actually creating the entities, **we're actually properly drafting the documents,** the non-pro rata distribution clauses, we're filing the entities with the state. Now, as we file the entities, we'll actually get in touch with you to give us some form of payment for the state fees. Alright? We don't pay the fees. [emphasis added]

Plaintiffs recall Mr. Lethbridge saying the same thing to them when they attended the Buying Summit.

200. Plaintiff Thode purchased the Veil "asset protection" plan based upon the above representations of Bud Lethbridge. Soon after returning home from the Buying Summit, she received this email from Bud Lethbridge (Exhibit OO):

Subject: Welcome to Veil
From: Bud Lethbridge
Date: 3/17/2015 12:09 PM
To: Eva M.

Dear Eva M.

Hello again and welcome to Veil!

Thank you for your trust and confidence in us. We value your business and are already working hard to ensure that you, your family and all your own is protected.

\*\*\*\*\*\*

STEP 3

After we have received your Questionnaire **we will forward it on to Guardian Law, which is the law firm that acts as the fulfillment company for Veil Corporate's clients. An attorney at Guardian Law will then create a unique**

67

**and detailed Asset Protection Blueprint that outlines how to best protect your assets**……

\*\*\*\*\*\*

After you have reviewed your Blueprint, **please call our office to set up a time to review your Blueprint with one of Guardian Law's attorneys – we want to make sure to answer any questions you might have.  In the weeks following your consultation you will work closely with the attorneys and paralegals at Guardian Law as they implement your asset protection structure. WE'RE HERE TO HELP** [emphasis added]
\*\*\*\*\*\*

Thank you again for the opportunity.  We look forward to working with you.

Sincerely

Bud Lethbridge

201.  On March 23, 2015, Plaintiff Thode received an email from Bud Lethbridge

(Exhibit M) containing the following:

What is Guardian Law?
Guardian Law is the fulfillment law firm for Veil Corporate's asset protection clients.  Guardian Law offers attorneys and paralegals who are well versed in Veil Corporate's asset protection strategies. Once you submit your questionnaire you will work closely with the attorneys and paralegals of Guardian Law as they plan and implement your asset protection structure

202.  The assets to be conveyed to these new LLCs pursuant to this "protection package" were the very same properties, assets and transactions which were fraudulently sold to Plaintiffs and which are the subject of this instant RICO action.

203.  Guardian Law was simultaneously representing the Defendants in helping to perpetuate their fraudulent scheme while representing the Plaintiffs regarding the selection and creation of an entity for their Buying Summit purchases which could significantly impact proper venue in the event of litigation.

68

204.  Plaintiff Thode was convinced by other purported expert consultants at the Buying Summit to convert her retirement account into a self-directed IRA with American Estate and Trust.  All properties purchased by Plaintiff Thode at or through the Buying Summit were conveyed to:

> American Estate and Trust FBO Eva Thode, IRA, whose address is 6900 Westcliff Dr., Ste. 603, Las Vegas NV 89145

205.  Unbeknownst to Plaintiff Thode until recently, at no time were any of the properties she purchased at the Buying Summit conveyed to any of the LLCs created for her by Veil Corporate or Guardian Law because they were conveyed to her self-directed IRA.

206.  A majority purchasers of properties at the Buying Summit who were induced there by purported expert consultants to convey their purchased properties to self-directed IRAs were also induced by purported experts from Veil and Guardian Law to pay $6,495.00 to create limited liability companies which have never been used.

207.  Thus, the roles of Defendants Lethbridge, Veil and Guardian Law aid the fraudulent scheme and conspiracy in the follow ways:

a.  By having the naïve Buying Summit victims interact with an actual law firm, the victims believe that they are being represented by an attorney in the creation of these numerous limited liability companies;

b.  Because victims tend to believe that they have been represented by an attorney in the creation of their LLCs, there is much less likelihood that they will hire another attorney to review the advice that they received from these Defendants and the other Defendants and who would have caught on to the scheme at the earliest possible moment;

c.  Defendant Lethbridge advises all of the naïve Buying Summit victims that they will need to purchase an almost endless "supply" of additional LLCs.  The initial charge for a single LLC set up by Defendant Veil is generally in the amount of $500.00.  However, Defendant Lethbridge convinces most of the victims to purchase a plan that provides for an unlimited number of additional LLCs, the so-called Veil "asset protection" package for the price of $6,495.00 which is the cost of creating around twelve or thirteen LLCs in the future.  None of those are remotely necessary for any of the victims of the Buying Summit scheme since generally all of the properties they might purchase can be held by a single LLC.  Veil is basically robbing each of the Buying Summit victims of around $6,000.00 for the "asset protection" plan.

d.  The advice from Defendants Guardian Law, Veil and Lethbridge is to create the victims' LLC in the State of Utah.  No advice is given to create the LLC in the state where the purchased housing will be located and no advice is given that a foreign Utah LLC must register in the state where the housing is located.  Such registration rarely, if ever, occurs.

e.  Veil regularly sells its "asset protection" package to Buying Summit victims who never utilize an LLC to hold the properties they purchase at and through the Buying Summit because they are induced to transfer those properties to an IRA.

f.  Plaintiffs submit that the use of actual attorneys whose primary client is the fraudulent scheme and conspiracy creates a fiduciary duty which was breached when those attorneys failed to alert the victims of the nature of the scheme or that the contracts they make with the schemers contain arbitration clauses.  For this reason, *inter alia*, those arbitration clauses are void and unenforceable.

208.  Defendants Veil, Lethbridge and Guardian Law engage in the same fraudulent behavior using emails and the telephone to perpetuate wire fraud over and over and over which is evidence of a conspiracy to further and facilitate the fraudulent scheme and the conspiracy.

## EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY <u>DEFENDANTS DEAN GRAZIOSI AND SCOTT YANCEY</u>

209.  Defendants Graziosi and Yancey are minor cable television celebrities who send out advertisements via the internet, the United States mails and television promoting the Buying Summit Fraudulent Scheme.

210.  Defendants Graziosi and Yancey appear in person at various Buying Summit events and repeat to the attendees the false representations they have made in their initial mailings, emails and TV ads about the properties and assets that are offered for sale there, expressly vouching for the honesty and integrity of the promoters of the fraudulent scheme upon which the attendees, including the Plaintiffs, have materially relied to their detriment.

211.  Each round of the Buying Summit Fraudulent Scheme initially begins with mailings or email messages to potential victims from minor cable television celebrities Defendants Graziosi and/or Yancey whose messages fraudulently induce Plaintiffs and the other recipients to attend "private pre-auction events" by, *inter alia*, express promises via email or United State Mail. See paragraphs 19, 62 and 63, *supra.*

212.  These messages amount to literally thousands of instances of wire and mail fraud. Those persons who believe and rely upon the truth of these false representations are the very people who ultimately pay to the attend the Buying Summit and purchase overpriced properties

and assets at the Buying Summit often thereby wiping out their life savings, all of which is known to Defendants Graziosi and Yancey as well as all of the other Defendants.

213.  Defendant Scott Yancey has lent his name to "Yancey Events, LLC" and "Yancey LCC" which are the purported entities from whom several Plaintiffs have purchased their Buying Summit packages.

214.  The Buying Summit contracts of Plaintiffs Saenz, Dunn, Vohadrik, and Wilson indicate that the contracting party is perhaps "Deans Advanced Training.com".

215. The Buying Summit contracts of Plaintiffs Hampshire and Houtz indicate that the contracting party is perhaps "Insider's Financial Deans Advanced Training.com".  See.  These are patterns of behavior employed by the fraudulent scheme to confuse potential Plaintiffs about who the perpetrators of the fraudulent scheme actually are.

216.  The initial fraudulent mail and wire communications from Defendants Dean Graziosi and Scott Yancey are the most important predicate acts perpetuated by the scheme.

**EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY DEFENDANT INVICTUS LAW, PLLC**

217.  Defendant Invictus Law is one the primary law firms representing the Buying Summit Fraudulent Enterprise throughout its entire existence.  However, it has gone beyond mere legitimate representation of a client and has directly participated in the affairs of the Buying Summit Fraudulent Scheme, *inter alia,* by unethically simultaneously representing both a loan borrower, one who "borrowed" purchase money from Insider's Cash, LLC and the person who purchased the same loan and mortgage from Insider's Cash, LLC for its face value.  This

representation is unethical because the primary clients of Invictus Law are the participants in the Buying Summit Fraudulent Scheme itself.

218.  In 2015, Defendant Invictus Law was acting as the collection law firm for Defendant Insider's Cash.  See demand letter attached as Exhibit PP.

219.  Plaintiff Paul Valenti, through his LLC Plaintiff ReInvestor 702, LLC had purchased a $42,200.00 note and mortgage on a property located at 15515 Prevost St., Detroit, MI 48227 for $42,200.00 from Defendant Income Property USA, LLC on August 24, 2014.  The borrower was "Lade Real Estate, LLC", another Utah LLC created at the Buying Summit and owned and controlled by Anthony Jackson of Clinton, Maryland.  The property was never worth more than $25,000.00 (known to Insider's Cash, LLC and Income Property, USA, LLC when the property was originally sold) and had been stripped of its furnace and hot water heater prior to its conveyance to Mr. Valenti's LLC "RE Investor 702, LLC" as described *infra*.  Additionally the house was in a general state of disrepair requiring an expenditure of $20,343.50 to make it inhabitable.  Finally, a delinquent water bill and taxes totaling $3,360.13 were required to receive the occupancy permit.

220.  On August 25, 2015. Mr. Valenti received an unsolicited email from Insider's Cash, LLC regarding the inability of the borrower of the loan associated with 15515 Prevost St. to make further payments. Exhibit QQ.  Apparently, Insider's Cash, LLC became aware of the default because the borrower was making automatic payments through an affiliate of Insider's Cash, LLC. All mailings and electronic transfers to and through that affiliate are instances of wire and mail fraud. The first paragraph of the email suggested that foreclosure was a long and expensive process and offered a deed in lieu of foreclosure as a solution.

221.  No mention was made to Mr. Valenti that Mr. Jackson had signed a personal guaranty of the loan agreement, and no mention was made to regarding Mr. Jackson's personal collectability or the exceedingly low value of the underlying property (well known to Insider's Cash, LLC, Income Property USA, LLC, their affiliates and attorneys).  Being naïve and without expert counsel, Mr. Valenti chose "option 2", which involved paying the borrower $1,000, discharging the borrower of all liability and receiving title to the underlying property.  He received in essence a Deed in Lieu of Foreclosure.

222.  As part of the procedure that was selected with Insider's Cash, LLC to obtain a Deed in Lieu of Foreclosure and without any input from or informed understanding by Mr. Valenti, his limited liability company RE Investor 702, LLC was charged and paid an attorney fee to "Invictus Law" for "Escrow services to complete the property transfer and associated paperwork for 15515 Prevost from borrower to lender" pursuant to an invoice, Exhibit RR.

223.  Part of the "paperwork" for which Mr. Valenti was charged by Invictus Law was an "Agreement" dated October 13, 2015 ostensively between a) Mr. Valenti and his company and b) Mr. Anthony Jackson and his company.  Unbeknownst to Mr. Valenti, Invictus Law had inserted a release paragraph into the document whereby the four parties to the agreement unintentionally agreed to the following which released every member of the Buying Summit Fraudulent Scheme and conspiracy from any liability for any claims whatsover:

> Likewise, Borrower and Lender also specifically release **any and all claims they may have against Insider's Cash, LLC, its agents, attorneys, assign, or successors, as well as any third party company associated with it.**  Emphasis added. Exhibit SS

224.  The individual owners of the two companies and the two limited liability companies were both tricked by Invictus Law into granting a full general release to Insider's Cash, LLC and

its affiliates pursuant to a simple Deed in Lieu of Foreclosure agreement in which neither Insider's Cash, LLC, Income Property USA, LLC nor any of their affiliates were parties.

225.  Invictus Law had taken on the role of attorney for ReInvestor 702, LLC and owed it and Mr.Valenti a fiduciary duty to disclose to Mr. Valenti the underling facts of the Buying Summit Fraudulent Scheme and contents of this transaction because he was paying them to draft documents regarding obtaining a Deed in Lieu of Foreclosure.  Their activities on behalf of their primary client, the RICO enterprise, was active participation in the fraudulent scheme.

226.  Invictus Law has long been a primary law firm representing Insider's Cash, LLC, BuyPD, Income Property USA, LLC and their various associated affiliates regarding the Buying Summit but Mr. Valenti was unaware of this when he retained them to draft the documents regarding receiving a Deed in Lieu of Foreclosure.

227.  Upon information and belief, Invictus Law has at least on dozens of other occasions engaged in similar activities designed to cheat other victims of the Buying Summit Fraudulent Scheme into releasing their rights to sue the perpetrators of the scheme for damages.

228.  Further, attorneys employed by Invictus Law regularly communicate by email with persons who purchased properties at or through the Buying Summit and who executed loan agreements with Defendant Insider's Cash, LLC when such persons are in default under said loan agreements and the loan agreement has been sold to a new third party victim, to wit:

A.  Borrowers in default were encouraged by Invictus Law attorneys to convey their property to the loan purchaser by way of documents prepared by the Invictus Law attorney without independent representation of either the borrower or loan purchaser.

B.  The documents prepared by Invictus Law attorneys for both parties (but unbeknownst to them) invariably includes language which purports to release Defendant Insider's Cash, LLC and all associated entities (which could amount to all participants in the entire RICO enterprise) from any and all liability for any claims either the borrower or loan purchaser may have against any of them even though none of them are parties to the "Deed in Lieu of Foreclosure Agreement" {"DIL"].

C.  Plaintiffs are aware of at least three occasions (in addition to the incident with Paul Valenti, *supra*) where Invictus Law attorneys attempted to trick borrowers and loan purchasers pursuant to a proposed "DIL Template" which provides:

> Likewise, Borrower and Lender also specifically release any and all claims they may have against Insider's Cash, LLC, or their agents, attorneys, assigns, or successors, as well as any company associated with them.

These proposed "templates" containing a full release of "Insider's Cash, LLC, or their agents, attorneys, assigns, or successors, as well as any company associated with them" have been sent to:

Patricia Roskens regarding 13999 Sherman, Warren, Michigan;

John Loya regarding 8432 St. Olaf, St. Louis, Missouri;

Defendant Joanne Beldotti regarding 12442 Coleen Ave, Warren, MI.

229.  Defendant Invictus Law has clearly crossed the line of mere representation of the participants in the fraudulent scheme and has actively solicited work with Buying Summit victims and active Plaintiffs in the instance case so that it could trick them into executing full releases of the perpetrators of the fraudulent scheme and conspiracy.

**A DESCRIPTION OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE BY DEFENDANT AMERICAN LEGAL AND ESCROW WORKING WITH JOHN GRAHAM INC.**

230.  Defendant American Legal and Escrow, LLC is a Nevada law firm whose principal is Blair Jackson who is also a principal with Defendant Invictus Law PLLC and Guardian Law LLC.

231.  In July, 2014, Anthony Sellers of Pennsylvania attended a Buying Summit in Las Vegas.

232.  As with so many other attendee/victims of the fraudulent scheme, Mr. Sellers was induced to purchase two overpriced properties in the City of Detroit, Michigan from Defendant Green Apple Homes, LLC.

233.  Mr. Sellers was induced by the purported expert consultants at the Buying Summit to discuss his situation with a representative of Defendant American Legal and Escrow, LLC.

234.  As the result of this discussion, Mr. Sellers was induced to grant a limited Power of Attorney to Blair Jackson for Mr. Jackson to execute on behalf of Mr. Sellers the various fraudulent contractual agreements he have been induced to make with the various Defendants.

235.  On August 24, 2014, Defendant Blair Poelman as Manager of Defendant Green Apple Homes, LLC signed a Warranty deed drafted by Defendant Guardian Law conveying for a price of $90,950.00 the property at 17164-66 Roselawn Dr., Detroit, Michigan to Mobiz, LLC, a Utah limited liability company which Mr. Sellers had been induced to create by Defendants Veil Corporate and Guardian Law.

236.  Blair Poelman on behalf of Defendant Green Apple Homes, LLC and Blair Jackson, allegedly on behalf of Mobiz, LLC executed a "Conflict of Interest Disclosure" purportedly

waiving any concerns Mobiz, LLC and Mr. Sellers might have about Guardian Law representing all of the Defendants in the fraudulent scheme and having drafted all of the deeds used in the scheme. Exhibit TT.

237.  Blair Jackson, allegedly on behalf of Mobiz, LLC, executed an interest-only loan agreement with Insider's Cash, LLC in the amount of $70,200.00 on July 24, 2014.

238.  Blair Jackson, allegedly on behalf of Mr. Sellers, executed a personal guaranty of the Mobiz/Roselawn loan agreement Exhibit UU.

239.  The 2014 S.E.V. of the Roselawn property was $13,200.00 and the True Cash Value was $26,400.00.

240.  As with all of the other personal guarantees executed at or through the Buying Summit, Mr. Sellers was unaware of this personal guaranty and never granted anyone, including Blair Jackson, the authority to execute one on his behalf.

241.  Blair Jackson fraudulently executed this personal guaranty purportedly on behalf of Mr. Sellers without the knowledge of permission of Mr. Sellers in order to trap Mr. Sellers into liability for an obligation which he would have never knowingly made in order to perpetuate the Buying Summit Fraudulent Scheme.

242.  On March 17, 2015, JGI purchased the property located at 8252 Orchard, Warren, MI for $14,500.00 from New Seasons Community Development.  On December 23, 2015, it sold the property at or through the Buying Summit to Green Egg Investors, LLC for $59,850.00.  The S.E.V of the property for 2015 was $17,770.00 with the True Cash Value being $35,540.00.

243.  Flora McQueen from Florida attended a Buying Summit in September 2015 and would like to become a Plaintiff in the instant action.  She purchased three overpriced properties

in the Detroit area, two from Defendant John Graham, Inc. with each deed having been drafted

by Defendant Guardian Law  On March 17, 2015, JGI purchased the property located at 8252

Orchard, Warren, MI for $14,500.00 from New Seasons Community Development.  On

December 23, 2015, it sold the property at or through the Buying Summit to Green Egg

Investors, LLC for $59,850.00.  Green Egg Investments, LLC is the Utah LLC which was

created by Ms. McQueen upon the advice of Veil and Guardian Law for which Ms. McQueen

paid a fee.  The S.E.V of the property for 2015 was $17,770.00 with the True Cash Value being

$35,540.00.

   244.  Ms. McQueen purchased 8252 Orchard, Warren, Michigan for the exceedingly high

price of $59,850.00 and was induced to execute a loan agreement with Defendant Insider's Cash,

LLC in the amount of $41,800.00 by the fraudulent representations of the allegedly expert

consultants from Property Direct, LLC.  This sum is far in excess of the value of the property

which was known at that time by all of the Defendants.  She was induced by Defendant Veil

Corporate and Guardian Law to create a limited liability company in Utah, Green Egg Investors,

LLC to which she conveyed the property.  She was induced by Blair Jackson of Defendant

American Legal and Escrow to execute a limited Power of Attorney for both Ms. McQueen and

her son  granting to attorney the Blair Jackson law firm American Legal and Escrow, specifically

Kirstyn Anderberg, the power to execute documents regarding the purchase of 8252 Orchard,

Warren, Michigan.

   245.  Without the knowledge or permission of Ms. McQueen, Ms. Anderberg executed a

Personal Guaranty so that Ms. McQueen and her son Stephen A. Fogel would be personally

liable would be personally liable for the "loan" from Insider's Cash, LLC to pay the purchase

price to John Graham, Inc.  Ms. Anderberg also executed the Conflict of Interest Disclosure regarding Guardian Law's participation in the transaction (Exhibit VV).

246.  Here we have fraudulent behavior by American Legal and Escrow facilitating direct fraudulent sales to Buying Summit victims by JGI which are also facilitated by the other participants in the enterprise and conspiracy, including the "expert" consultants from Property Direct, LLC, and "loans" from Insider's Cash, LLC.

### EXAMPLES OF THE PARTICIPATION IN THE AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND CONSPIRACY BY DEFENDANT KORY THURSTON

247.  Kory Thurston is the main presenter and speaker at the various Buying Summit events.

248.  Mr. Thurston noted while speaking at the Buying Summit that the entity sponsoring the Buying Summit was not the entity with which the attendee had executed a Buying Summit contract or "training contract", but was another entity altogether, Defendant Property Direct. Further, according to Mr. Thurston, it is Property Direct which goes out "and they spend the time fixing, renting, getting property management together that's the whole idea and they put turnkey investments together":

22:00  Another thing that I get to do is introduce you to a company named Property Direct.  I know most of you have heard about it before.  ***** Real quick, Property Direct, that's what they do, that's what they do for investors.  **They go out and they spend the time fixing, renting, getting property management together that's the whole idea and they put turnkey investments together** so that we have positive cash flow.  One more time for me. How many of you would like positive cash flow?  Man, I love this crowd. Yeah, this is great. And that's the whole idea.

So what I thought would be fun is to I'd kinda introduce you to Property Direct and just kinda show you what they've done over the last 19 months.  Alright, they been doing it a lot longer than that but putting these Buying Summits together.  By the way, **Property Direct is the major sponsor here this weekend** and there's a reason for that.  Look

what they have done in the last 19 months.  Over $24 million in cash flow properties. How many of you like that?  ***** I want you to think about what that, in the last 19 months, 498 homes. How many of you have set this goal, you'd like to do one a month?

249.  Mr. Thurston claimed that Defendant Property Direct has "teams all around the nation going through and doing the due diligence and getting these things ready through the rehab and the fixing and the property management."  This is precisely the role played by John Graham, Inc. within the fraudulent scheme.

250.  At every Buying Summit, Mr. Thurston encouraged every attendee to make a purchase at the Buying Summit that particular weekend because all the properties for sale had allegedly been purchased by Defendants "wholesale" and were being sold to the attendees at "wholesale":

> **Of course, we want you to do a deal this weekend. You should be doing a deal this weekend.** But if that doesn't work out, that's OK. We want to be able to have that long term relationship with you so we can appeal to you again and again and again.  **One thing that we specialize in doing obviously is going out, finding property, buying it, fixing it up, getting it under property management and get it tenanted so it is cash flowing.** How many of you would like a property like that? Can I see your hands? **That's what we do. And we do it at a wholesale [sic]…..In other words, we go out and buy wholesale and we turn around and we sell it at…..[Crowd: "WHOLESALE"!] at wholesale!**

251.  All victims of the Buying Summit Fraudulent Scheme, including all Plaintiffs, relied to their detriment upon this fraudulent misrepresentation that the properties being sold at and through the Buying Summit were being sold at "wholesale" or at a substantial discount from market price when, in fact, all such properties were being sold at prices far in excess of market value.

252.  Again, Mr. Thurston labeled the role played within the fraudulent scheme by John Graham, Inc. as the "one thing that we specialize in doing" which is "finding property, buying it, fixing it up".

253.  Further, Mr. Thurston falsely claimed (and upon which all Plaintiffs relied) that all of the properties for sale were "turnkey", when, in fact, most of them had serious structural problems, no tenants or non-paying tenants:

> So the properties you'll see this weekend through your property specialist, that's what they are, they're turnkey. They're already rented, they are under property management, they are ready to go.

254.  Repeatedly at the various Buying Summits, Mr. Thurston falsely represented that the "hard money lenders" at the Buying Summit, Defendants American Cash Fund, LLC and Insider's Cash, LLC, were invariably lending against the fair market value of the underlying property at a rate of 50% to 66% of value and this was the reason they would make these loans with no credit check of the borrower:

> So because it's hard money to get, you guys know with American Cash Funding **they will loan up to 66% of the purchase price of a home to any real estate investor. Does it matter what your credit is?  Does it matter what your job history is?  Does it matter anything, they will loan that amount. You guys got it?  So when they loan that amount, right, on a 66% loan to purchase value,** alright, is there a little bit of equity in that house? Yeah yeah.

255.  Mr. Thurston again claimed that the "Lending Defendants are only "lending on the house", meaning that the value of the properties were far in excess of the loan amounts:

> Is there financing available today? Yes. The beautiful thing about American Cash Funding if I didn't mention it, I'll mention it again. American Cash Funding. **They don't check your credit. They don't care about your work history. They are not going to ask for a DNA sample alright. They only care about the house. That's American Cash Funding. They're lending on the house. So I don't care what your history is. What credits you have, anything like that, you have financing options**

**available this weekend though American Cash Funding.** Can we give them a huge round of applause for that?

256.  All victims of the Buying Summit Fraudulent Scheme, including all Plaintiffs,

relied to their detriment upon this fraudulent misrepresentation that the "hard money" loans from

Insider's Cash, LLC and American Cash Fund, LLC were for only 50% to 66% of the value of

the properties secured by the loans.

257.  Mr. Thurston then falsely stated that when attendees borrow purchase money from

the "Lending Defendants" via 12% interest-only loans, that it would only take three to six

months to be able to refinance those loans at a lower rate with a local bank when the attendee

returned home from the Buying Summit:

> What you guys are understanding if you're the investor and you got a house that's got a cash flow of 300 bucks a month but you have a 1% a month charge on that, **you're going to go in and get that refinanced how soon?  As quick as the bank will let you.  Right?  Right now.  Having done this somewhat before I can tell you this, I've had many people tell them that they've had banks that will refinance the next week or the next month. Ok. My experience in it is it's usually 3 months to 6 months called seasoning.  And that's where a bank wants to make sure that you're getting the rental payments and things are going in and it's an investment property, then they'll refinance you. OK.  I say 6 months because I'm trying to prepare you. Most of the time it's a 3 month seasoning.**  You guys got it?

258.  All victims of the Buying Summit Fraudulent Scheme, including all Plaintiffs,

relied to their detriment upon this fraudulent misrepresentation that the "hard money" loans from

Insider's Cash, LLC and American Cash Fund, LLC were for only 50% to 66% of the value of

the properties secured by the loans.  Because the "loans" (even after a substantial down payment)

were invariably far in excess of the value of the underlying property, the loans could never be

refinanced.

259.  Kory Thurston encouraged Buying Summit attendees to purchase properties far away from where the attendees resided.  This was an essential part of the fraudulent scheme agreed to by all participants in the enterprise who are also co-conspirators in the conspiracy so that the naïve property purchasers could not inspect the purchased properties or familiarize themselves with the neighborhood or tenants and would therefore not realize immediately that they had been defrauded:

> Buying outside your area. OK. We talk about this all the time. But it's really really simple. Should you buy outside your area? I would tell you this from personal experience I would tell each one of you this. If you could buy your first rental property 1,000 miles away from where you live, it would be the best decision you made. And the reason is if your first rental property is in your backyard, guess what? You going to go there all the time. Every night after work you're going to go there. Check it out, man, what's going on? You'll drive your property manager crazy 'cause you'll go there more than they'll go there. I'm telling you gang, your first one, yeah, get it away from you. And get used to just getting that cash flow coming in and not looking at that property alright. That's a very very good thing.

> Hey and let's call it what it is. Some of you don't live in a very good area. Where's my Californians? Don't be mad. It might be better for you to start outside your area, right. Don't worry about buying outside your area gang, in today's world with the technology that we have, that's again my recommendation would be everybody get one far enough away so you never go and see it, not even on vacation. Alright.

260.  Kory Thurston misrepresented the values of the underlying properties and loans (described as "Trust Deeds"):being sold to Buying Summit attendees:

> But Trust Deeds, it's really really simple, we're the bank, what are we gonna get every single month?  A check until it's paid off. And when it's paid off, how much are we gonna get back? Our entire investment! And then what are we gonna do? Just buy another one, turn it again and again.

261.  Contrary to these misrepresentations of Kory Thurston, every property sold at the Buying Summit was worth less that the balance due on the purchase money "loan" after the

purchaser had made a substantial down payment.  Plaintiffs' transactions in this regard are detailed in the various counts describing in detail the claims of the various Plaintiffs, infra. Further, Kory Thurston made material omissions by failing to disclose that these loans and mortgages ("Trust Deeds") were the purchase money loans made by American Cash Fund, LLC and Insider's Cash, LLC to original property purchase victims of the Buying Summit, that all of the properties which secured these loans were worth less than the balloon payment and/or purchase price paid to purchase the loan, that most of the loans were in serious default and that at least half of them were held by Self Directed IRAs and were non-recourse, meaning the loan purchaser could never sue the borrower for a default or a deficiency.

262.  These false statements of Kory Thurston also reflect his agreement to further and facilitate the fraudulent scheme by encouraging victims to purchase properties, take out loans and purchase loans and mortgages from the Property Sales Defendants, the Lending Defendants, and Income Property USA, LLC.  This is also evidence that Mr. Thurston conspired with those entities, their owners and managers further and facilitate the fraudulent scheme.

263.  Mr. Thurston also admitted that everyone who attended the Buying Summit was first introduced to the fraudulent scheme by way of a fraudulent mailing (which is a predicate act of mail fraud) and that regardless of the entity one dealt with, this was all part of a single enterprise and conspiracy:

> But think about the weeding out process that's taken place. You wanna talk about why I'm honored to be here.  Think about what you guys went through. Go way back.  Go way back.  Remember when you got that letter in the mail?  Were you the only one who got the letter?  No.  A lot of people got that letter and then went to that first meeting.  You think about that first meeting you were at. Everybody who was at that first meeting, did they go to that three day workshop? Hey, how many of you have been to Boots on the Ground, can I see your hands? Oh man.  Thank You.  Yes.  That's the whole idea. I mean you made it. I love

what Robert said.  You're at the Summit.  You made it.  Yes! Is that good?
That's power.  So when we talk about setting a goal, everybody in here wants out
of this weekend going home from Vegas a real estate investor!

264.  Mr. Thurston gives an almost identical presentation over and over and over at each

of the Buying Summit events.  He is clearly a participant in the fraudulent scheme and

conspiracy by, at least, carrying out his role in the scheme.

**EXAMPLES OF THE PARTICIPATION IN THE
AFFAIRS OF THE BUYING SUMMIT FRAUDULENT ENTERPRISE AND
<u>CONSPIRACY BY THE PROPERTY SALES DEFENDANTS</u>**

265.  The participation of the Property Sales Defendants, including their interaction with

the allegedly expert consultants and the lending Defendants is set forth in detail in the various

counts of each Plaintiff, *infra.*

**<u>COUNT I – THE CLAIMS OF REBECCA K. WILSON</u>**

The allegations of paragraphs 1 - 265 are incorporated by reference as if fully set forth

herein.

266.  Plaintiff Rebecca K. Wilson ("Wilson") is sixty three years old and resides in Grosse

Pointe Park, Michigan.

267.  In August, 2012, Mrs. Wilson's husband died of brain cancer and she thereafter

received some life insurance proceeds as the result of her husband's death.

268.  She was interested in investing some of the insurance money into investments that

would provide a higher return than what was being offered by banks.

269.  In February or March, 2013, she saw an informercial on television in the Detroit,

Michigan area which advertised the alleged opportunity to invest in real estate with Dean Graziosi,

Defendants' agent and spokesperson which is an incidence of wire fraud intended to further and facilitate the fraudulent scheme and conspiracy.

270.   Mrs. Wilson thereafter inquired of Defendants' agents about this real estate investment offer.  It is unknown which entity actually employed these agents.

271.   Mrs. Wilson was then provided with free tickets to attend a dinner and introductory seminar in early April, 2013 at a hotel facility in Bloomfield Hills, Michigan where she heard a motivation speaker urge the attendees that signing up with the various investment and training programs that were being offered would be the gateway to financial independence.

272.   Mrs. Wilson thereafter registered for another seminar which was held April 10th, 2013 at 6:00 p.m. at The Met Troy, 5500 Crooks Road Troy, MI 48098.

273.   Confirmation of her registration for this seminar came via email from Defendant Dean Graziosi, self-described "Author and Millionaire Mentor" which also expressly promised that:

> When you attend my private pre-auction event I will show you:
>
> How to buy property for as low as pennies on the dollar just like to large institutional investors!
>
> How to get the best properties before the public has access to them!
>
> How to purchase property at rock bottom prices before they are bid up by hundreds of other investors.  See email attached hereto as Exhibit C.

274.   Relying upon the express promises of Dean Graziosi as set forth *supra*, and expecting to be provided with expert guidance in making such real estate purchases as the result of purchasing the various training packages which were offered by Defendants, Wilson attended the

aforementioned event held April 10, 2013 where she purchased from Defendant Insiders Financial Education, LLC the following packages:

    A.  Insider's Financial Enhance Note Network System for $197.00;

    B.  Insider's Financial 3-Day Real Estate Workshop Package for $1,997.00; and

    C.  Insider's Financial Tax Lien Program for $997.00.

275.  The email described *supra,* was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

276.  While subsequently attending the aforementioned local 3-Day Real Estate Workshop Package, Mrs. Wilson was induced by the express promises of Defendants' agents to purchase a "Diamond Package" from Defendant Investor's Financial Education LLC and paid $39,997.00 for said package on April 27, 2013 which included additional purported real estate investment training plus airfare to and hotel accommodations in Las Vegas, Nevada plus admittance to the "Buying Summit 3 Day Asset Buying Retreat" held in there in June, 2013.

277.  The presenters at Defendants' local workshops informed Plaintiff Wilson and the other the attendees that:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b)  Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the staff at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

278.  Defendants' agents also informed the attendees at the local workshops including Mrs. Wilson that attendees of the Buying Summit needed to set up a limited liability company ("LLC") prior to attending the Buying Summit so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

279.  Defendants' agents also informed the attendees at the local workshops, including Mrs. Wilson, that they should purchase a package from Defendant Veil Corporate, LLC for the set-up of an LLC as described, supra.

280.  Plaintiff Wilson purchased such a package for the set-up of an LLC prior to attending the Buying Summit and had direct interaction with agents of Veil Corporate and individual(s) from Defendant Guardian Law in this regard.

281.  Relying upon the purposed expert advice of Defendant Veil Corporate and Guardian Law, Mrs. Wilson set up a limited liability company in Utah so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

282.  Veil Corporate and Guardian Law both represented Defendants in the perpetuation of the Buying Summit Fraudulent Scheme.

283.  As the result of providing Mrs. Wilson with expert legal advice for a fee, Veil Corporate and Guardian Law owed a fiduciary duty to Mrs. Wilson to disclose their dual representation and to make full disclosure to her of the entire contents of the documents she was about to sign including the multiple fora for dispute resolution and the contractual terms which

contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

284.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Mrs. Wilson are void.

285.  Shortly before attending the aforementioned "Buying Summit", Mrs. Wilson received an email dated June 12, 2013 from "Shawn Alden", identified as "Shawn (shawn.a@deansadvancedtraining.com)" regarding "Deans Inner Circle" which stated in part:

> I tried to contact you today, I'm sorry that I missed you. I would like to explain who I am and why I'm calling. *MY* role is to support *YOU*...... think of me as your personal concierge.  My goal is to make sure you get the most out of our program. If you have any issues, concerns or if you are frustrated for any reason, I'm your goto person.

286.  The email described *supra,* was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

287.  Mrs. Wilson further relied upon the statements of "Shawn Alden" made in Paragraph 120, *supra*, to believe that agents of Defendants would at all times be providing her with expert advice and guidance in finding and purchasing real estate bargains consistent all of the numerous prior representations and promises of Defendants.

288.  Mrs. Wilson did attend the Buying Summit held in Las Vegas held June 21 to June 23, 2013 where the attendees were subjected to rounds of motivational speakers proclaiming the real estate bargains available for purchase at the Buying Summit.

289.  Upon arrival at the Buying Summit, Mrs. Wilson received a copy of a "Buying Summit Workbook" as described *supra*.

290.  Mrs. Wilson relied upon the express promises of Kory Thurston made at the Buying Summit as described *supra.*

291.  Further relying upon these additional promises and representations made by Defendants' agents as set forth, *supra,* Mrs. Wilson met with whom she considered to be an expert sales consultant who working on her behalf as she had been repeatedly promised by Defendants' agents and for which she had paid $39,997.00.

292.  While meeting with the purported expert sales consultant, Mrs. Wilson was shown information on an internet screen about a house available for purchase located at 2011 Lynn Street, Cahokia, Illinois, near St. Louis, Missouri.

293.  One such internet screen display stated that the property had a "Suggested Retail Price" of $71,000.00 but could be purchased immediately at the discounted price of $53,900.00.

294.  The internet display as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

295.  Relying upon these inducements and material representations by the purported expert sales consultant, Mrs. Wilson agreed to purchase the home for the following terms:  A purported sales price of $53,900.00, plus "closing costs" of $2,050.00 to be paid to Defendants' attorneys "Guardian Law" and a ten percent "origination fee" of $3,805.00 to be paid to one of the Defendant lenders, plus an $800.00 annual insurance premium and a $900.00 tax adjustment.  Mrs. Wilson was to put down $19,601.00 and finance the balance of $42,400.00 for a total cost to Mrs. Wilson of $62,001.00 ($19,601.00 + $42,400.00).  The $42,400.00 balance was to be financed by a "loan" from one of the Defendant lenders pursuant to an interest-only loan agreement at 12% for twenty-

four months with all principle due at the end of twenty-four months.  Mrs. Wilson wrote a check to Defendants in the amount of the $19,601.00 down payment.

296.  As a further inducement to make the purchase, Mrs. Wilson was repeatedly told by Kory Thurston at the Buying Summit that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months.  See promises of Kory Thurston, supra.

297.  Defendants' representation to Mrs. Wilson that that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months was knowingly false when made.

298.  Defendants' representation to Mrs. Wilson that that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months was made with the specific bad intent by Defendants of precluding Mrs. Wilson as purchaser from learning from such a local bank that the property she had purchased at the Buying Summit was worth far less than even the outstanding loan balance owing to one of the Defendant Lenders until it was too late cancel said fraudulent transaction.

299.  At the Buying Summit, Mrs. Wilson was also induced to purchase a lot in Florida, a tax deed in Florida, and a promissory note for $50,000.00 regarding a home in Redford Township.  Mrs. Wilson wrote an additional check to Defendants in the amount of $50,000.00 to purchase the promissory note.

300.  As a further inducement to make the purchase of these properties, Mrs. Wilson was told by representatives of Defendants that there was no need for an inspection or appraisal of the subject properties because "We [Defendants] take care of everything".

301.  Within days of returning home from the Buying Summit, Mrs. Wilson decided that she no longer trusted the advice she had received from Defendants regarding her purchases at the Buying Summit and stopped payment on all checks she had written to Defendants for these purchases effectively cancelling these transactions.

302.  Mrs. Wilson has been demanding a refund of all funds which she has paid to Defendants for "training" and to attend the Buying Summit ever since.  Defendants have failed to respond to these demands.

303.  Mrs. Wilson has demanded of Defendant BuyPD that it identify the legal entity described as Insider's Financial Education LLC (to whom she paid all of the fees for "training" and to attend the Buying Summit) including state of registration of said entity, but such demand has been ignored by Defendant BuyPD and its counsel.

304.  At least a year after cancelling the purchase transactions that she had made at the Buying Summit, Mrs. Wilson discovered that the property located at 2011 Lynn Street, Cahokia, Illinois had an assessed True Cash Value of only $24,510.00 for the year 2013.

305.  At least a year after cancelling the purchase transactions that she had made at the Buying Summit, Mrs. Wilson learned for the first time that on June 18, 2013 (just days before the Buying Summit) that the property located at 2011 Lynn Street, Cahokia, Illinois had been conveyed to Defendant Screaming Eagle Properties LLC by Warranty Deed for the consideration of only $37,800.00.  This conveyance was part of the ubiquitous fraudulent markup process of the Buying Summit Fraudulent Scheme employed by these Defendants regarding all purchasers of properties at the Buying Summit.

306.  The fraudulent markup process of the Buying Summit Fraudulent Scheme was known to Defendants and their attorneys who participated in and facilitated all stages of said fraudulent scheme.

307.  The Utah limited liability company created on behalf of Mrs. Wilson, *supra* has never held any assets and is not a party to this action.

308.  As set forth *supra*, Defendants conducted the affairs of the Buying Summit Fraudulent Enterprise and conspired to do so in part to fraudulently obtain money from Plaintiff Wilson who was fraudulently induced to pay Defendants in excess of $43,000.00 in exchange for expert advice and guidance in purchasing real estate bargains while the actual purpose of the Buying Summit was to defraud the naïve attendees by misleading and guiding them to purchase grossly overpriced real estate from Defendants.

309.  As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Wilson such that Defendants owed Mrs. Wilson a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

310.  Plaintiff Wilson has incurred damages in excess of $43,000.00 as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

311.  Mrs. Wilson is entitled to restitution from all of these Defendants of all money she has paid to the non-existent Insider's Financial Education LLC which is but an alter ego participant of the Buying Summit Fraudulent Enterprise and/or contract damages for breach of contract.

312. Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and knowingly conspired together to further and facilitate the scheme and they are each individually liable to Plaintiff Wilson for her damages as RICO "persons".

## COUNT II –THE CLAIMS OF PLAINTIFF DENNIS HOUTZ

The allegations of paragraphs 1 - 312 are incorporated by reference as if fully set forth herein.

313. In January, 2013 while living in Richboro, Pennsylvania, Plaintiff Dennis Houtz viewed an infomercial playing on television featuring Defendant Dean Graziosi which promoted a free seminar concerning real estate investing such that the attendees would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

314. The aforementioned infomercial suggested that interested people fill out an online form to obtain further information which Mr. Houtz did.  This online form was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

315. In response to the aforementioned online form, Mr. Houtz received a postcard in the U.S. Mail as an entrance ticket for Mr. Houtz to attend a free seminar on how to purchase real estate at discounted prices to be later sold for a profit.  This postcard was a use of the mails by Defendants that was incident to an essential part of their scheme to defraud and was thus an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

316. On March 2, 2013, Mr. Houtz attended the aforementioned seminar which was held at the Four Points Sheraton Hotel in Philadelphia, Pennsylvania where he purchased the "Insider's

Financial Tax Lien Program" for $997.00 and the "Insider's Financial Real Estate Workshop Package" for $1997.00, described as a 3-day real estate investing workshop where the attendees would be taught how to purchase real estate properties at deep discounts.

317.  At the free seminar held on March 2, 2013, Defendants had the attendees, including Mr. Houtz fill out a financial questionnaire which sought detailed information concerning, *inter alia*, the income, debt, credit card balances, 401k, IRA Retirement account balances of the attendees.

318.  Defendants subsequently used this information to their advantage when persuading the attendees, including Mr. Houtz, to buy their so called Advanced Training Products.

319.  At the seminar held on March 2, 2013, Defendants instructed the attendees, including Mr. Houtz to call all of their credit card companies and seek a credit limit increase. There was actually a script in the training material on what to say verbatim.

320.  Mr. Houtz had purchased the Insider's Financial 3 day Real Estate Workshop Package and paid $1,997.00 on March 2, 2013 with a credit card which was held March 8, 9 & 10 2013 at the Sonesta Hotel at 1800 Market Street Philadelphia, PA 19103.

321.  The presenters at Defendants' local workshops informed Plaintiff Houtz and the other the attendees that:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b)  Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the staff at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

322.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz at the aforementioned seminar regarding the opportunities to purchase deeply discounted real estate properties at the Buying Summit, on March 10, 2013, Mr. Houtz purchased "Deans Insider's Financial Advanced Training Diamond Package" for $39,997 ($5,000.00 paid on March 10, 2013 with a credit card and $34,502.00 with a check on March 18, 2013) which included attendance at a Buying Summit.  Mr. Houtz took out a $39,850.00 loan from his 401k account to reimburse himself for these expenditure which he is still paying off at the present time.

322.  The aforementioned "training" and Buying Summit packages were purchased by Mr. Houtz from a purported entity entitled "Insider's Financial Education LLC".

323.  The written contractual agreements between Mr. Houtz and "Insider's Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

324.  None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Insider's Financial Education LLC".

325.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz at the aforementioned seminar regarding the alleged necessity of conveying any properties he might purchase from Defendants to a limited liability entity, on March 12, 2013, Mr. Houtz purchased the Veil Corporate Single Entity Setup

(for a Utah LLC) for $495.00 with a credit card.  This Utah limited liability company has never held any property or assets because Mr. Houtz eventually conveyed the properties he purchased from Defendants to a self-directed individual retirement account, a procedure which does not utilize a limited liability company.

326.  On March 11, 2013, Mr. Houtz received an email from Defendants' agent Julie Garfield (julie.g@deansadvancedtraining.com) which stated:

> (By the way, the Buying summit in Vegas is a great opportunity to acquire cash flow properties **AT STEEP DISCOUNTS** [emphasis added].  A lot of our clients get to the Buying Summit wishing they had moved their retirement funds into a self-directed IRA so they can use it to invest in real estate. Please contact me if you be interested in learning how to do that.).

327.  The email described *supra*, is an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it was incident to an essential part of Defendants' scheme to defraud as there were no properties offered at the Buying Summit at steep discounts to the attendees.

328.  Simultaneously with his execution of the Buying Summit contract, Plaintiff Houtz checked the box to purchase an "asset protection" package for $595.00 from Defendant Veil Corporate which is described *infra*.

329.  There is no arbitration or forum selection clause associated with the agreement of Plaintiff Houtz to purchase this "Asset Protection" package from Defendant Veil Corporate.

330.  Defendants' purported expert consultants also informed the attendees at the local workshops including Plaintiff Houtz that attendees of the Buying Summit needed to set up a limited liability company ("LLC") prior to attending the Buying Summit so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

331.  Plaintiff Houtz purchased such a package for the set-up of an LLC entity prior to attending the Buying Summit and had direct interaction with purported professionals employed by Defendants Veil Corporate and Guardian Law who provided legal advice to him in this regard.

332.  Having purchased the "Asset Protection" plan of Defendant Veil Corporate and relying upon the purported expert advice of Defendant Veil Corporate and Guardian Law, Plaintiff Houtz set up a limited liability company in Utah so that there would exist an entity into which properties and other purchases made at the Buying Summit could be conveyed.  This would prove completely unnecessary because Plaintiff Houtz conveyed all purchases he made at and through the Buying Summit to his self-directed IRA.

333.  Despite providing professional services for a fee to Plaintiff Houtz, Defendants Veil Corporate and Guardian Law both continued to represent the Defendants both before and during their simultaneous representation of Plaintiff Houtz regarding the same transactions and occurrences throughout the perpetuation of the Buying Summit Fraudulent Scheme and failed to disclose such representation to either Plaintiff Houtz or the other attendees of the workshops, the Buying Summit or to persons who purchased professional services from them in relation to the Buying Summit.

334.  As the result of providing Plaintiff Houtz with expert legal advice for a fee, Veil Corporate and Guardian Law each owed a fiduciary duty to Plaintiff Houtz to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to him at the workshops, at the

Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

335.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiff Houtz with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

336.  In the middle of April, 2013, Mr. Houtz received a telephone phone call at home from an agent of the Defendants asking if he was planning on converting his 401k plan over to a Self - Directed IRA so that Mr. Houtz would have purchasing power at the Buying Summit.  During this telephone call, Defendants' agent expressly stated that so many people that attend the Buying Summit wish that they would have done this before arriving.

337.  The telephone call described *supra*, is an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it was incident to an essential part of Defendants' scheme to defraud..

338.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz as set forth in the email described *supra*, and the telephone call described *supra*, and throughout the entire relationship with Defendants, Mr. Houtz:

      A.  On May 31, 2013 forwarded a check from his 401k account in the amount of $73,627.35 payable to American Estate and Trust as the first step in setting up a Self-Directed IRA;

B.  Purchased three properties in Macomb County, Michigan from Defendants at the Buying Summit using funds from his Self-Directed IRA further described *infra*;

C.  Was fraudulently led to believe that these properties were being offered for sale at steep discounts;

D.  Had the properties he purchased from Defendants conveyed to his Self -Directed IRA.

339.  Mr. Houtz attended the Buying Summit Event # 130530 held in Las Vegas, Nevada at the Mirage Hotel & Casino from May 30, 2013 to June 1, 2013.

340.  Upon arriving at the Buying Summit, Mr. Houtz was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook".

341.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Mr. Houtz and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**  We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

342.  Mr. Houtz relied to his detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

343.   Mr. Houtz relied to his detriment upon the Defendants' repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

344.   As the result of the promises, inducements, relationships and agreements between Mr. Houtz and Defendants, Defendants owed Mr. Houtz a fiduciary duty during their relationship concerning the subject matter of their various contractual agreements.

345.   As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Houtz was induced to attend a sales session with an agent of Defendants at the Buying Summit.

346.   During a sales session attended by Mr. Houtz with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 11055 Jewett Ave., Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $67,000.00.   The purported bargain contract price offered by Defendants for this home was $65,000.00 as displayed on this internet monitor.

347.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

348.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Jewett Ave. property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant

Frontline Properties, LLC for $64,000.00.  However, with various add-ons, including a $3,386.10 "loan origination fee" and "closing costs" including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was in excess of $71,000.00 and the property was conveyed by Warranty Deed drafted by Defendant dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA" and signed by Blair Poelman, Manager.

349.   The aforementioned Buying Summit Workbook had announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Mr. Houtz, the false impression that the homes he was purchasing were worth in excess of the amount of any "bridge loans" from Defendants when, in fact, the homes he purchased were worth less than the amount of his "bridge loan" and thus could not be refinanced or sold.

350.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Houtz made a down payment of $33,861.00 from his IRA savings regarding his purchase of the Jewett Ave. home and his IRA management company signed  a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $37,247.00 with interest-only payments of $378.00 per month for 24 months and the balance of $37,247.00 being due August 20, 2015.

351. As described *supra*, Defendants American Cash Fund, LLC and Frontline Properties, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

352. At the aforementioned sales session attended by Mr. Houtz with a purported expert consultant at the Buying Summit, Defendants' internet monitor also displayed a "Suggested Retail Price for a home located at 22533 Hillock, Warren, Michigan of $63,000.00. The purported bargain contract price offered by Defendants for this home was $61,000.00 as displayed on this internet monitor.

353. Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

354. Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Hillock Ave. property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant Frontline Properties, LLC for $60,000.00. However, with various add-ons, including a $4,233.50 "loan origination fee" and "closing costs" including a fee of $2,050.00 paid to Defendants Guardian Law, the actual sales price was in excess of $67,000.00 and the property was conveyed by Warranty Deed drafted by Defendant Guardian Law dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA" by Blair Poelman, Manager.

355.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr Houtz made a down payment of $20,044.00 from his IRA savings regarding his purchase of the Hillock Ave. home and his IRA management company signed  a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $47,100.00 with interest-only payments of $465.69 per month for 24 months and the balance of $47,100.00 being due July 31, 2015.

356.  As described *supra*, Defendants American Cash Fund, LLC and FrontSide Properties, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

357.  At the aforementioned sales session attended by Mr. Houtz with a purported expert consultant at the Buying Summit, Defendants' internet monitor also displayed a "Suggested Retail Price for a home located at 23061 Peters St., Warren, Michigan of $53,200.00.  The purported bargain contract price offered by Defendants for this home was $45,000.00 as displayed on this internet monitor.

358.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

359.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Peters St. property and the express promises of Defendant Kory Thurston who described the purported the bargains to be

purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant Max Ultra, LLC for $44,300.00. However, with various add-ons, including a $3,191.60 "loan origination fee" and "closing costs" including a fee of $1,850.00 paid to Defendant Guardian Law, the actual sales price was in excess of $51,000.00 and the property was conveyed by Warranty Deed dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA".

360. Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Houtz made a down payment of $16,858.24 from his IRA savings regarding his purchase of the Peters Ave. home and his IRA administrator signed a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $35,700.00 with interest-only payments of $351.08 per month for 24 months and the balance of 35,700.00 being due September 11, 2105.

361. Unbeknownst to Mr. Houtz but known to Defendants at the time of purchase, the Jewett Ave. home had been available for sale at the distressed sale price of $21,675.00 in September, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Rio Vista Farms Real Estate LLC on September 6, 2012 for $21,675.00.

362. Thereafter, in a series of transactions, Rio Vista Farms Real Estate LLC sold the Jewett Ave. property to John Graham Inc. on April 24, 2013 for a purported 35,000.00; John Graham, Inc. then sold it on May 28, 2013 to defendant Frontside Properties, LLC for a purported $54,500.00 and Frontside Properties, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $71,000.00.

363.   Unbeknownst to Mr. Houtz but known to Defendants at the time of purchase, the Hillock Ave. home had been available for sale at the distressed sale price of $16,900.00 in October, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Rio Vista Farms Real Estate LLC on October 23, 2012 for $16,900.00.

364.   Thereafter, in a series of transactions, Rio Vista Farms Real Estate LLC sold the Jewett Ave. property to John Graham Inc. on April 24, 2013 for a purported $33,000.00; John Graham, Inc. sold it on May 29, 2013 to defendant Frontside Properties, LLC for a purported $49,500.00 and Frontside Properties, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $67,000.00.

365.   Unbeknownst to Mr Houtz but known to Defendants at the time of purchase, the Peters Ave. home had been available for sale at the distressed sale price of $25,000 in January, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Buy Right Properties LLC on January 9, 2012 for $25,000.00.

366.   Thereafter, in a series of step transactions, Buy Right Properties LLC sold the Peters Ave. property to Defendant Max Ultra LLC on October 18, 2012 for a purported $33,956 and Max Ultra LLC, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $51,000.00.

367.   As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Houtz such that Defendants owed Mr. Houtz a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

368.  Defendants had a contractual and fiduciary duty owing to Mr. Houtz to locate the properties he purchased at such the promised discounted prices, inform him of both their existence and availability and to facilitate their purchase by him at such a discounted prices.

369.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Houtz at a prices greatly in excess of their fair market value or true cash value.     \\\

370.  After making purchases of property at the Buying Summit based upon the purported expert advice of an expert consultant, Plaintiff Houtz and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC.  Mr. Lethbridge was introduced as the foremost expert on "asset protection".

371.  Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate a more elaborate "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney from Guardian Law regarding setting up those entities to which the Buying Summit property purchases would be conveyed.

372.  Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Plaintiff Houtz purchased the Veil Corporate plan for $6,495.00.

373.  As the result of purchasing the Veil Corporate "Asset Protection Plan", Plaintiff Houtz did indeed receive what was purported to be one-on one expert legal advice from Defendants

Veil Corporate and Guardian Law for the purpose of setting up additional limited liability companies which could allegedly not be found by potential litigants. .

374.    In fact, it was unnecessary for Mr. Houtz to have set up any limited liability companies because all properties purchased by Plaintiff Houtz at or through the Buying Summit were conveyed to his self-directed IRA.

375.   As the result of providing Plaintiff Houtz with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Plaintiff Houtz to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents he was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to his at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

376.   Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiff Houtz with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

377.   Plaintiff Houtz has incurred and is entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

378.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme, and they are each individually liable to Plaintiff Houtz for his damages.

## COUNT III – THE CLAIMS OF PLAINTIFFS
## CARNEY LOOK WONG, ROBERT WONG AND KENNETH WONG

The allegations of paragraphs 1 to 378 are incorporated by reference as if fully set forth herein.

379.   Plaintiff Robert Wong received a flyer in the United States Mail at his place of business in New York state in April 2013 which advertised a free seminar with special guest speakers Scott & Aime Yancey from the TV show "Flipping Vegas".

380.  The mailing described *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

381.   The advertisement provided multiple locations for the seminar within the New York City area.  Mr. Wong called to register for an event at "Terrace On The Park" in Flushing Meadows Park, Queens, NY, and attended on May 19, 2013.  He was allowed and encouraged to bring a guest, so he brought along his brother Defendant Kenneth Wong.

382.  At the seminar which Robert and Kenneth Wong attended on May 19, 2013, both of the Yanceys appeared, but only spoke briefly about the "life-changing benefits" of making money through real estate.

383.   At the free May 19, 2013 event, the attendees were told by purported expert consultants that in order to receive further training, they should attend the next level seminar, at a cost of $1,997.00 for two attendees.  The written agreement for this package suggests that the entity providing the training services was "Yancey Events LLC", an entity which did not exist.

384.  Robert Wong paid the aforementioned $1,997.00 fee with a credit card, and he and Kenneth attended the seminar from May 29, 2103 through May 31, 2013 at the Brooklyn Marriott Hotel.  This seminar consisted of 3 days of training for 8 hours each day, and led by a trainer and expert consultant named Mark Gonsalves who had a staff of 4 others who were also trained in Defendants' system, but mostly handled the logistics of the seminar.  The purported expert consultants appeared to explain to the attendees their method of how to buy houses far below market value, as well as other real estate investments (title liens, tax deeds, etc).

385  The representations made by Defendants' purported expert consultants to the Wong brothers created a fiduciary relationship and a duty to  make a full disclosure to them of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents they were about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to them at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

386.  At the end of the seminar described *supra,* the attendees were told by the purported expert consultants that they now had sufficient information necessary to start buying properties at steeply discounted prices.  However, attendees were told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold".

387. Robert and Kenneth Wong chose to purchase the Diamond package and Robert Wong charged $3,000 on his credit card towards the full fee of $39,997.00 and paid the balance through a wire transfer on June 25, 2013. The written agreement for this package also suggests that the entity providing the training services was "Yancey Events LLC" and entity which does not exist.

388. The purported expert consultants convinced Robert Wong to purchase the Diamond Package by stating that it included further one-on-one training, as well as attendance at the Buying Summit for both brothers. Further, they expressly stated to Robert Wong that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars. As such, Defendants' agents expressly stated to Mr. Wong that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and "seasoned" (were presently income-producing with tenants that had at least 1 year left on their lease). Further, Robert Wong was told that a person could only purchase these properties by attending the Buying Summit. Attendees could also purchase legal services, insurance, wealth and estate planning and other financial services at the Buying Summit.

389. Robert and Kenneth Wong relied to their detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

390. Robert and Kenneth Wong relied to their detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

391.   At the Buying Summit, Robert and Kenneth Wong and the other attendees were subjected to additional rounds of Defendant Kory Thurston proclaiming the great real estate bargains that Defendants were offering for sale there.

392.   As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, Robert and Kenneth Wong were induced by Defendants to convey any properties they purchased at the Buying Summit into Self-Directed IRAs, one for Robert's wife Carney Look Wong and the other for Kenneth Wong.

393.   As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Robert Wong was induced to attend a sales session with an agent of Defendants at the Buying Summit.

394. At a sales session attended by Robert Wong with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 11808 Rossiter, Detroit Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $55,000.00.  The purported bargain contract price offered by Defendants for this home was $46,350.00 as displayed on this internet monitor.

395.   Defendants knew at the time of the events described *supra*, that the Rossiter home was not worth $55,000.00 and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

396.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

397.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rossiter property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, it was agreed that Carney Look Wong would purchase the property from Defendant Screaming Eagle Properties, LLC for $45,350.00 and it would be conveyed to her self-directed IRA.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" including a fee of $1,850.00 paid to Defendant "Guardian Law", the actual sales price was in excess of $50,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Carney Look Wong's self directed IRA by Warranty Deed drafted by Defendant Guardian Law dated August 22, 2013 and signed by Blair Poelman, manager.

398.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Carney Look Wong made a down payment of $21,459.93 regarding his purchase of the Rossiter St. home and a Non-Recourse loan agreement between the Carney Look Wong IRA and Defendant Insiders Cash, LLC was executed by Ms. Wong's IRA service provider to pay the "loan" balance of $46,800.00 with interest-only payments of $480.00 per month for 24 months and the balance of $46,800.00 being due November 14, 2015.

399.  As described *supra*, Defendants Insider's Cash, LLC and Screaming Eagle Properties, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

400.  Unbeknownst to Robert Wong or Carney Look Wong but known to Defendants at the time of purchase, the Rossiter St. home had been available for sale at the distressed sale price of $24,000.00 on June 18, 2013 and was purchased on behalf of Defendants own account by

114

Defendants' agent Metro Detroit Home Solutions, LLC on said date. The June 18, 2013 Warranty Deed had been drafted by Defendants Guardian Law, LLC.

401. Metro Detroit Home Solutions, LLC soon thereafter conveyed the Rossiter St. property to Defendant Screaming Eagle Properties LLC for a purported $31,000.00 by Warranty Deed dated June 19, 2013 prepared by Defendants' attorneys Guardian Law.

402. Defendant Screaming Eagle Properties, LLC then conveyed the Rossiter St. property to Carney Look Wong's IRA on November 7, 2013 for the aforementioned effective price of in excess of $50,000.00.

403. Defendants had a contractual and fiduciary duty owing to Robert Wong and Carney Look Wong to locate the Rossiter St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Wong at such a discounted price.

404. Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Rossiter St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Robert Wong at a price greatly in excess of its fair market value or true cash value

405. In further breach of their contractual and fiduciary duties, Defendants induced Robert Wong to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced contrary to what Mr. Wong had been informed by Defendants at the Buying Summit.

406. At a sales session attended by Robert Wong with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale. For one such home located

at 2724 Central Ave., Anderson, Indiana, Defendants' internet monitor displayed a "Suggested Retail Price" of $72,000.00.  The purported bargain contract price offered by Defendants for this home was $69,00.00 as displayed on this internet monitor.

407.  Defendants knew at the time of the events described *supra*, that the Rossiter home was not worth $69,000.00 and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

408.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

409.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rossiter property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, it was agreed that Carney Look Wong would purchase the property from Defendant DLS Properties, LLC for $68,000.00 and it would be conveyed to her self-directed IRA.  However, with various add-ons, including a $3,576.30 "loan origination fee" and "closing costs" including a fee of $2,050 paid to Defendant "Guardian Law", the actual sales price was in excess of $68,000.00 and the property was conveyed by Defendant DLS Properties, LLC to Carney Look Wong's self directed IRA by Warranty Deed drafted by Defendant Guardian Law dated August 22, 2013 and signed by Blair Poelman, manager.

410.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Carney Look Wong made a down payment regarding his purchase of

the Cental Ave. home and a Non-Recourse loan agreement between the Carney Look Wong IRA and Defendant Insiders Cash, LLC was executed by Ms. Wong's IRA service provider to pay the "loan" balance of $39,900.00 with interest-only payments of $399.00 per month for 24 months and the balance of $39,990.00 being due at the end of that period.

411.   As described *supra*, Defendants Insider's Cash, LLC and DLS Properties, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

412.   Unbeknownst to Robert Wong or Carney Look Wong but known to Defendants at the time of purchase, the Central Ave. home had been available for sale at the distressed sale price and was purchased by Defendant Insider's Cash, LLC on February 6, 2013 at a distressed sale price by Warranty Deed.   It was then conveyed by Insider's Cash, LLC to Defendant DLS Properties, LLC by Warranty Deed drafted by Defendant Guardian Law and dated February 7, 2013.

413.   Defendant DLS Properties, LLC then conveyed the Central Ave. property to Carney Look Wong's IRA on August 23, 2013 for the aforementioned effective price of in excess of $72,000.00 as described *supra.*

414.   Defendants had a contractual and fiduciary duty owing to Robert Wong and Carney Look Wong to locate the Central Ave. property at such a discounted price, inform them of its existence and availability and to facilitate its purchase by Ms. Wong at such a discounted price.

415.   Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Central Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Carney Look Wong at a price greatly in excess of its fair market value or true cash value

416.  In further breach of their contractual and fiduciary duties, Defendants induced Carney Look Wong to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced contrary to what Mr. Wong had been informed by Defendants at the Buying Summit.

417.  Further, and as the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Kenneth Wong was induced to attend a sales session with an agent of Defendants at the Buying Summit.

418.  At a sales session attended by Kenneth Wong with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 22020 Cushing, Eastpointe, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $61,000.00.  The purported bargain contract price offered by Defendants for this home was $55,950.00 as displayed on this internet monitor.

419.  Defendants knew at the time of the events described *supra*, that the Cushing St. home was not worth $61,000.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit.

420.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

421.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Cushing St. property and the rounds and rounds of

motivational speakers extolling the bargains to be purchased at the Buying Summit, Kenneth Wong purchased the property from Defendant Screaming Eagle Properties, LLC for $54,950.00. However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was in excess of $61,000.00 and the property was subsequently conveyed by Defendant Screaming Eagle Properties, LLC to Mr. Kenneth Wong's self directed IRA by Warranty Deed drafted by Guardian Law dated September 10, 2013 and signed by Blair Poelman, its manager.

422.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Kenneth Wong made a down payment of $29,464.00 regarding his purchase of the Cushing St. home and a Non-Recourse loan agreement  between Kenneth Wong and Defendant Insiders Cash was executed by Mr. Wong's IRA service provider to pay the "loan" balance of $32,464.00 with interest-only payments of $324.00 per month for 24 months and the balance of $32,464.00  being due in 2015.

423.   Unbeknownst to Kenneth Wong but known to Defendants at the time of purchase, the Cushing St. home had been available for sale at a distressed sale price in January, 2013 and was purchased on behalf of Defendants own account by Defendants' agent Buy Right Properties, LLC for $13,000.00 on February 8, 2013.  The property was subsequently conveyed to Kenneth Wong's IRA by Defendant Screaming Eagle Properties, LLC for in excess of $61,928 on September 10, 2013.

424.   Defendants had a contractual and fiduciary duty owing to Kenneth Wong to locate the Cushing St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Kenneth Wong at such a discounted price.

425.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Cushing St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Kenneth Wong at a price greatly in excess of its fair market value or true cash value

426.  The City of Eastpointe, Michigan assessed the True Cash Value of the Cushing St. property at $31,740.00 for the year 2013, at 31,400.00 for the year 2014 and at $33,320.00 for the year 2015.

427.  After making purchases of property at the Buying Summit based upon the purported expert advice of an expert consultant, Plaintiff Robert and Kenneth Wong and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC.

428.  Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate a more elaborate "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney from Guardian Law regarding setting up those entities to which the Buying Summit property

purchases would be conveyed.

A more detailed description of

the representations of Defendant

Lethbridge are found in

Paragraph _____, *supra*.

429.   Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Plaintiffs Robert and Kenneth Wong purchased the Veil Corporate plan for $6,495.00.

430.   As the result of purchasing the Veil Corporate "Asset Protection Plan", Plaintiffs Robert and Kenneth Wong did indeed receive what was purported to be one-on one expert legal advice from Defendants Veil Corporate and Guardian Law.

431.  Based upon this purported expert advice from Defendant Guardian Law, a limited liability company was set up by Defendant Veil for the Wongs in the State of Utah, "Skyhigh Developments LLC". This limited liability company was completely unnecessary because all properties purchased by the Wongs at or through the Buying Summit were conveyed to self-directed IRAs.

432.  As the result of providing Plaintiff Robert and Kenneth Wong with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Plaintiffs Robert Wong, Carney Look Wong and Kenneth Wong to disclose their dual representation and to make a full disclosure to them of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents they had and were about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to them at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

433.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiffs Robert Wong, Carney Look Wong and Kenneth Wong with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

434.  Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Robert Wong, Carney Look Wong and Kenneth Wong by Defendants

and their agents to engender their unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts they executed contained language identical and/or similar to that described *supra.*

435.  Plaintiffs Robert Wong, Carney Look  and Kenneth Wong were unaware that the sales agreements they executed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

436.  Robert Wong, Carney Look Wong and Kenneth Wong were thus unaware that the sales agreement contained a Utah forum selection clause and/or a Utah choice of law clause.

437.  Robert Wong, Carney Look Wong and Kenneth Wong were unaware that the training and Buying Summit agreements they signed provided for binding arbitration of disputes.

438.  Robert Wong, Carney Look Wong and Kenneth Wong were unaware that the Commercial Loan Agreements they signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.

439.  There was and is no relationship whatsoever between either Robert and/or Kenneth Wong, their attendance at the Buying Summit in Nevada nor any aspect of their agreements to purchase the aforementioned properties from Defendants that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

440.  Plaintiffs Robert Wong, Carney Look Wong and Kenneth are entitled to damages, including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated by each Defendant

herein through conducting and participating in the affairs of the Buying Summit Fraudulent Enterprise.

441.  Each Defendant had a distinct role in conducting and participating in the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Robert Wong, Carney Look Wong and Kenneth Wong for their damages.

## COUNT IV – THE CLAIMS OF PLAINTIFFS MIKE HAMPSHIRE AND LIONS FAN, LLC

The allegations of paragraphs 1 - 441 are incorporated by reference as if fully set forth herein.

442.  In late January/early February, 2013 while living in Murphy, Texas, Plaintiff Mike Hampshire received a postcard-type piece of mail featuring Dean Graziosi inviting him to a free ½ day seminar on Friday, February 15, 2013 at a hotel in Plano, Texas concerning real estate investing such that the attendees would be taught how to purchase rental real estate properties at deeply discounted prices for investment purposes.

443.  The mailing described *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

444.  Mr. Hampshire called the telephone phone number on the aforementioned postcard sometime in early February, 2013 and reserved a spot at the ½ day seminar

445.  Expecting to be provided with expert guidance in making such real estate purchases as the result of purchasing the various training packages which were offered by Defendants, Mr. Hampshire attended the aforementioned event held February 15, 2013 where he purchased from Defendant Insiders Financial Education, LLC the following packages:

a) Insider's Financial Enhance Note Network System at a cost of $497.00;

b) Insider's Financial Tax Lien Program at a cost of $997.00; and

c) Insider's Financial Real Estate Workshop Package at a cost of $1997.00.

446.  Mr. Hampshire then attended the 3-day "Real Estate Workshop" (@ $1997.00) which took place on February 22-24, 2013 at a hotel in Dallas, Texas.

447. At the aforementioned 3-day "Real Estate Workshop", the attendees, including Mr. Hampshire, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

448.  The pressure to buy a package was more subtle the first 2 days.  However, if an attendee had not bought a package by the 3rd day, then the pressure was noticeably firmer.  Mr. Hampshire observed the woman sitting next to him at the "workshop" gamely trying to hold out and she was being harangued strongly by one of the Defendants' agents pushing the packages.

449.  The express promises made by Defendants' agents of providing expert advice for a fee prior to attending any of these workshops created a fiduciary duty in Defendants to Mr. Hampshire and the other attendees and they owed a duty to Mr. Hampshire to make a full disclosure to him of the entire contents of the documents he was about to sign with the Defendants including the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to his at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

450.  The presenters at Defendants' local workshops informed Plaintiff Hampshire and the other the attendees that:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b) Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the staff at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

451. While attending the aforementioned local 3-Day Real Estate Workshop Package, Mr. Hampshire was induced by the express promises of Defendants' agents to purchase a "Platinum Package" from an entity purported to be named "Investor's Financial Education LLC" and he paid $24,997.00 for said package on April 27, 2013 which included additional purported real estate investment training plus airfare to and hotel accommodations in Las Vegas, Nevada plus admittance to the "Buying Summit 3 Day Asset Buying Retreat" held there in June, 2013.

452. Simultaneously with his execution of the Buying Summit contract, Mr. Hampshire checked the box to purchase the "asset protection" package from Defendant Veil Corporate which is described *infra*.

453. There is no arbitration or forum selection clause associated with the agreement of Plaintiff Hampshire to purchase this "Asset Protection" package from Defendant Veil Corporate.

454. Defendants' purported expert consultants also informed the attendees at the local workshops including Mr. Hampshire that attendees of the Buying Summit needed to set up a limited liability company ("LLC") prior to attending the Buying Summit so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

455.  Plaintiff Hampshire purchased such a package for the set-up of an LLC entity prior to attending the Buying Summit and had direct interaction with purported professionals employed by Defendants Veil Corporate and Guardian Law who provided legal advice to him in this regard.

456.  The day immediately after the 3-day workshop (Monday, February 25, 2013), an agent of Defendants from "Dean's Inner Circle" made a telephone call to Mr. Hampshire and harangued him for over an hour about buying an additional $25,000 training program from Dean. Mr. Hampshire tried to resist and told the caller that he had just spent $25,000.00 two days ago and was in no mood and in no position to spend another $25,000.00.

457.  The very next day a different agent of Defendants from "Dean's Inner Circle" made a telephone call to Mr. Hampshire and again harangued him for over an hour about purchasing additional real estate training packages from Defendants.

458.  Again, Mr. Hampshire succumbed and agreed to buy a program called the "PMI (Professional Marketing Institute) Real Estate Success Academy" for another $8,000.00.

459.  Each of these telephone calls to Mr. Hampshire and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

460.  Having purchased the "Asset Protection" plan of Defendant Veil Corporate and relying upon the purported expert advice of Defendant Veil Corporate and Guardian Law, Mr. Hampshire set up a limited liability company in Texas so that there would exist an entity into which properties and other purchases made at the Buying Summit could be conveyed.

461.  Despite providing professional services for a fee to Mr. Hampshire, Defendants Veil Corporate and Guardian Law both continued to represent the Defendants both before and during their simultaneous representation of Plaintiff Hampshire regarding the same transactions and occurrences throughout the perpetuation of the Buying Summit Fraudulent Scheme and failed to disclose such representation to either Mr. Hampshire or the other attendees of the workshops, the Buying Summit or to persons who purchased professional services from them in relation to the Buying Summit.

462.  As the result of providing Mr. Hampshire with expert legal advice for a fee, Veil Corporate and Guardian Law each owed a fiduciary duty to Mr. Hampshire to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents he was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to him at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

463.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Mr. Hampshire with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

464.  The aforementioned "training" and Buying Summit packages were purchased by Mr. Hampshire from a purported entity entitled "Insider's Financial Education LLC".

465.  The written contractual agreements between Mr. Hampshire and "Insider's Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

466.  None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Insider's Financial Education LLC" and Defendants have refused and neglected to so identify said entity.  Thus, is has been impossible for any of the Plaintiffs to initiate an arbitration proceeding against "Insider's Financial Education LLC" which is nothing other than an alter ego of the Defendants.

467.  Mr. Hampshire attended The Buying Summit in Las Vegas May 29-June 1, 2013 where the attendees, including Mr. Hampshire, were expressly told that the houses offered for sale there by Defendants were already rehabbed, tenanted, under the care of a property management company and that they were available at well below market value.  These same express promises and representations were also made at the prior ½ day seminar and the 3-day workshop which Mr. Hampshire attended as described *supra*.

468.  Upon arriving at the Buying Summit, Mr. Hampshire was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook".

469.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Mr. Hampshire and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

**15.  What resources to you use to complete the due-diligence?**  We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

470.  Mr. Hampshire relied to his detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

471.  Mr. Hampshire relied to his detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

472.  Mr. Hampshire relied to his detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the properties they offered for sale had been fully rehabbed and had paying tenants.

473.  Mr. Hampshire relied to his detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the purported "hard money loans" offered at the Buying Summit by Defendants Insider's Cash, LLC and American Cash Fund, LLC were for no more than 66% of the value of the property which secured such loan.

474.  Based upon the representations of the purported expert consultants prior to purchasing the Buying Summit package and based upon the express representations of Defendants' Buying Summit presenter Kory Thurston, Mr. Hampshire was induced to meet with a person at the Buying Summit represented to be an expert personal consultant working on behalf of Mr. Hampshire in the selection and purchase of properties at and through the Buying Summit.

475.   At the Buying Summit, Mr. Hampshire and the other attendees were not given the option of whether or not they wanted to speak to one of the purported expert consultants.  Instead, the consultants came into the seminar room and escorted different people at different times out to the lobby to sit down and look at some of the properties that were for sale.

476.   After making a purchase of property based upon the purported expert advice of an expert consultant, Mr. Hampshire and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC.

477.   Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate an "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney from Guardian Law regarding setting up those entities to which the Buying Summit property purchases would be conveyed

478.   Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Mr. Hampshire purchased the Veil Corporate plan for $6,095.00 which he was told was a price discount of $400.00 because it was purchased it at the Buying Summit.

479.   Agents of Veil Corporate also convinced Mr. Hampshire to purchase the "Safeguard Platinum Tax Package (Veil Corporation)" for $3,795.00.

480.   As the result of purchasing the Veil Corporate "Asset Protection Plan", Mr. Hampshire did indeed receive what was purported to be one-on one expert legal advice from Veil Corporate and Guardian Law.

481.   As the result of providing Mr. Hampshire with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Mr. Hampshire to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents he was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to his at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

482.   Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Mr. Hampshire with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

483.   At a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 17681 Lenore, Detroit, Michigan 48219, the purported bargain contract price offered by Defendants for this home was $46,600.00 as displayed on this internet monitor.

484.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Lenore property and the

express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $46,600.00.  However, with various add-ons, including a $3,362.40 "loan origination fee" and "closing costs" of $4,858.60 including a fee of $1,850.00 paid to Guardian Law, the actual sales price was $54,821 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 13, 2013 signed by Defendant Blair Poelman as Manager of Defendant FrontSide Properties, LLC with the name of manger Rob Lewis crossed out.

485.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultant, Mr. Hampshire made a down payment of $23,159.00 regarding his purchase of the Lenore St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Funding to pay a purported "loan" balance of $50,000.00 with interest-only payments of $500.00 per month for 24 months and the balance of $50,000.00 being due January 14, 2016.

486.   Mr. Hampshire relied to his detriment to the knowingly false claims of Defendants that the purported purchase money "loans" offered at the Buying Summit were for between only 50% and 66% of the value of the properties which secured the loan.  But for those false representations, neither Mr. Hampshire nor any other Plaintiff would have purchased a property through the Buying Summit Fraudulent Scheme.

487.   The purported loan from American Cash Fund to Plaintiff Lions Fans, LLC is illusory because both Defendant FrontSide Properties, LLC and Defendant American Cash Fund, LLC are

alter egos for the Buying Summit Fraudulent Enterprise and are owned and controlled by the same persons.

488.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants' counsel for said illusory purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Lenore St. home.

489.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Lenore St. home had been available for sale at the distressed sale price in May, 2013 and was conveyed directly by Metro Detroit Home Solutions LLC to Defendant FrontSide Properties LLC for a purported $31,850 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 31, 2013.  Defendant FrontSide Properties, LLC then sold the Lenore St. property to Lions Fan, LLC as described *supra*.

490.   At a sales session attended by Mr. Hampshire with a purported expert consultant the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 13591 Riverview Street, Detroit, Michigan for which Defendants' internet monitor displayed a "Suggested Retail Price of $59,000.00.   The purported bargain contract price offered by Defendants for this home was $44,800.00 as displayed on this internet monitor.

491.   Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

492.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Riverview St. property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $44,800.00.  However, with various add-ons, including a $3,257.00 "loan origination fee" and "closing costs" of $5,124.00 including a fee of $1,850.00 paid to Defendant Guardian Law, the actual sales price was $53,181.00 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian Law, dated July 8, 2013 and signed by Defendant Rob Lewis as manager of Defendant FrontSide Properties, LLC.

493.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $16,781.00 regarding his purchase of the Riverview St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Fund, LLC to pay the "loan" balance of $36,400.00 with interest-only payments of $358.31per per month for 24 months and the balance of 36,400.00 being due July 16, 2015.

494.   Unbeknownst to Plaintiff Hampshire, Defendant Rob Lewis is also the Registered Agent and Member of American Cash Fund, LLC a/b/a American Cash Funding.

495.   The purported loan from American Cash Fund to Plaintiff Lions Fans, LLC is illusory because both Defendant FrontSide Properties, LLC and Defendant American Cash Fund, LLC are alter egos for the Buying Summit Fraudulent Enterprise and are owned and controlled by the same persons.

.    496.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Riverview St. home.

497.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Riverview St. home had been available for sale at the distressed sale price in June, 2013 and had been conveyed by Metro Detroit Home Solutions LLC to Defendant FrontSide Properties LLC for a purported $31,850 by Warranty Deed prepared by Defendants' attorneys Guardian Law on May 31, 2013.  Defendant FrontSide Properties, LLC then sold the Riverview St. property to Lions Fan, LLC as described *supra*.

498.  Upon returning home from the Buying Summit, Mr. Hampshire continued to purchase homes from Defendants by using the internet.  Each such sale is an incidence of wire fraud.

499.  Defendants' internet website displayed various homes for sale including one such home located at 10031 Fielding Street, Detroit, Michigan, Michigan for which Defendants' internet website displayed a "Suggested Retail Price of $56,000.00.  The purported bargain contract price offered by Defendants for this home was $50,950.00 as displayed on this internet monitor.

500.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

501.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant $50,950.00.  However, with various add-ons, including a $3,624.80 "loan origination fee" and "closing costs" of $4,498.20 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $59,073.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian Law dated September 11, 2013 and signed on behalf of Defendant Screaming Eagle Properties, LLC by Blair Poelman, its manager.

502.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,673.00 regarding his purchase of the Fielding St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash, LLC to pay the "loan" balance of $40,400.00 with interest-only payments of $404.00 per per month for 24 months and the balance of $40,400.00 being due September 27, 2015.

503.  Unbeknownst to Plaintiff Hampshire, prior to the filing date of June 7, 2013, Blair Poelman was the member and Kristen Haskell was the Registered Agent of Insider's Cash.  After the filing date of June 7, 2013, Kristen Haskell was the Registered agent and "BuyPD" was the member of Insider's Cash, LLC.  As of the filing date of January 28, 2014, Blair Poelman became the Registered Agent of Insider's Cash, LLC.

504.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by

Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Fielding St. home.

505. The purported loan from American Cash Fund to Plaintiff Lions Fans, LLC is illusory because both Defendant FrontSide Properties, LLC and Defendant Insider's Cash, LLC are alter egos for the Buying Summit Fraudulent Enterprise and are owned and controlled by the same persons.

506. Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Fielding Street property had been available for sale at the distressed sale price of $25,000.00 in June, 2013 and was purchased on behalf of Defendants own account by Defendants' agent, Metro Detroit Home Solutions, LLC on June 19, 2013 for $25,000.00. The deed had been drafted by Defendants attorneys, Guardian Law.

507. Metro Detroit Home Solutions, LLC soon thereafter conveyed the Fielding St. property directly to Defendant Screaming Eagle Properties LLC for a purported $33,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 28, 2013. Defendant Screaming Eagle Properties, LLC then sold the Fielding St. property to Lions Fan, LLC as described *supra*.

508. Defendants' internet website also displayed a home located at 12053 Laing Street, Detroit, Michigan, Michigan for which Defendants' internet website displayed a "Suggested Retail Price of $51,500.00. The purported bargain contract price offered by Defendants for this home was $37,000.00 as displayed on this internet monitor.

509. Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud

138

pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

510.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultant regarding the Laing St. property and and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $37,000.00.   However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $4,666.00 including a fee of $1,850.00 paid to Defendant Guardian Law, the actual sales price was $44,666.00 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian Law dated September 4, 2013 and signed by Defendant Blair Poelman as Manager of  Defendant FrontSide Properties, LLC.

511.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultant, Mr. Hampshire made a down payment of $13,966.00 regarding his purchase of the Laing St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash, LLC to pay the "loan" balance of $30,700.00 with interest-only payments of $307.00 per per month for 24 months and the balance of $30,700.00 being due September 18, 2015.

512.   The purported loan from American Cash Fund to Plaintiff Lions Fans, LLC is illusory because both Defendant FrontSide Properties, LLC and Defendant Insider's Cash, LLC are alter egos for the Buying Summit Fraudulent Enterprise and are owned and controlled by the same persons.

513.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

514.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Laing Street property had been the subject of a tax forfeiture to the Wayne County Treasurer on April 8, 2013 and was conveyed to Metro Detroit Home Solutions, LLC at a distress sale price on June 6, 2013.

515.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Laing St. property directly to Defendant FrontSide Properties LLC for a purported $26,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 28, 2013.  Defendant FrontSide Properties, LLC then sold the Laing St. property to Lions Fan, LLC as described *supra*.

516.  Metro Detroit Home Solutions, LLC subsequently contracted with Lions Fan, LLC to provide property management services for various homes purchased by Lions Fan, LLC in the Detroit metropolitan area without disclosing their prior role in purchasing properties at distress sale prices for later sale to victims of the Buying Summit.

517.  Defendants' internet website also displayed a home located at 18740 Glenhurst Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,000.00.  The purported bargain contract price offered by Defendants for this home was $49,600.00 as displayed on this internet monitor.

518.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud

pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

519.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $49,600.00.  However, with various add-ons, including a $3,613.80 "loan origination fee" and "closing costs" of $5,702.20 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $58,916.00 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian Law dated September 25, 2013 and signed by Defendants "Blair Poelman or Rob Lewis its Manager(s)".

520.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,616.00 regarding his purchase of the Glenhurst St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash, LLC to pay the "loan" balance of $40,300.00 with interest-only payments of $403.00 per per month for 24 months and the balance of $40.300.00 being due October 11, 2015.

521.   The purported loan from Insider's Cash, LLC to Plaintiff Lions Fans, LLC is illusory because both Defendant FrontSide Properties, LLC and Defendant Insider's Cash, LLC are alter egos for the Buying Summit Fraudulent Enterprise and are owned and controlled by the same persons.

522.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Glenhurst St. home.

523.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Glenhurst Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $19,900.00 on May 9, 2013.

524.   Metro Detroit Home Solutions, LLC soon thereafter conveyed the Glenhurst St. property directly to Defendant FrontSide Properties LLC for a purported $31,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 24, 2013.   Defendant FrontSide Properties, LLC then sold the Glenhurst St. property to Lions Fan, LLC as described *supra*.

525.   Defendants' internet website also displayed a home located at 20519 Rosemont Avenue, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,800.00.   The purported bargain contract price offered by Defendants for this home was $53,200.00 as displayed on this internet monitor.

526.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

527.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rosemont St. property and the express promises of Defendant Kory Thurston who described the purported

142

bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $53,200.00.  However, with various add-ons, including a $3,789.70 "loan origination fee" and "closing costs" of $4,733.30 including $2,050.00 paid to Defendant Guardian Law, the actual sales price was $61,723.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed drafted by Defendant Guardian Law dated October 7, 2013 and signed by Blair Poelman, Manager of Defendant Silver Tie Homes, LLC.

528.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $19,523.00 regarding his purchase of the Rosemont St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $42,200.00 with interest-only payments of $422.00 per per month for 24 months and the balance of $42,200.00 being due October 29, 2015.

529.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Rosemont St. home.

530.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Rosemont Street property had been conveyed to Defendant Silver Tie Homes, LLC for a purported $33,700.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 6, 2013.  Defendant Silver Tie Homes, LLC then sold the Rosemont St. property to Lions Fan, LLC as described *supra*.

531.  Defendants' internet website also displayed a home located at 7666 Vaughan Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $68,000.00.   The purported bargain contract price offered by Defendants for this home was $50,400.00 as displayed on this internet monitor.

532.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

533.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the Vaughan Street property from Defendant Silver Tie Homes, LLC for $50,400.00. However, with various add-ons, including a $3,581.70 "loan origination fee" and "closing costs" of $4,369.30 including $2,050.00 paid to Defendant Guardian Law, the actual sales price was $58,351.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed drafted by Defendant Guardian Law dated October 7, 2013 and signed "By Ready Prop, by Blair Poelman its Manager(s)".

534.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,451.00 regarding his purchase of the Vaughan St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $39,900.00 with interest-only

payments of $399.00 per per month for 24 months and the balance of $39,999.00 being due November 4, 2015.

535.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Vaughan St. home.

535A.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Vaughan Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $24,750.00 on August 9, 2013 pursuant to a Warranty Deed drafted by Guardian Law.

536.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Vaughan St. property directly to Defendant Silver Tie Homes LLC for a purported $33,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.  Defendant Silver Tie Homes, LLC then sold the Vaughan St. property to Lions Fan, LLC as described *supra*.

537.  Defendants' internet website also displayed a home located at 18500 Dequindre Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $48,000.00.  The purported bargain contract price offered by Defendants for this home was $41,300.00 as displayed on this internet monitor.

538.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

539.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $41,300.00.  However, with various add-ons, including a $3,011.70 "loan origination fee" and "closing costs" of $4,903.30, including $1,850.00 fee paid to Defendant Guardian Law, the actual sales price was $49,215.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed drafted by Defendant Guardian Law dated October 29, 2013 and signed by Blair Poelman its Manager.

540.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $15,515.00 regarding his purchase of the Dequindre St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $33,700.00 with interest-only payments of $337.00 per per month for 24 months and the balance of $33.700.00 being due November 21, 2015.

541.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Dequindre St. home.

542.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Dequindre Street property had been conveyed to Sycamore Homes, LLC at a distress sale price on September 5, 2013 who soon thereafter conveyed the property directly to Defendant Silver Tie

Homes LLC for a purported $28,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 13, 2013.  Defendant Silver Tie Homes, LLC then sold the Dequindre St. property to Lions Fan, LLC as described *supra*.

543.  Defendants' internet website also displayed a home located at 6906 Longacre Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $52,000.00.   The purported bargain contract price offered by Defendants for this home was $38,900.00 as displayed on this internet monitor.

544.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

545.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $38,900.00. However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $5,507.00 including a $1,850.00 fee paid to Defendant Guardian Law, the actual sales price was $47,407.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated October 29, 2013 and signed by Defendant Blair Poelman its Manager.

546.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $14,907.00

regarding his purchase of the Longacre St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $32,500.00 with interest-only payments of $325.00 per per month for 24 months and the balance of $32,500.00 being due November 22, 2015.

547.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Longacre St. home.

548.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Longacre Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $25,000.00 on June 19, 2013 pursuant to a Warranty Deed drafted by Guardian Law.

549.   Metro Detroit Home Solutions, LLC soon thereafter conveyed the Longacre St. property directly to Defendant Screaming Eagle Properties, LLC for a purported $27,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 19, 2013.   Defendant Screaming Eagle Properties, LLC then sold the Longacre St. property to Lions Fan, LLC as described *supra*.

550.   Defendants' internet website also displayed a home located at 17511 Westmoreland Road, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $64,500.00.   The purported bargain contract price offered by Defendants for this home was $50,500.00 as displayed on this internet monitor.

551.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

552.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $50.500.00. However, with various add-ons, including a $3,624.00 "loan origination fee" and "closing costs" of $4,945.00 including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $59,069.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed drafted by Defendant Guardian Law dated October 29, 2013 by Blair Poelman its Manager.

553.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,669.00 regarding his purchase of the Westmoreland home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $40,400.00 with interest-only payments of $404.00 per per month for 24 months and the balance of $40,400.00 being due November 21, 2015.

554.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by

Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Westmoreland Road home.

555. Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Westmoreland Road property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price on July 31, 2013 who soon thereafter conveyed the property directly to Defendant Silver Tie Homes, LLC for a purported $31,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013. Defendant Screaming Eagle Properties, LLC then sold the Westmoreland Road property to Lions Fan, LLC as described *supra*.

556. Defendants' internet website also displayed a home located at 6906 Pierson Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $56,100.00. The purported bargain contract price offered by Defendants for this home was $48,000.00 as displayed on this internet monitor.

557. Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

558. Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Pierson St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $48,000.00. However, with various add-ons, including a $3,448.30 "loan origination fee" and "closing costs" of $4,815.70 including a $2,050.00 fee paid to Defendant Guardian Law, the actual

sales price was $56,264.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed drafted by Defendant Guardian Law dated November 19, 2013 and signed "Silver Tie Homes, LLC By Ready Prop by Blair Poelman, its Manager".

559.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $17,764.00 regarding his purchase of the Pierson St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $38,500.00 with interest-only payments of $385.00 per per month for 24 months and the balance of $38,500.00 being due December 11, 2015.

560.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

562.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Pierson Street property had been conveyed to GLS Props, LLC at a distress sale price on September 21, 2013 pursuant to a Warranty Deed drafted by Guardian Law who soon thereafter conveyed the property directly to Defendant Silver Tie Homes, LLC for a purported $29,200.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 21, 2013. Defendant Silver Tie Homes, LLC then sold the Pierson St. property to Lions Fan, LLC as described *supra*.

563.  Defendants' internet website also displayed a home located at 3435 Wasmund Avenue, Warren, Michigan, for which Defendants' internet website displayed a "Suggested Retail

Price" of $64,000.00.  The purported bargain contract price offered by Defendants for this home was $59,400.00 as displayed on this internet website.

564.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

565.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant Patriot Homes, LLC for $59,400.00.  However, with various add-ons, including a $4,178.70 "loan origination fee" and "closing costs" of $4,447.30 including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $68,026.00 and the property was conveyed by Defendant Patriot Homes, LLC to Lions Fan, LLC by Warranty Deed dated December 5, 2013 and signed by "Patriot Homes, LLC by Ready Prop by Blair Poelman, its Manager".

566.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,526.00 regarding his purchase of the Wasmund St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,500.00 with interest-only payments of $465.00 per per month for 24 months and the balance of $46,500.00 being due December 20, 2015.

567.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Wasmund St. home.

568.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Wasmund Street property had been conveyed to by the Federal Home Loan Mortgage Corp. (Freddie Mac) to John Graham, Inc. at a distress sale price of $35,000.00 on June 7, 2013..

569.  John Graham, Inc., soon thereafter conveyed the Wasmund St. property directly to Defendant Patriot Homes, LLC for a purported $51,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.  Defendant Patriot Homes, LLC then sold the Wasmund St. property to Lions Fan, LLC as described *supra*.

570.  Defendants' internet website also displayed a home located at 19960 Kenosha Street, Harper Woods, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,000.00.  The purported bargain contract price offered by Defendants for this home was $58,500.00 as displayed on this internet website.

571.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

572.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire

purchased the property from Defendant Patriot Homes, LLC for $58,500.00.  However, with various add-ons, including a $4,146.60 "loan origination fee" and "closing costs" of $4,914.40 including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $67,561.00 and the property was conveyed by Defendant Patriot Homes, LLC to Lions Fan, LLC by Warranty Deed drafted by Defendant Guardian Law dated December 12, 2013 and signed by "Patriot Homes, LLC By Ready Prop by Blair Poelman or Rob Lewis its manager(s)".

573.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,361.00 regarding his purchase of the Kenosha St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,200.00 with interest-only payments of $462.00 per per month for 24 months and the balance of $46,500.00 being due January 7, 2016.

574.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Kenosha St. home.

575.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Kenosha Street property had been conveyed to John Graham, Inc. at a distress sale price of $32,000.00 on June 7, 2013.

576.  John Graham, Inc., soon thereafter conveyed the Kenosha St. property directly to Defendant Patriot Homes, LLC for a purported $48,000.00 by Warranty Deed prepared by

Defendants attorneys Guardian Law on August 9, 2013.  Defendant Patriot Homes, LLC then sold the Kenosha St. property to Lions Fan, LLC as described *supra*.

577.  Defendants' internet website also displayed a home located at 15324 Semrau Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $69,000.00.   The purported bargain contract price offered by Defendants for this home was $64,250.00 as displayed on this internet website.

578.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

579.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $64,250.00. However, with various add-ons, including a $4,495.70 "loan origination fee" and "closing costs" of $4,413.30 including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $73,159.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated January 8, 2014 by Rob Poelman its Manager.

580.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,159.00 regarding his purchase of the Semrau St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $50,000.00 with interest-only

payments of $500.00 per per month for 24 months and the balance of $50,000.00 being due January 14, 2016.

581.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Semrau St. home.

582.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Semrau Street property had been conveyed to John Graham, Inc. at a distress sale price of $27,000.00 on June 5, 2013..

583.   John Graham, Inc., soon thereafter conveyed the Semrau St. property directly to Defendant Screaming Eagle Properties, LLC for a purported $53,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.  Defendant Screaming Eagle Properties, LLC then sold the Semrau St. property to Lions Fan, LLC as described *supra*.

584.  Defendants' internet website also displayed a home located at 11036 Packard Avenue, Warren, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home was $61,150.00 as displayed on this internet website.

585.  Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

586.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Semrau St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $61,150.00.  However, with various add-ons, including a $4,269.30 "loan origination fee" and "closing costs" of $4,073.70 including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $69,493.00 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 3, 2014 and signed by Blair Poelman, its Manager.

587.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,993.00 regarding his purchase of the Packard Avenue home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $47,500.00 with interest-only payments of $475.00 per per month for 24 months and the balance of $47,500.00 being due June 23, 2017. .

588.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Packard Avenue home.

589.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Packard Avenue property had been conveyed to by the Secretary of Veterans Affairs to Benjamin Soloman at a distress sale price of $7,000.00 on July 19, 2013.

590.   On August 19, 2013, Benjamin Soloman conveyed the property to A Plus Technologies for $100.00.

591.   On January 10, 2014, the property was conveyed to John Graham, Inc. for a purported $26,000.00.

592.   John Graham, Inc., soon thereafter conveyed the Packard Avenue St. property directly to Defendant EZ Street Properties, LLC for a purported 49,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on February 12 2014.   Defendant EZ Street Properties, LLC then sold the Packard Avenue St. property to Lions Fan, LLC as described *supra*.

593.   Defendants' internet website also displayed a home located at 22126 Hayes Avenue, Eastpointe, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $63,350.00.

594.   Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

595.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $63,350.00.  However, with various add-ons, including a $4,468.70 "loan origination fee" and "closing costs" of $4,901.30 including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $72,720 and

the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 4, 2014 by Blair Poelman, its Manager.

596.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,020.00 regarding his purchase of the Hayes St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $49,700.00 with interest-only payments of $597.00 per per month for 24 months and the balance of $50,000.00 being due June 23, 2017.

596.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Hayes St. home.

597.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Hayes Street property had been conveyed to John Graham, Inc. at a distress sale price of $30,000.00 on December 27, 2013.

598.  John Graham, Inc., soon thereafter conveyed the Hayes St. property directly to Defendant EZ Street Properties, LLC for a purported $52,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on February 12, 2014.  Defendant EZ Street Properties, LLC then sold the Hayes St. property to Lions Fan, LLC as described *supra*.

599.  Defendants' internet website also displayed a home located at 2152 Otis Avenue, Warren, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $61,650.00.

600.  Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

601.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $61,650.00.  However, with various add-ons, including a $4,326.80 "loan origination fee" and "closing costs" of $4,413.20, including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $70,390 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 25, 2014 signed by Blair Poelman, its Manager.

602.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $22,290.00 regarding his purchase of the Otis Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $48,100.00 with interest-only payments of $481.00 per per month for 36 months and the balance of $48,100.00 being due June 15, 2017.

603.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Otis Ave. home.

604.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Otis Ave. property had been conveyed to John Graham, Inc. at a distress sale price of $28,000.00 on March 20, 2014.

605.   John Graham, Inc., soon thereafter conveyed the Otis Ave. property directly to Defendant EZ Street Properties, LLC for a purported $48,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on March 31, 2014.   Defendant EZ Street Properties, LLC then sold the Otis Ave. property to Lions Fan, LLC as described *supra*.

606.   Defendants' internet website also displayed a home located at 22809 Rein Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $63,950.00.

607.   Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

608.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $63,950.00.  However, with various add-ons, including a $4,509.10 "loan origination fee" and "closing costs" of $4,969.90, including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $73,429 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by

Warranty Deed drafted by Defendant Guardian Law dated August 1, 2014 by Rob Lewis its Manager.

609.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,229.00 regarding his purchase of the Rein Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $50,200.00 with interest-only payments of $502.00 per per month for 24 months and the balance of $50,200.00 being due July 21, 2017.

610.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Rein Ave. home.

611.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Rein Ave. property had been conveyed on January 24, 2014 at the distress sale price of $29,000.00 by the Veterans Administration to G-USA, LLC.

612.   On May 30, 2014 G-USA, LLC conveyed the property to GWH Properties, LLC by quit claim deed drafted by Guardian Law for a recited consideration of $10.00.

613.   GWH Properties, LLC soon thereafter conveyed the Rein Ave. property directly to Defendant EZ Street Properties, LLC for a purported $51,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 30, 2014.  Defendant EZ Street Properties, LLC then sold the Rein Ave. property to Lions Fan, LLC as described *supra*.

614.  Defendants' internet website also displayed a home located at 23106 Lambrecht Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $67,450.00.

615.  Defendants' internet website display of the fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

616.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the express promises of Defendants Kory Thurston who described the purported bargains to be purchased at and through the Buying Summit, Mr. Hampshire purchased the property from Defendant Malibu Breeze Properties, LLC for $67,450.00.  However, with various add-ons, including a $4,704.50 "loan origination fee" and "closing costs" of $4,381.50 including a $2,050.00 fee paid to Defendant Guardian Law, the actual sales price was $76,536.00 and the property was conveyed by Defendant Malibu Breeze Properties, LLC to Lions Fan, LLC by Warranty Deed drafted by Defendant Guardian Law dated June 4, 2014 by Blair Poelman its Manager.

617.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $24,236.00 regarding his purchase of the Lambrecht Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $52,300.00 with interest-only payments of $523.00 per per month for 24 months and the balance of $52,300.00 being due June 23, 2017.

618.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Lambrecht Ave. home.

619.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Lambrecht Ave. property had been conveyed on December 12, 2013 at the distress sale price of $33,000.00 to John Graham, Inc.

620.   John Graham, Inc. soon thereafter conveyed the Lambrecht Ave. property directly to Defendant Malibu Breeze Properties, LLC for a purported $55,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on January 22, 2014.  Defendant Malibu Breeze Properties, LLC then sold the Lambrecht Ave. property to Lions Fan, LLC as described *supra*.

621.   During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 6912 E 114th Street, Kansas City, Missouri 64134, the purported bargain contract price offered by Defendants for this home was $56,000.00 as displayed on this internet monitor.

622.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the 114th Street property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant Green Apple Homes, LLC for $56,000.00.  However, with various add-ons, including a $3,912.00 "loan origination fee" and "closing costs" of $3,837.00 including a fee of $2,050.00 paid to Defendant

Guardian Law, the actual sales price was $63,749.00 and the property was conveyed by Defendant Green Apple Homes, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian Law dated September 8, 2014 and signed by Defendant Rob Lewis as Manager of Defendant Green Apple Homes, LLC.

623.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $20,149.00 on August 8, 2014 regarding his purchase of the 114th Street property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insider's Cash, LLC to pay a purported "loan" balance of $43,600.00 with interest-only payments of $436.00 per month for 36 months and the balance of $43,600 being due August 16, 2017.

624.  During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 909 Maurice Avenue, Ferguson, Missouri 63135, the purported bargain contract price offered by Defendants for this home was $48,100.00 as displayed on this internet monitor.

625.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Maurice Street property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant Green Apple Homes, LLC for $48,100.00.  However, with various add-ons, including a $3,434.60 "loan origination fee" and "closing costs" of $4,458.40 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $55,993 and the property was conveyed by Defendant

Green Apple Homes, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian Law dated September 8, 2014 and signed by Defendant Rob Lewis as Manager of Defendant Green Apple Homes, LLC..

626.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $17,693.00 on August 1, 2014 regarding his purchase of the Maurice Street property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insider's Cash, LLC to pay a purported "loan" balance of $38,300.00 with interest-only payments of $383.00 per month for 36 months and the balance of $38,300  being due August 16, 2017.

627.  During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 4186 N Toronto Street, Milwaukee, Wisconsin 53216 from Screaming Eagle Properties, LLC, the purported bargain contract price offered by Defendants for this home was $53,500.00 as displayed on this internet monitor.

628.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the 40th Street property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $53,500.00.  However, with various add-ons, including a $3,811.40 "loan origination fee" and "closing costs" of $4,822.60 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $62,134.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed

prepared by Defendant Guardian Law dated July 26, 2013 and signed by Defendant Blair Poelman as Manager of Defendant Screaming Eagle Properties, LLC.

629.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $19,634  on June 27, 2013 regarding his purchase of the Toronto Street property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Funding to pay a purported "loan" balance of $42,500.00 with interest-only payments of $425.00 per month for 24 months and the balance of $42,500.00 being due August 14, 2015.

630.  During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 3803 Wayne Avenue, Kansas City, Missouri 64109, the purported bargain contract price offered by Defendants for this home was $51,700.00 as displayed on this internet monitor.

631.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Wayne Street property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $51,700.00.  However, with various add-ons, including a $3,611.70 "loan origination fee" and "closing costs" of $3,593.30 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $58,905.00 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian

Law dated August 6, 2014 and signed by Defendant Blair Poelman as Manager of Defendant EZ Street Pro2erties, LLC.

632.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $18,605.00 on June 30, 2014 regarding his purchase of the Wayne Street property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insider's Cash, LLC to pay a purported "loan" balance of $40,300.00 with interest-only payments of $403.00 per month for 36 months and the balance of $40,300.00 being due July 15, 2017.

633.   During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 2352 Gardner Drive, Saint Louis, Missouri 63136, the purported bargain contract price offered by Defendants for this home was $56,000.00 as displayed on this internet monitor.

634.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Gardner Drive property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant 5 Choices, LLC for $56,000.00.   However, with various add-ons, including a 3,959.50 "loan origination fee" and "closing costs" of $4,537.50 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $64,497.00 and the property was conveyed by Defendant 5 Choices, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian Law dated

January 5, 2015 and signed by by Steve Liechty or Rob Lewis as Manager of Defendant 5 Choices, LLC.

635.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $20,397.00 on November 25, 2014 regarding his purchase of the Gardner Drive property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insider's Cash, LLC to pay a purported "loan" balance of $44,100.00 with interest-only payments of $441.00 per month for 36 months and the balance of $44,100.00 being due December 30, 2017.

636.  During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 5877 Buck Street, Taylor, Michigan 48180, the purported bargain contract price offered by Defendants for this home was $59,950.00 as displayed on this internet monitor.

637.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Buck Street property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $59,950.00.  However, with various add-ons, including a $4,216.10 "loan origination fee" and "closing costs" of $4,453.90 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $68,620.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian

Law dated December 5, 2013 and signed by Defendant Blair Poelman as Manager of Defendant Silver Tie Homes, LLC

638.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $21,720 on October 22, 2013 regarding his purchase of the Buck Street property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insider's Cash, LLC to pay a purported "loan" balance of $46,900.00 with interest-only payments of $469.00 per month for 24 months and the balance of $46,900.00 being due December 20, 2015.

639.  During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 153 Bascom Drive, Ferguson, Missouri 63135, the purported bargain contract price offered by Defendants for this home was $62,400.00 as displayed on this internet monitor.

640.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Bascom Street property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant Green Apple Homes, LLC for $62,400.00.  However, with various add-ons, including a 4,359.70 "loan origination fee" and "closing costs" of $4,198.30 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $70,958.00 and the property was conveyed by Defendant Green Apple Homes, LLC to Lions Fan, LLC by Warranty Deed prepared by Defendant Guardian

Law dated October 13, 2014 and signed by Defendant Blair Poelman as Manager of Defendant Green Apple Homes, LLC.

641.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $22,458.00 on August 1, 2014 regarding his purchase of the Bascom Street property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insider's Cash, LLC to pay a purported "loan" balance of $48,500.00 with interest-only payments of $485.00 per month for 36 months and the balance of $48,500 .00 being due August 28, 2017.

642.  During a sales session attended by Mr. Hampshire with a purported expert consultant at the Buying Summit, an internet monitor of Defendants displayed various homes for sale.  For one such home located at 2037 N 40th Street, Milwaukee, Wisconsin 53208 the purported bargain contract price offered by Defendants for this home was $55,500 as displayed on this internet monitor.

643.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the 40th Street property and the express promises of Defendant Kory Thurston who described the purported bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $55,500.00.  However, with various add-ons, including a $3,978.70 "loan origination fee" and "closing costs" of $5,317.30 including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was $64,796.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed

prepared by Defendant Guardian Law dated July 30, 2013 and signed by Defendant Blair Poelman as Manager of Defendant Screaming Eagle Properties, LLC.

644.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultants, Mr. Hampshire made a down payment of $20,496.00 on June 27, 2017 regarding his purchase of the 40th Street property and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Funding to pay a purported "loan" balance of $44,300.00 with interest-only payments of $443.00 per month for 24 months and the balance of $44,300.00 being due August 14, 2015.

645.   Mr. Hampshire was unaware that the sales agreements he signed contained language describing the purchased properties as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

646.   Mr. Hampshire was thus unaware that the sales agreements contained a Utah forum selection clause and/or a Utah choice of law clause.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

647.   Mr. Hampshire was unaware that the training and Buying Summit agreements he signed provided for binding arbitration of disputes.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

648.   Mr. Hampshire was unaware that the Commercial Loan Agreements he signed provided for binding arbitration within the State of Utah of disputes regarding said agreements or

litigation of disputes in the courts of the State of Utah.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

649.  There was and is no relationship whatsoever between Mr. Hampshire, Lions Fan, LLC, and/or his attendance at the Buying Summit in Nevada with the State of Utah nor did any aspect of his agreements to purchase the aforementioned properties in Michigan and other states have any relationship whatsoever with the State of Utah except that all of the Defendant entities are registered in the State of Utah.

650.  As the result of the facts alleged *supra,* thise existed a fiduciary relationship between Defendants and Plaintiffs Mike Hampshire and Lions Fan LLC such that Defendants owed them a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth hisein.

651.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Mike Hampshire and Lions Fan LLC to locate the properties they purchased at the promised discounted prices, inform them of both their existence and availability and to facilitate their purchase by them at such a discounted prices.

652.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Hampshire and his company at a prices greatly in excess of their fair market value or true cash value.

653.  Plaintiffs Mike Hampshire and Lions Fan LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them

to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

654.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to

655.  Each Defendant had a distinct role in perpetuating the Defendants' fraudulent scheme and knowingly conspired together to further and facilitate the scheme and they are each jointly and severally liable to Plaintiffs Hampshire and Lions Fan, LLF for their damages as RICO "persons".

### COUNT V –THE CLAIMS OF LINDA SAENZ AND ABBY CREEK INVESTMENT LLC

The allegations of paragraphs 1 - 655 are incorporated by reference as if fully set forth herein.

656.  In March, 2013 while living in Houston, Texas, Plaintiff Linda Saenz viewed an infomercial playing on television featuring Dean Graziosi which promoted a free seminar concerning real estate investing promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

657.  The aforementioned television advertisement was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

658.  In response to the aforementioned March 2013 television infomercial, Ms. Saenz called the advertised telephone number and spoke with an agent of the Defendants during which her attendance at such a free seminar was scheduled for April 28, 2013 at a nearby hotel.

659.  At the free seminar held on April 28, 2013, Ms. Saenz was induced by agents of Defendants to purchase the "Insider's Financial 3-Day Real Estate Workshop Package" for $1,997.00 and the "Insider's Financial Tax Lien Program" for $997.00 based upon express promises and inducements that by taking these courses, she would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

660.  The "Insider's Financial 3-Day Real Estate Workshop" was held May 3-5, 2013 at the Techniplex Conference Center, Stafford, Texas.  At this "workshop", the attendees, including Ms. Saenz, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

661.  Ms. Saenz did as instructed and called her credit card company and obtained an increase in her credit limit.

662.  At the aforementioned "Insider's Financial 3-Day Real Estate Workshop", Ms. Saenz was induced by the fraudulent statements of Defendants agents on May 5, 2013 to purchase "Dean's Advanced Training – silver package – Boots on the Ground" for $11,997.00 but which did not include attending the Buying Summit.  The purported purpose of this course as repeatedly expressed by Defendants' agent was so that Ms. Saenz could obtain expert training and guidance from purported expert consultants in order to obtain the skills and knowledge necessary to locate and invest in deeply discounted and below market rental real estate investment properties.

663.  While at home on June 4, 2013, Ms. Saenz received a telephone call from an agent of Defendants identified as a member of "Dean's Inner Circle" who forcefully and relentlessly

inquired about Ms. Saenz' financial status.  During this "hard sell" telephone call, Ms. Saenz was promised, *inter alia*, the opportunity to purchase rental housing properties at steeply discounted prices if she would purchase the Buying Summit package and attend the Buying Summit.

664.  When Defendants' agent discovered during the aforementioned telephone call how much credit was available on Ms. Saenz' credit cards, she was induced on June 4, 2013 by the various promises and inducements of purported expert consultants to purchase "Dean's Advanced Training Inner Circle" package (which included attendance at the Buying Summit) for an additional $15,075.00 specifically relying upon the following representations:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b)  Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the purported expert consultants at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

665.  Each of these telephone calls made Defendants' agents to Ms. Saenz and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

666.  The aforementioned expert "training" and Buying Summit packages were purchased by Ms. Saenz from a purported entity entitled "Insider's Financial Education, LLC".

667.  The written contractual agreements between Ms. Saenz and "Insider's Financial Education, LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

668.  None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Insider's Financial Education LLC" and Defendants have refused and neglected to so identify said entity.  Thus, is has been impossible for any of the Plaintiffs to initiate an arbitration proceeding against "Insider's Financial Education LLC" which is nothing other than an alter ego of the Defendants.

669.  Because the fiduciary relationship created by Defendants with Plaintiff Saenz, Defendants had a duty to make a full disclosure to her of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

670.  Ms. Saenz attended a Buying Summit in Las Vegas, Nevada from July 11, 2013 to July 13, 2013.

671.  Upon arriving at the Buying Summit, Ms. Saenz was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook".

672.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Ms. Saenz and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale

and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**  We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

673.    Ms. Saenz relied to her detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

674.  At the Buying Summit the attendees, including Plaintiff Saenz, were expressly told that the properties offered for sale there by Defendants were already rehabbed, tenanted, under the care of a property management company and that they were available to purchase at well below market value.

675.  Plaintiff Saenz relied to her detriment upon the Defendants' and especially Defendant Kory Thurs5ton's repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

676.  Plaintiff Saenz relied to her detriment upon the Defendants' and especially Defendant Kory Thurston's repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

677.  Plaintiff Saenz relied to her detriment upon the Defendants' and especially Defendant Kory Thurston's repeated material misrepresentations that the properties they offered for sale had been fully rehabbed and had paying tenants.

678.   Plaintiff Saenz relied to her detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the purported "hard money loans" offered at the Buying Summit by Defendants Insider's Cash, LLC and American Cash Fund, LLC were for no more than 66% of the value of the property which secured such loan.

679.   Based upon the representations of the purported expert consultants prior to purchasing the Buying Summit package and based upon the express representations of Defendants Kory Thurston, Plaintiff Saenz was induced to meet with a person at the Buying Summit represented to be an expert personal consultant working on behalf of Plaintiff Saenz in the selection and purchase of properties at and through the Buying Summit.

680.   After agreeing to the purchases of property at the Buying Summit based upon the purported expert advice of an expert consultant, Plaintiff Saenz and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC.

681.   Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate a more elaborate "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney from Guardian Law regarding setting up those entities to which the Buying Summit property purchases would be conveyed.  A more detailed description of the representations of Defendant Lethbridge are found *supra*.

682.   Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Plaintiff Saenz purchased the Veil Corporate plan for $6,495.00.

683.  As the result of purchasing the Veil Corporate "Asset Protection Plan", Plaintiff Saenz did indeed receive what was purported to be one-on one expert legal advice from Defendants Veil Corporate and Guardian Law.

684.  Based upon this purported expert advice from Defendant Guardian Law, another limited liability company was set up by Defendant Veil for Plaintiff Saenz in the State of Alaska based upon the purported professional advice of Guardian Law that this would allow her to "hide" assets in such an entity.  This entity has never been used by Plaintiff Saenz.

685.  As the result of providing Plaintiff Saenz with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Plaintiff Saenz to disclose their dual representation and to make a full disclosure to her of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

686.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiff Saenz with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

687.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Saenz was induced to attend a sales session with a purported expert consultant at the Buying Summit.

688.  During a sales session attended by Ms. Saenz with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home

located at 21920 Elroy Ave., Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $75,000.00.   The purported bargain contract price offered by Defendants for this home was $60,350.00 as displayed on this internet monitor.

689.   Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

690.   Defendant's agents attempted to induce Ms. Saenz to create a Utah based limited liability company ("LLC") to which the homes she purchased at the Buying Summit were to be conveyed.   However, Ms. Saenz instead created a Texas-based LLC entitled "Abby Creek Investment, LLC" for such purpose.

691.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Elroy Ave. property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Ms. Saenz purchased the property from Defendant Screaming Eagle Properties, LLC for $59,350.00.   However, with various add-ons, including a $4,203.00 "loan origination fee" and "closing costs" which included a fee of $2,050.00 paid to Defendants Guardian Law, the actual sales price was in excess of $68,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Abby Creek Investment, LLC by Warranty Deed drafted by Defendant Guardian Law dated October 29, 2013 and signed by Rob Lewis, Manager.

692.  The aforementioned Buying Summit Workbook announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Fund, LLC and Insiders Cash, LLC in amounts described as 50% to 66% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Saenz, the false impression that the homes she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

693.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Saenz made a down payment of $21,459.93 regarding her purchase of the Elroy Ave. home and a signed a loan agreement on behalf of Abby Creek Investment, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,800.00 with interest-only payments of $480.00 per month for 24 months and the balance of $46,800.00 being due November 14, 2015.

694.  As described *supra*, Defendants Insider's Cash, LLC and Screaming Eagle Properties, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

695.  Unbeknownst to her and due only to Defendants' successful attempts to engender the unqualified trust of Ms Saenz, Ms. Saenz also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Abby Creek Investment, LLC for the purchase of the Elroy St. home.

696.   Unbeknownst to Ms. Saenz but known to Defendants at the time of purchase, the Elroy Ave. home had been available for sale at the distressed sale price of $26,000.00 in June 2013 and was purchased on behalf of Defendants own account by Defendants' agent, John Graham Inc. on June 6, 2013 for $26,000.00.

697.   John Graham Inc. soon thereafter conveyed the Elroy Ave. property directly to Defendant Screaming Eagle Properties LLC for $47,500.00 by Warranty Deed prepared by Defendant Guardian Law on July 3, 2013.  Defendant Screaming Eagle Properties, LLC then sold the Elroy Ave. property to Abby Creek Investment, LLC on November 7, 2013 for the aforementioned effective price of in excess of $68,000.00.

698.   Defendants had a contractual and fiduciary duty owing to Ms. Saenz to locate the Elroy Ave. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Saenz and/or her company at such a discounted price.

699.   Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Elroy Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Ms. Saenz and her company at a price greatly in excess of its fair market value or true cash value

700.   In further breach of their contractual and fiduciary duties, Defendants induced Ms. Saenz to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Ms. Saenz had been informed by Defendants at the Buying Summit.

701.  The City of Warren, Michigan assessed the Elroy Ave. property as having a True Cash Value of $ 37,820.00 for the year 2013 and a True Cash Value of $35,000.00 for the year 2014.

702.  In 2015, Ms. Saenz ordered a professional appraisal of the Elroy Ave. property and the property was appraised at $44,000.00.

703.  In 2015, Ms. Saenz attempted to find a local lender to refinance the $46,800.00 "bridge loan" with Insiders Cash but was unable to do so because the property was worth less than what she owed on the loan.

704.  Ms. Saenz is and has been unable to sell the Elroy Ave. property because the property is not worth what she owes on said bridge loan.

705.  Also at the aforementioned sales session at the Buying Summit, Defendants' internet monitor displayed a home located at 3901 49th Way, Birmingham, AL.  For this home, Defendants' internet monitor displayed a "Suggested Retail Price" of $45,000.00.  The purported bargain contract price offered by Defendants for this home was $36,800.00 as displayed on this internet monitor.

706.  Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

707.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Birmingham, AL property and the express promises of Defendant Kory Thurston who described the purported the

bargains to be purchased at the Buying Summit, Ms. Saenz purchased the property from Defendant Screaming Eagle Properties, LLC for $35,800.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" including a fee of  $1,850.00 paid to Defendant Guardian Law, the actual sales price was in excess of $42,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Abby Creek Investment, LLC by Warranty Deed dated September 6, 2013 signed by Blair Poelman, Manager.

708.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Saenz made a down payment of $19,494.00 regarding her purchase of the Birmingham, AL. home and a signed a loan agreement on behalf of Abby Creek Investment, LLC with Defendant Insiders Cash to pay the "loan" balance of $23,000.00 with interest-only payments of $230.00 per month for 24 months and the balance of $23,000.00 being due October 8, 2015.

709.  Unbeknownst to her and due only to Defendants' successful attempts to engender the unqualified trust of Ms Saenz, Ms. Saenz also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Abby Creek Investment, LLC.

710.  Unbeknownst to Ms. Saenz but known to Defendants at the time of purchase, the Birmingham, AL home had been available for sale at the distressed sale price of $24,000.00 in June 2013 and was purchased by Defendant Screaming Eagle Properties, LLC on June 27, 2013 for $24,000.00 pursuant to a Warranty Deed drafted by Defendants' counsel, Jeff R. Palmer. Defendant Screaming Eagle Properties, LLC thereafter sold the property to Abby Creek Investment, LLC on September 6, 2013 for the aforementioned effective price of in excess of $42,000.00.

711.  Defendants had a contractual and fiduciary duty owing to Ms. Saenz to locate the Birmingham, AL property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Saenz and/or her company at such a discounted price.

712.  Instead, Defendants breached its duties as described in *supra*, and absconded with the opportunity to purchase the Birmingham, AL property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Ms. Saenz and her company at a price greatly in excess of its fair market value or true cash value

713.  In 2015, Ms. Saenz ordered a professional appraisal of the Birmingham, AL property and the property was appraised at $28,000.00.

714.  The aforementioned professional appraisal of the Birmingham, AL property states that "ROTTEN WOOD WAS OBSERVED IN NUMEROUS PLACES ON THE EXTERIOR OF THE DWELLING".

715.  Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Ms. Saenz by Defendants and their agents to engender her unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts Ms. Saenz executed to purchase the Elroy St. and Birmingham, AL properties contained language identical and/or similar to that described in *supra*.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

716.  Ms. Saenz was unaware that the sales agreements she signed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the

prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale. The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud and which Defendants had a duty to disclose.

717. Ms. Saenz was thus unaware that the sales agreements contained a Utah forum selection clause and/or a Utah choice of law clause. The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud and which Defendants had a duty to disclose.

718. Ms. Saenz was unaware that the training and Buying Summit agreements she signed provided for binding arbitration of disputes. The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud and which Defendants had a duty to disclose.

719. Ms. Saenz was unaware that the Commercial Loan Agreements she signed provided for binding arbitration within the State of Utah of disputes regarding said agreements. The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud and which Defendants had a duty to disclose.

720. As the direct and proximate result of Ms. Saenz investing in Defendants' fraudulent scheme, her life savings have been completely wiped out.

721. As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs Saenz/Abby Creek Investment LLC such that Defendants owed them a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

722.   Defendants had a contractual and fiduciary duty owing to Plaintiffs Saenz/Abby Creek Investment LLC to locate the properties they purchased at the promised discounted prices, inform them of both their existence and availability and to facilitate their purchase by them at such a discounted prices.

723.   Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Ms. Saenz and her company at a prices greatly in excess of their fair market value or true cash value.

724.   Plaintiffs Linda Saenz and Abby Creek Investment LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated by each Defendant herein through conducting and participating in the affairs of the Buying Summit Fraudulent Enterprise.

725.   Each Defendant had a distinct role in conducting and participating in the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Saenz and Abby Creek Investment, LLC for their damages.

## **COUNT VI – THE CLAIMS OF PLAINTIFF JAMES DUNN**

The allegations of paragraphs 1 - 725 are incorporated by reference as if fully set forth herein.

726.  Plaintiff James Dunn received a flyer in the United States Mail in the State of Georgia in May, 2013 from Defendants which advertised a free seminar on how to purchase real estate at deeply discounted prices.  Mr. Dunn and his wife attended this seminar in May 2013.

727.  At this free seminar, was induced by the statements and promises of Defendants to purchase a three day training course for $1997.00 where the attendees would allegedly be taught how to purchase real estate at deeply discounted prices.

728.  Mr. Dunn then attended the seminar which consisted of 3 days of training for 8 hours each day where Defendants' agents explained to the attendees their method of how to buy houses far below market value, as well as other real estate investments.

729.  At the end of the seminar described *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices.  However, attendees were told that if they wanted to get further training, it would be necessary to sign up for an addition training package which were designated "Diamond, Platinum and Gold".

730.  Mr. Dunn chose to purchase the Diamond package which included more "training" and attendance at the Buying Summit.  On June 2, 2013, Mr. Dunn charged $22,000 on his credit card and took $12,997.00 from his 401k account towards the full fee of $39,502.00 and subsequently paid the balance due.  The written agreement for this package also suggests that the entity providing the training services was "Insider's Financial Education, LLC".

731.  Mr. Dunn agreed to attend the Buying Summit because Defendants' agents expressly stated to Mr. Dunn that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of

purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars.  As such, Defendants' agents expressly stated to Mr. Dunn that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and were presently income-producing with tenants that had at least 1 year left on their lease.  Further, Mr. Dunn was told that a person could only purchase these properties by attending the Buying Summit.

732.   Simultaneously with his execution of the Buying Summit contract, Plaintiff Dunn checked the box to purchase an "asset protection" package Defendant Veil Corporate which is described *infra*.

733.   There is no arbitration or forum selection clause associated with the agreement of Plaintiff Dunn to purchase this "Asset Protection" package from Defendant Veil Corporate.

734.   Defendants' purported expert consultants also informed the attendees at the local workshops including Plaintiff Dunn that attendees of the Buying Summit needed to set up a limited liability company ("LLC") prior to attending the Buying Summit so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

735.   Plaintiff Dunn purchased such a package for the set-up of an LLC entity prior to attending the Buying Summit and had direct interaction with purported professionals employed by Defendants Veil Corporate and Guardian Law who provided legal advice to him in this regard.

736.   Having purchased the "Asset Protection" plan of Defendant Veil Corporate and relying upon the purported expert advice of Defendant Veil Corporate and Guardian Law, Plaintiff Dunn set up a limited liability company in Utah so that there would exist an entity into which properties and other purchases made at the Buying Summit could be conveyed.  This would prove

completely unnecessary because Plaintiff Dunn conveyed all purchases she made at and through the Buying Summit to his self-directed IRA.

737.   Despite providing professional services for a fee to Plaintiff Dunn, Defendants Veil Corporate and Guardian Law both continued to represent the Defendants both before and during their simultaneous representation of Plaintiff Dunn regarding the same transactions and occurrences throughout the perpetuation of the Buying Summit Fraudulent Scheme and failed to disclose such representation to either Plaintiff Dunn or the other attendees of the workshops, the Buying Summit or to persons who purchased professional services from them in relation to the Buying Summit.

738.   As the result of providing Plaintiff Dunn with expert legal advice for a fee, Veil Corporate and Guardian Law each owed a fiduciary duty to Plaintiff Dunn to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to him at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

739.   Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiff Dunn with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

740.    Mr. Dunn relied to his detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

741.    Mr. Dunn relied to his detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

742.    At the Buying Summit, Mr. Dunn and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

743.    As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Dunn was induced by Defendants to convey any properties he purchased at the Buying Summit to a Self-Directed IRA.

744.    As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Dunn was induced to attend a sales session with an agent of Defendants at the Buying Summit.

745.    During a sales session attended by Mr. Dunn with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 8030 Studebaker, Warren, Michigan, Defendants' internet monitor displayed a purported bargain contract price offered by Defendants for this home of $50,500.00.

746.    Defendants knew at the time of the events described in *supra*, that the Studebaker St. home was not worth $50,500.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit.

747.  Defendants' internet screen display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme..

748.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Studebaker property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Mr. Dunn purchased the property from Defendant Red List Homes, LLC for $50,500.00.   However, with various add-ons, including a $3,572.00 "loan origination fee" and "closing costs" including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was in excess of $58,000.00 and the property was conveyed by Defendant Red List Homes, LLC to Mr. Dunn's self directed IRA by Warranty Deed drafted by  Guardian Law dated October 25, 2013 and signed by Rob Lewis, Manager.

749.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Dunn made a down payment of $18,406.00 regarding his purchase of the Studebaker St. home and a Non-Recourse loan agreement between Mr. Dunn and Defendant Insiders Cash was executed by Mr. Dunn's IRA service provider to pay the "loan" balance of $39,900.00 with interest-only payments of $399.00 per month for 24 months and the balance of $39,900.00 being due November 14, 2015.

750.  As described *supra*, Defendants Insider's Cash, LLC and Red List Homes, LLC are owned and controlled by the same persons thereby making the alleged purchase money "loan" illusory.

751.  Unbeknownst to Mr. Dunn but known to Defendants at the time of purchase, the Studebaker St. home had been available for sale at the distressed sale price shortly before he purchased it.  On November 2, 2012, Melissa Allor and Kenneth Honkanen sold the property to Fast Cash for Homes LLC for $5,000.00.  On October 24, 2013, Fast Cash for Homes LLC sold the property to Buy Right Properties LLC for $7,506.00 (note that the chain of title is not in chronological order - - also note that this is one day prior to the sale of the property to Mr. Dunn for $58,000.00).  On January 4, 2013, Buy Right Properties LLC sold the property to defendant Red List Homes, LLC for $36,076.00, a conveyance made by a Warranty Deed drafted by Guardian Law.

752.  Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the Studebaker St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Dunn at such a discounted price.

753.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Studebaker property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Dunn at a price greatly in excess of its fair market value or true cash value

754.  In further breach of their contractual and fiduciary duties, Defendants induced Mr. Dunn to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Mr. Dunn had been informed by Defendants at the Buying Summit.

755.  At the aforementioned sales session attended by Mr. Dunn with a purported expert consultant at the Buying Summit, an internet monitor displayed a home for sale located at 2001 Woodlawn, Middletown, Ohio, Defendants' internet monitor displayed a purported bargain contract price offered by Defendants for this home of $62,135.00.

756.  Defendants knew at the time of the events described in *supra*, that the Woodlawn St. home was not worth $62,135.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit so that it could be resold to unaware victim at a Buying Summit for a price far in excess of its Fair Market Value or True Cash Value.

757.  Defendants' internet screen display of the fraudulent purported bargain sales price as described, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B)  as it facilitated Defendants' Buying Summit Fraudulent Scheme..

758.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Woodlawn property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Mr. Dunn purchased the property from Defendant Patriot Homes, LLC for $62,135.00.  However, with various add-ons, including a $4,379.50 "loan origination fee" and "closing costs" including a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was in excess of $70,000.00 and the property was conveyed by Defendant Patriot Homes, LLC to Mr. Dunn's self directed IRA by Warranty Deed drafted by Guardian Law dated October 25, 2013 by Blair Poelman or Rob Lewis, Authorized Agent.

759.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Dunn made a down payment of $22,575.00 regarding his purchase of the Woodlawn St. home and a Non-Recourse loan agreement between Mr. Dunn and Defendant Insiders Cash was executed by Mr. Dunn's IRA service provider to pay the "loan" balance of $38,612.16 with interest-only payments of $386.00 per month for 24 months and the balance of $38,612.16 being due October 7, 2015.

760.  As described *supra*, Defendants Insider's Cash, LLC and Patriot Homes, LLC are owned and controlled by the same persons thereby making the alleged purchase money "loan" illusory.

761.  Unbeknownst to Mr. Dunn but known to Defendants at the time of purchase, the Woodlawn St. home had been purchased by Patriot Homes, LLC on August 29, 2013 for $38,000.00 but was resold to Mr. Dunn in October, 2013 for in excess of $70,000.00.   The "Statement of Value" was executed by Roger Reynolds, CPA, Butler County, Ohio auditor and listed the "Total Value" of the Woodlawn St. property as $20,660.00.

762.  Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the Woodlawn St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Dunn at such a discounted price.

763.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Woodlawn St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Dunn at a price greatly in excess of its fair market value or true cash value.

764.  After making purchases of property at the Buying Summit based upon the purported expert advice of an expert consultant, Plaintiff Dunn and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC who was described as the foremost expert on "asset protection".

765.  Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate a more elaborate "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney from Guardian Law regarding setting up those entities to which the Buying Summit property purchases would be conveyed.  A more detailed description of the representations of Defendant Lethbridge are found *supra.*

766.  Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Plaintiff Dunn purchased the Veil Corporate plan for $6,495.00.

767.  As the result of purchasing the Veil Corporate "Asset Protection Plan", Plaintiff Dunn did indeed receive what was purported to be one-on one expert legal advice from Defendants Veil Corporate and Guardian Law.

768.  As the result of providing Plaintiff Dunn with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Plaintiff Dunn to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents he was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to his at the workshops, at the

Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

769.   Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiff Dunn with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

770.   In further breach of their contractual and fiduciary duties, Defendants induced Mr. Dunn to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Mr. Dunn had been informed by Defendants at the Buying Summit.

771.   Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Mr. Dunn by Defendants and their agents to engender his unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contract contained language identical and/or similar to that described *supra.*

772.   Mr. Dunn was unaware that the sales agreement he signed contained language describing the purchased property as being sold "AS IS", and/or that it repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

773.  Mr. Dunn was thus unaware that the sales agreement contained a Utah forum selection clause and/or a Utah choice of law clause.

774.  Mr. Dunn was unaware that the training and Buying Summit agreements he signed provided for binding arbitration of disputes.

775.  Mr. Dunn was unaware that the Commercial Loan Agreements he signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.

776.  There was and is no relationship whatsoever between Mr. Dunn, his attendance at the Buying Summit in Nevada nor any aspect of his agreement to purchase the aforementioned properties that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

777.  As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Dunn such that Defendants owed Mr. Dunn a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

778.  Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the properties he purchased at such the promised discounted prices, inform him of both their existence and availability and to facilitate their purchase by him at such a discounted prices.

779.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Dunn at a prices greatly in excess of their fair market value or true cash value.

780.   Plaintiff Dunn has incurred and is entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by him to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

781.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiff Dunn for his damages.

## COUNT VII – THE CLAIMS OF PLAINTIFF JOANNE BELDOTTI

The allegations of paragraphs 1 - 781 are incorporated by reference as if fully set forth herein.

782.   Plaintiff Joanne Beldotti received an invitation in the United States Mail at her residence in Connecticut in October 2014 which advertised a free seminar with special guest speakers Scott & Aime Yancey from the TV show "Flipping Vegas".

783.  The mailing described *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

784.  The advertisement was for the seminar in Stamford, CT.  Plaintiff Beldotti called to register for the event at The Crowne Plaza in Stamford and attended the event.

785.  At the free October, 2014 event, the attendees were told by Defendants' agents that in order to receive further training, they should attend the next level seminar, at a cost of $1,997.00. The written agreement for this package suggests that the entity providing the training services was "Yancey LLC", a Utah based limited liability company.

786.   Plaintiff Beldotti paid the aforementioned $1,997.00 fee with a credit card, and attended the seminar in November 2014 at the Stamford Hilton.  This seminar consisted of 3 days of training for 8 hours each day.  Defendants' agents explained to the attendees their method of how to buy houses far below market value, as well as other real estate investments (title liens, tax deeds, etc).

787.   At the end of the seminar described *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices.  However, attendees were told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold".

788.   Plaintiff Beldotti chose to purchase the Diamond package. She signed up for the Buying Summit but left no payment on the day of the workshop. She was advised that the $29,997 could be paid by credit card. At the second workshop, the sales representative Rob Oborn met with Plaintiff Beldotti at a private table outside of the training room within the Stamford, CT hotel. The attendees were assigned a sales person and called out by name at the beginning of the workshop. When it was time to meet with Mr. Oborn, he used many high pressure techniques to convince her that the Buying Summit was worthwhile and offered her lifetime education and support for her to be a successful real estate investor. She advised Mr. Oborn that she could not afford such an investment. He advised that if she had good credit then she could pay these costs with various credit cards. He expressly stated to her: "You can't afford not to do this" and stressed that the return on your investment would be great. He specifically promised that his company would assist with

the sales deals in Plaintiff Beldotti's community and that the cost of the Buying Summit would pay for itself.

789.  Defendants' agents convinced Plaintiff Beldotti to purchase the Diamond Package by stating that it included further one-on-one training as well as attendance at the Buying Summit and "boots on the ground" training before and after the Buying Summit called Inner Circle Training. Further, Defendants' agents expressly stated to Plaintiff Beldotti that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars.  As such, Defendants' agents expressly stated to Plaintiff Beldotti that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and "seasoned" (were presently income-producing homes with tenants that had at new annual lease).  Further, Plaintiff Beldotti was told that a person could only purchase these properties by attending the Buying Summit.

790.  Plaintiff Beldotti relied to her detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

791.  Plaintiff Beldotti relied to her detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

792.  At the Buying Summit, Plaintiff Beldotti and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

793.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Beldotti was induced by Defendants to convey any properties they purchased at the Buying Summit to a Self-Directed IRA.

794.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Beldotti was induced to attend a sales session with an agent of Defendants at the Buying Summit named Jesse Harrison.

795.   During a sales session attended by Plaintiff Beldotti with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 12442 Coleen Ave, Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $67,500.00.  The purported bargain contract price offered by Defendants for this home was $64,450.00 as displayed on this internet monitor.

796.  Defendants knew at the time of the events described *supra*, that the Coleen Ave. home was not worth $64,500.00 and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

797.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

798.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Warren, Michigan property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Plaintiff Beldotti purchased the property from

Defendant Five Choices, LLC for a purported $64,450.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $2,050.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $72,000.00 and the property was conveyed by Defendant 5 Choices, LLC to Plaintiff Beldotti's self directed IRA by Warranty Deed dated March 4, 2015.

799.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Plaintiff Beldotti made a down payment of $23,209.00 regarding her purchase of the Coleen Ave. home and a Non-Recourse loan agreement between Plaintiff Beldotti and Defendant Insiders Cash was executed by Plaintiff Beldotti's IRA service provider to pay the "loan" balance of $49,100 with interest-only payments of $491.00 per month for 36 months and the balance of $49,100.00 being due April 22, 2018.

800.   Unbeknownst to Plaintiff Beldotti but known to Defendants at the time of purchase, the Coleen Ave. home had been available for sale at the distressed sale price of $25,000.00 on November 10, 2014 and was purchased on behalf of Defendants own account by Defendants' agent RDG Fund-5 RCR, LLC on said date.

801.   RDG Fund-5 RCR, LLC soon thereafter conveyed the Coleen Ave. property to Defendant 5 Choices, LLC for a purported $44,000.00 by Warranty Deed dated December 12, 2014 prepared by Defendants' attorneys Guardian Law.

802.   Defendant5 Choices, LLC then conveyed the Coleen Ave. property to Plaintiff Beldotti's IRA on March 4, 2015 for the aforementioned effective price of in excess of $72,000.00.

803.  Defendants had a contractual and fiduciary duty owing to Plaintiff Beldotti to locate the Coleen Ave. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Plaintiff Beldotti at such a discounted price.

804.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Coleen Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Beldotti at a price greatly in excess of its fair market value or true cash value

805.   In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Beldotti to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced contrary to what Plaintiff Beldotti had been informed by Defendants at the Buying Summit.

806.  Further, in the year 2015, Plaintiff Beldotti also purchased the property located at 10408 Durness, St. Louis, Missouri from Defendant 5 Choices, LLC through the same fraudulent pattern as that for the Coleen Ave. property pursuant to the Defendants' Buying Summit Fraudulent Scheme.  She has been advised by her property manager that because the Durness property is located in such a bad and dangerous neighborhood, she should consider installing a $500.00 cage to protect the outdoor A/C unit.

807.  Plaintiff Beldotti also purchased from Defendants several vacant lots in other states through the same fraudulent pattern as that for the Coleen Ave. property pursuant to the Defendants' Buying Summit Fraudulent Scheme all at prices significantly above fair market value. She is entitled to rescission of said fraudulent sales and a refund of the purchase prices as damages.

808.  Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Plaintiff Beldotti by Defendants and their agents to engender her unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts they executed contained language identical and/or similar to that described *supra.*

809.  Plaintiff Beldotti was unaware that the sales agreements she executed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

810.  Plaintiff Beldotti was thus unaware that the sales agreement contained an alleged Utah forum selection clause and/or a Utah choice of law clause.

811.  Plaintiff Beldotti was unaware that the training and Buying Summit agreements she signed provided for binding arbitration of disputes.

812.   There was and is no relationship whatsoever between Plaintiff Beldotti, her attendance at the Buying Summit in Nevada nor any aspect of her agreements to purchase the aforementioned properties from Defendants that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

813.  Plaintiffs Plaintiff Beldotti has incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

.    814.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent

scheme and they are each individually liable to Plaintiff Beldotti for her damages.

### COUNT VIII – THE CLAIMS OF PLAINTIFFS RAMONA LORRAINE SOLANO-OWEN, GREINER 11831, LLC, COYLE 12071, LLC AND SARSFIELD 12460, LLC

The allegations of paragraphs 1 – 814 are incorporated by reference as if fully set forth

herein.

815.  Plaintiff Ramona Lorraine Solano-Owen aka "Lori Owen" is a 66 year old woman

living in Hawaii.  She received a flyer in the mail to attend a local free seminar with Scott Yancey

and his wife Amie in April, 2013.

816.  The flyer stated in part:

> Are you ready to get the best properties before the rest of the public has access to them?
>
> Find properties in your area before they're made available to the general public.
>
> Properties can be available for as low as pennies on the dollar.
>
> Purchase property at rock bottom prices before they are bid up by other investors.  [Exhibit E]

817.   Relying upon the inducements of the aforementioned flier, Ms.. Owen attended the

free seminar.

818. Scott Yancey did not appear at the seminar but Ms. Owen was told that he would

personally be teaching at the three-day workshop that was being offered where they would teach

you literally everything one needed to know in order to be a successful real estate investor.  Ms.

Owen asked Defendants' representative for and received specific reassurance that this three day

workshop was all one needed and that there was no necessity to expend additional money or to

attend additional classes after attending this workshop in order to be a successful real estate investor.

819. The aforementioned representations of Defendants created a fiduciary relationship with Plaintiff Owen.

820. Relying upon these assurances, Ms. Owen purchased the three day workshop for $ 1,997.00 and the tax lien program for $ 997.00 and attended the workshop.

821. At the three day workshop, Ms. Owen's "one-on-one" purported expert consultant induced her to purchase the $24,997.00 package to attend The Buying Summit from Yancey Events, LLC. This purported expert consultant expressly promised Ms. Owen that she would save so much on buying properties way below market value that she would make back the cost of the Buying Summit by investing in a few houses. Further, Ms. Owen was promised that Defendants would provide pre-approved financing for these purchases.

822. Ms. Owen specifically relied upon the following representations of the purported expert consultants in making her decision to purchase the Buying Summit package:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b) Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from expert consultants at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

823.  Once at the Buying Summit, Ms. Owen and the other attendees were told that the properties for sale had been fully rehabbed because the Defendants had done all the work for the purchasers.  Attendees were told that because the properties were being sold below market that this would provide instant equity in the properties which would allow a refinancing once one returned home from the Buying Summit at a very low rate.  The Defendants urged that the attendees get down payment money from either their IRA, 401(k) or from an increase in the credit limit on their credit cards.

824.  Defendant Kory Thurston announced to the attendees, including Plaintiff Owen that Defendant Guardian Law had a booth at the Buying Summit and they were a law firm that all attendees should speak to for expert legal advice.

825.  Relying upon the representations of Kory Thurston regarding Defendant Guardian Law, Plaintiff Owen spoke with attorney Phillip Martin of Guardian Law who gave her his business card.  Mr. Martin is presently associated with Defendant Invictus Law, PLLC.

826.  Guardian Law also passed out advertisements to Buying Summit attendees.

827.  The aforementioned activities of Guardian Law created a fiduciary relationship between themselves and the attendees at the Buying Summit and thus had a duty to  disclose their dual representation and to make a full disclosure to Plaintiff Owen of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

828.   Plaintiff Owen relied to her detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

829.   Plaintiff Owen relied to her detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

830.   During a one-on-one session attended by Plaintiff Owen with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 12460 SARSFIELD, Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $60,000.00.  The purported bargain contract price offered by Defendants for this home was $57,200.00 as displayed on this internet monitor.   Defendants knew at the time that the Sarsfield home was not worth that amount and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

831.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

832.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Sarsfield property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Plaintiff Owen purchased the property from Defendant Patriot

Homes, LLC for $54,500.00 plus closing costs and the property was conveyed at her direction to Sarsfield 12460, LLC, her wholly owned limited liability company.

833.   Unbeknownst to Plaintiff Owen but known to Defendants at the time of purchase, the Sarsfield. home had been available for sale at the distressed sale price of $24,999.00 in June 2013 and was purchased on behalf of Defendants own account by Defendants' agent John Graham, Inc. for that sum on June 25, 2013.

834.   Thereafter, in a series of transactions, John Graham Inc. sold the Sarsfield property to Defendant Patriot Homes, LLC on August 9, 2013 for $46,500.00. On November 6, 2013, Patriot Homes sold the property to Sarsfield 12460, LLC for $54,200.00 plus closing costs.

835.   Defendants fraudulent induced Ms. Owen to purchase two additional properties located in the City of Detroit pursuant to the same fraudulent scheme.  These were conveyed directly to her wholly owned companies Greiner 11831, LLC, and Coyle 12071, LLC.

836.  For each of the three purchased properties, the LLC executed a loan agreement.  The Sarsfield loan agreement states the following:

> This Agreement will be governed by, construed, and enforced in accordance with the laws of the State of Utah without regard to its conflict of laws rules.  This Agreement has been accepted and funded by Lender in the State of Utah.  As for venue, **ANY ACTION OR PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY RIGHT ARISING OUT OF, THIS AGREEMENT** shall be brought against any of the parties in the courts of the State of Utah, or alternatively, **IN THE COURT OF THE STATE AND COUNTY WHERE THE REAL PROPERTY SECURING THE LOAN IS LOCATED**, at the sole discretion of the Lender. And Borrower hereby waives any objection to the venue laid therein and agrees no to plead or claim in any such courts that such proceeding brought therein has been brought in any inconvenient forum [emphasis added].  Emphasis added.

Plaintiffs submit that the instant action is not an action or proceeding seeking to enforce any provision of, or based on any right arising out of, this agreement.  Therefore, this forum selection clause inapplicable to the instant case.

837.  Unbeknownst to Ms. Owen, she executed a personal guarantee for each of the three loan agreements made with her three limited liability companies.  For the reasons stated above for the other Plaintiffs in the same situation, these personal guarantees are unenforceable and/or void and/or must be rescinded.   Further, they also contain no forum selection clause.

838.  Defendants had a contractual and fiduciary duty owing to Plaintiff Owen to locate the Sarsfield. property at a discounted price, inform her of its existence and availability and to facilitate its purchase by Plaintiff Owen at such a discounted price.

839.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Sarsfield property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Owen at a price greatly in excess of its fair market value or true cash value.

840.  Defendant Owen was also fraudulently induced to purchase a property located at 11831 Greiner, Detroit, Michigan.  The first step in Defendants' fraudulent mark-up procedure regarding the Greiner property was a sale from MJ Income Property, LLC to Evergreen Investment Properties, LLC of Orem, Utah for  $25,000.00 on June 12, 2012.  The second step was the sale of the property to Defendant Scree 44, LLC for $33,720.73 on September 11, 2012 pursuant to a Warranty Deed drafted by Defendant  Guardian Law.  Finally, Scree 44, LLC sold the property to Lori Owen for $50,375.00 on October 22, 2013 pursuant to a Warranty Deed executed by Blair Poelman or Rob Lewis, its Manager(s) and prepared by Guardian Law.  The Greiner property was

conveyed by Scree 44. LLC to a newly created Utah limited liability company, Plaintiff Greiner 11831, LLC.

841.   Each of the three properties which Lori Owen purchased from Defendants was conveyed to a separate newly registered Utah limited liability company based upon what was perceived as Defendants' expert advice as described, *infra*.

842.   The Greiner transaction is reflected in a Settlement Statement prepared by Guardian Law. It shows a total cost to the purchaser of $59,061.00, a down payment of $18,661.00 and a loan amount of $40,400.00.   At the time of the property purchase, Ms. Owen signed a loan agreement between her new LLC and Insider's Cash and which is a two year interest-only-loan in the amount of $40,400.00.  On page six of the loan agreement is a purported arbitration clause.

843.   Ms. Owen was also fraudulently induced by Defendants to execute a personal guaranty which Ms.  Owen and many other victims of Defendants' fraudulent scheme signed without notice or understanding. The personal guaranty does not contain an arbitration or forum selection clause.

844.   Defendant Owen was also fraudulently induced to purchase a property located at 12071 Coyle, Detroit, Michigan.  The first step in Defendants' fraudulent mark-up procedure regarding the Coyle property was a Default Judgment of Quiet Title to Real Property in favor of G-USA, LLC on September 17, 2013.  G-USA, LLC then quit claimed the property to GWH Properties, LLC for $10 on January 17, 2014  pursuant to a deed drafted by Defendants' attorneys, Guardian Law.  The next step was the sale of the property to Defendant Red Apple for $35,069.14 on January 17, 2014 pursuant to a Warranty Deed also drafted by Defendants' attorneys, Guardian Law.  The final step was the sale of the property by Red Apple to Ms. Owen's new Utah limited

liability company, Coyle 12071, LLC for $49,950.00 on April 23, 2014 pursuant to a Warranty

Deed executed by Blair Poelman or Rob Lewis, its Manager(s) and prepared by Defendant

Guardian Law.

845.   The transaction is reflected in a Settlement Statement prepared by Guardian Law.  It

shows a total cost to the purchaser of $57,785.13, a down payment of $18,690.00 and a loan

amount of $39,900.00.

846.   At the time of the property purchase, Ms. Owen signed a loan agreement regarding

the Coyle property between her new LLC and Insider's Cash and which is a three year interest-

only loan in the amount of $39,900.00. On page six of the agreement is what purports to be a forum

selection clause.  Like the Sarsfield property loan agreement, the Coyle loan agreement states the

following:

> This Agreement will be governed by, construed, and enforced in accordance with
> the laws of the State of Utah without regard to its conflict of laws rules. This
> Agreement has been accepted and funded by Lender in the State of Utah. As for
> venue**, ANY ACTION OR PROCEEDING SEEKING TO ENFORCE ANY
> PROVISION OF, OR BASED ON ANY RIGHT ARISING OUT OF, THIS
> AGREEMENT** shall be brought against any of the parties in the courts of the State
> of Utah, or alternatively, **IN THE COURT OF THE  STATE AND COUNTY
> WHERE THE REAL PROPERTY SECURING THE LOAN IS LOCATED**,
> at the sole discretion of the Lender. And Borrower hereby waives any objection to
> the venue laid therein and agrees no to plead or claim in any such courts that such
> proceeding brought therein has been brought in any inconvenient forum  [emphasis
> added].

Plaintiffs submit that the instant action is not an action or proceeding seeking to enforce any

provision of, or based on any right arising out of, this agreement.  Therefore, the forum selection

clauses of both the Sarsfield and Coyle property loan agreements are inapplicable to the instant

case EVEN IF VALID, and do not  preclude the instant lawsuit for RICO and/or rescission of the

fraudulently induced  agreement.

847.  After agreeing to the purchases of property at the Buying Summit based upon the purported expert advice of an expert consultant, Plaintiff Owen and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC.

848.  Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate a more elaborate "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney from Guardian Law regarding setting up those entities to which the Buying Summit property purchases would be conveyed.  A more detailed description of the representations of Defendant Lethbridge are found , *supra.*

849.  Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Plaintiff Owen purchased the Veil Corporate plan for $6,495.00.

850.  As the result of purchasing the Veil Corporate "Asset Protection Plan", Plaintiff Owen did indeed receive what was purported to be one-on one expert legal advice from Defendants Veil Corporate and Guardian Law.

851.  Based upon this purported expert advice from Defendant Guardian Law, three limited liability companies were set up by Defendant Veil for Plaintiff Owen in the State of Utah based upon the purported professional advice of Guardian Law that this would allow her to "hide" assets in such entities from frivolous lawsuits.

852.  Defendant Guardian Law was simultaneously representing the Defendants in the same transaction in which they were representing Plaintiff Owen.

853.  As the result of providing Plaintiff Owen with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Plaintiff Owen to disclose their dual representation and to make a full disclosure to her of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

854.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiff Owen with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

856.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Owen to execute the aforementioned loan agreements for a principle amount which exceeded the fair market value or true cash value of the subject properties knowing that therefore the loan could not be refinanced contrary to what Plaintiff Owen had been informed by Defendants at the Buying Summit.

857.  Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Plaintiff Owen by Defendants and their agents to engender her unqualified trust and that they were selling real estate at discounted prices and upon which they

had performed due diligence upon which a purchaser could rely, the sales contracts they executed contained language identical and/or similar to that described *supra.*

858.   Plaintiff Owen was unaware that the sales agreements she executed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

859.   Plaintiff Owen was thus unaware that the sales agreement contained an alleged Utah forum selection clause and/or a Utah choice of law clause.

860.   Plaintiff Owen was unaware that the training and Buying Summit agreements she signed provided for binding arbitration of disputes.

861.   Defendants Scree 44, LLC, (Greiner seller), Red Apple Homes, LLC (Coyle seller), Patriot Homes, LLC by Ready Prop (Sarsfield seller) and Insider's Cash, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

862.   Plaintiffs Owen and Greiner 11831, LLC, Coyle 12071, LLC and Sarsfield 12460, LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated by each Defendant herein through conducting and participating in the affairs of the Buying Summit Fraudulent Enterprise.

863.   Each Defendant had a distinct role in conducting and participating in the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Owen, Greiner 11831, LLC, Coyle 12071, LLC and Sarsfield 12460, LLC for their damages.

### COUNT IX – THE CLAIMS OF PLAINTIFFS PASCAL VOHRADNIK, <u>SIMONE VOHRADNIK AND 13607 VIRGIL, LLC</u>

The allegations of paragraphs 1 - 863 are incorporated by reference as if fully set forth herein.

864.  In March, 2013 while living in Manhattan, New York, Plaintiffs Pascal & Simone Vohradnik viewed an infomercial playing on television featuring Defendant Dean Graziosi which promoted a free seminar concerning real estate investing promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

865.  The aforementioned television advertisement was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

866.  In response to the aforementioned March 2013 television infomercial, Mr. Vohradnik called the advertised telephone number and spoke with an agent of the Defendants during which the attendance of both Pascal & Simone Vohradnik at such a free seminar was scheduled for March 10, 2013 at a nearby hotel.

867.  At the free seminar held on March 10, 2013, the Plaintiffs were induced by purported expert consultants to purchase from "Insider's Financial Education, LLC" the "Insider's Financial 3-Day Real Estate Workshop Package" for $1,997.00 and the "Insider's Financial Tax Lien Program" for $997.00 based upon express promises and inducements that by taking these courses, they would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market rental real estate investment properties.

868.  The "Insider's Financial 3-Day Real Estate Workshop" was held March 15-17, 2013 at the Dream Hotel, Manhattan, New York.  At this "workshop", the attendees, including the

Vohradniks, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

869. The Vohradniks did as instructed and called their credit card companies and obtained an increase to all their credit limits.

870. At the aforementioned "Insider's Financial 3-Day Real Estate Workshop", the Vohradniks were induced by the fraudulent statements of the purported expert consultants on March 16, 2013 to purchase "Dean's Advanced Training – Diamond Package – Boots on the Ground" for $39,997.00. The purported purpose of this course as repeatedly expressed by Defendants' purported expert consultants was so that the Vohradniks could obtain expert training and guidance from Defendants in order to obtain the skills and knowledge necessary to locate and invest in deeply discounted and below market rental real estate investment properties.

871. At the end of the seminar described *supra,* the attendees were told by Defendants' purported expert consultants that they now had sufficient information necessary to start buying properties at steeply discounted prices. However, attendees were told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold". The purported expert consultants convinced the Vohradniks to purchase the Diamond Package by stating that it included further one-on-one training, as well as attendance at the Buying Summit for both of them. Further, Defendants' agents expressly stated to them that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training

seminars.  As such, Defendants' agents expressly stated to the Vohradniks that these properties had already been "vetted" (evaluated using their methods) by the BuyPD group, and were presently income-producing with tenants that had at least 1 year left on their lease.  Further, they were told that a person could only purchase these properties by attending the Buying Summit.  Attendees could also purchase legal services, insurance, wealth and estate planning and other financial services at the Buying Summit.

872.  Simultaneously with their execution of their Buying Summit contract, the Vohadriks checked the box to purchase the "asset protection" package from Defendant Veil Corporate which is described *infra*.

873.  There is no arbitration or forum selection clause associated with the agreement of the Vohadriks to purchase this "Asset Protection" package from Defendant Veil Corporate.

874.  Defendants' purported expert consultants also informed the attendees at the local workshops including the Vohadriks that attendees of the Buying Summit needed to set up a limited liability company ("LLC") prior to attending the Buying Summit so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

875.  The Vohadriks purchased such a package for the set-up of an LLC entity prior to attending the Buying Summit and had direct interaction with purported professionals employed by Defendants Veil Corporate and Guardian Law who provided legal advice to them in this regard.

876.  Having purchased the "Asset Protection" plan of Defendant Veil Corporate and relying upon the purported expert advice of Defendant Veil Corporate and Guardian Law, the Vohadriks were convinced to allow Defendant Veil Corporate, LLC set up a limited liability company in Utah so that there would exist an entity into which properties and other purchases

made at the Buying Summit could be conveyed.  Utah was chosen by Veil as the state of registration for this LLC because the Defendant entities are Utah limited liability companies.

877.  Despite providing professional services for a fee to the Vohadriks, Defendants Veil Corporate and Guardian Law both continued to represent the Defendants both before and during their simultaneous representation of the Vohadriks regarding the same transactions and occurrences throughout the perpetuation of the Buying Summit Fraudulent Scheme and failed to disclose such representation to either the Vohadriks or the other attendees of the workshops, the Buying Summit or to persons who purchased professional services from them in relation to the Buying Summit.

878.  As the result of providing the Vohadriks with expert legal advice for a fee, Veil Corporate and Guardian Law each owed a fiduciary duty to the Vohadriks to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents he was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to his at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

879.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by the Vohadriks with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

880.   The Vohradniks relied to their detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

881.   The Vohradniks relied to their detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

882.   The Vohradniks relied to their detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale had vetted and paying tenants.

883.   The written contractual agreements between the Vohradniks and "Insider's Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.   This clause was included in the documents without the knowledge or understanding of the Vohradniks.  Further, this forum selection clause provided for a separate and distinct forum than other clauses surreptitiously inserted in the other documents by the Defendants which the Vohradniks executed but which concerned the same transaction and occurrence.

884.   Insider's Financial Education, LLC does not exist.

885.   The Vohradnik's attended a Buying Summit in Las Vegas, Nevada from May 30, 2013 to June 1, 2013.

886.   Upon arriving at the Buying Summit, the Vohradnik's were provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook"

887.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to The Vohradnik's and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**  We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

888.  The Vohradnik's relied to their detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

889.  The Vohradnik's relied to their detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

890.  At the Buying Summit, The Vohradnik's and the other attendees were subjected to the continuous false representations of Defendant Kory Thurston proclaiming the great real estate bargains that Defendants were offering for sale there.

891.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, the Vohradniks were induced to attend a sales session with a purported expert consultant at the Buying Summit.

892.  During a sales session attended by the Vohradniks with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 13607 Virgil, Michigan, Detroit, Defendants' internet monitor displayed a "Suggested

Retail Price" of $59,000.00.  The purported bargain contract price offered by Defendants for this home was $46,595.00 as displayed on this internet monitor.

893.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

894.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultant regarding the Virgil Street property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, the Vohradniks purchased the property from Defendant Screaming Eagle Properties, LLC for $46,595.00.  However, with various add-ons, including a $3,314.00 "loan origination fee" and "closing costs" including a fee of $1,850.00 paid to Defendant Guardian Law, the actual sales price was in excess of $55,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to 13607 Virgil , LLC by Warranty Deed drafted by Defendant Guardian Law dated August 23, 2013 and signed by Blair Poelman or Rob Lewis, its manager(s).

895.   The aforementioned Buying Summit Workbook announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Fund, LLC and Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including The Vohradniks, the false impression that the homes they were purchasing were worth in excess

of the amount of their "bridge loans" from Defendants when, in fact, the home they purchased was worth less than the amount of their "bridge loan" and thus could not be refinanced or sold.

896.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, The Vohradnik's made a down payment of $17,073.00 regarding their purchase of the Virgil Street home and a signed a loan agreement on behalf of 13607 Virgil LLC  with Defendant Insiders Cash to pay the "loan" balance of $37,000.00 with interest-only payments of $370.00 per month for 24 months and the balance of $37,000.00 being due October  4, 2018.

897.  As described *supra*, Defendants Insider's Cash, LLC and Screaming Eagle Properties, LLC are owned and controlled by the same persons thereby making the alleged purchase money "loan" illusory.

898.  Unbeknownst to them and due only to Defendants' successful attempts to engender the unqualified trust of the Vohradniks, they also signed a personal guaranty drafted by Defendant Guardian Law for said purchase money "loan" obligation of 13607 Virgil, LLC for the purchase of the Virgil Street home.

899.  Unbeknownst to the Vohradniks but known to Defendants at the time of purchase, the Virgil Street home had been available for sale at the distressed sale price of $24,000.00 in June 2013 and was purchased on behalf of Defendants own account by Defendants' agent, Metro Detroit Home Solutions, LLC. on June 28, 2013 for $24,000.00.

900.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Virgil Street. property directly to Defendant Screaming Eagle Properties LLC by Warranty Deed prepared by Defendant Guardian Law dated June 27, 2013 for $34,000.00.  Defendant Screaming Eagle

Properties, LLC then sold the Virgil St. property to 13607 Virgil , LLC on August 23, 2013 for the aforementioned effective price of in excess of $55,000.00.

901.  Defendants had a contractual and fiduciary duty owing to the Vohradniks to locate the properties they purchased at such a discounted "wholesale" price, inform them of their existence and availability and to facilitate its purchase by the Vohradniks and/or their company at such a discounted price.

902.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunities to purchase the properties they purchased at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the properties to the Vohradniks and their company at a price greatly in excess of its fair market value or true cash value.

903.  In further breach of their contractual and fiduciary duties, Defendants induced the Vohradniks to execute loan agreements for a principle amount which exceeded the fair market value or true cash value of the subject properties knowing that therefore the loan could not be refinanced within six months as the Vohradniks had been informed by Defendant Kory Thurston and other prior to and at the Buying Summit.

904.  The Vohradniks are and have been unable to sell the Virgil Street. property because the property is not worth what they owe on said bridge loan.

905.  During a sales session attended by the Vohradniks with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 901 N. 74th St., East St. Louis, Illinois, Defendants' internet monitor displayed a purported bargain price $41,000.00.

906.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

907.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultant regarding the 74th St. property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Pascal Vohadrik through his self-directed IRA purchased the property from Defendant Frontside Properties, LLC for $41,000.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" including a fee of $1,850.00 paid to Defendant Guardian Law, the effective sales price was of $48,632.38 and the property was conveyed by Defendant FrontSide Properties, LLC to the IRA of Pascal Vohadrik by Warranty Deed drafted by Defendant Guardian Law dated July 8, 2013 and signed by Blair Poelman or Rob Lewis, its manager(s).

908.   The aforementioned Buying Summit Workbook announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Pascal Vohradnik, the false impression that the homes he was purchasing was worth in excess of the amount of their "bridge loans" from Defendants when, in fact, the home they purchased was worth less than the amount of the "bridge loan" and thus could not be refinanced or sold.

909.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Pascal Vohradnik made a down payment of regarding his purchase of the 74th Street home and is IRA custodian signed a loan agreement with Defendant Insiders Cash to pay the "loan" balance of $27,600.00 with interest-only payments of $260.00 per month for 24 months and the balance of $27,600.00 being due at the end of said period.

910.  As described *supra*, Defendants Insider's Cash, LLC and FrontSide Properties, LLC are owned and controlled by the same persons thereby making the alleged purchase money "loan" illusory.

911.  The 74th St. property had a true cash value of $20,016.00 according to the 2015 assessment of St. Clair, County, Illinois.

912.  Unbeknownst to Pascal Vohadrik, the 74th St. property had been purchased by agents of FrontSide Properties, LLC at a distressed sale price soon before it was sold to him at a purported "wholesale" price.

913.  Pascal Vohradnik has been unable to sell the 74th Street. property because the property is not worth what is owed on the illusory "bridge" loan.

914.  During a sales session attended by the Vohradniks with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 817 N. 73rd St., East St. Louis, Illinois, Defendants' internet monitor displayed a purported bargain price of $44,550.00.

915.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud

pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

916.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants and the purported expert consultant regarding the 73rd St. property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Pascal Vohadrik through his self-directed IRA purchased the property from Defendant Frontside Properties, LLC for $44,550.00.  However, with various add-ons, including a $$3,181.90 "loan origination fee" and "closing costs" including a fee of $1,850.00 paid to Defendant Guardian Law, the effective sales price was in excess of $51,000.00 and the property was conveyed by Defendant FrontSide Properties, LLC to the IRA of Pascal Vohadrik by Warranty Deed drafted by Defendant Guardian Law dated November 7, 2013 and signed by Blair Poelman or Rob Lewis, its manager(s).

917.   The aforementioned Buying Summit Workbook announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Pascal Vohradnik, the false impression that the homes he was purchasing was worth in excess of the amount of their "bridge loans" from Defendants when, in fact, the home they purchased was worth less than the amount of the "bridge loan" and thus could not be refinanced or sold.

918.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Pascal Vohradnik made a down payment of regarding

his purchase of the 73rd Street home and his IRA custodian signed a loan agreement with Defendant Insiders Cash to pay the "loan" balance of $35,600.00 with interest-only payments of $356.00 per month for 24 months and the balance of $35,600.00 being due at the end of said period.

919.  As described *supra*, Defendants Insider's Cash, LLC and FrontSide Properties, LLC are owned and controlled by the same persons thereby making the alleged purchase money "loan" illusory.

920.  The 73rd St. property had a true cash value of $21,602.00 according to the 2014 assessment of St. Clair, County, Illinois.

921.  Unbeknownst to Pascal Vohadrik, the 73rd St. property had been purchased by agents of FrontSide Properties, LLC at a distressed sale price soon before it was sold to him at a purported "wholesale" price.

922.  Pascal Vohradnik has been unable to sell the 73rd Street. property because the property is not worth what is owed on the illusory "bridge" loan.

923.  After making purchases of property at the Buying Summit based upon the purported expert advice of an expert consultant, Plaintiffs Pascal and Simone Vohadrik and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC.

924.  Mr. Lethbridge was described to the Buying Summit attendees by Defendants as the foremost expert on "asset protection".

925.  Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate a more elaborate "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property

purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney with Guardian Law regarding setting up those entities to which the Buying Summit property purchases would be conveyed.  A more detailed description of the representations of Defendant Lethbridge are found *supra.*

926.   Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Plaintiffs Pascal and Simone Vohadrik purchased the Veil Corporate plan for $6,495.00.

927.   As the result of purchasing the Veil Corporate "Asset Protection Plan", Plaintiffs Pascal and Simone Vohadrik did indeed receive what was purported to be one-on one expert legal advice from Defendants Veil Corporate and Guardian Law.

928.   As the result of providing Plaintiff Pascal and Simone Vohadrik with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Plaintiffs Pascal and Simone Vohadrik to disclose their dual representation and to make a full disclosure to them of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents they had and were about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to them at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

929.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiffs Pascal and Simone Vohadrik with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

930.  Plaintiffs Pascal Vohradnik, Simone Vohradnik and 13607 Virgil, LLC have incurred damages as the result of Buying Summit Fraudlent Scheme and are entitled to damages including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

.    931.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Pascal Vohradnik, Simone Vohradnik and 13607 Virgil, LLC for their damages.

## COUNT X –THE CLAIMS OF PLAINTIFF EVA THODE

The allegations of paragraphs 1 – 931 are incorporated by reference as if fully set forth herein.

932.  In January, 2015 while living in Myrtle Beach, Plaintiff Eva Thode received a promotional flyer in the United States Mails which promoted a free local seminar and dinner concerning real estate investing by celebrity and Defendant Scott Yancey promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.  The flyer promised access to "the best properties before the public has access to them", how to "Purchase real estate at all-time low prices before they are bid up by hundreds of investors" and "How do I get hold of pre-market and tax deed auction properties and turn them into cash or hold them for long-term monthly income?"

933.  The aforementioned promotional flyer was an incidence of mail fraud pursuant 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

934.  In response to the aforementioned flyer, Ms. Thode attended the local seminar/dinner where she was induced by the purported expert consultants to purchase a local workshop package based upon the express promises and inducements of said consultants that by taking these courses, she would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market rental real estate investment properties.

935.  As the result of paying to attend one of Defendants' local workshops, Plaintiff Thode received a flyer which stated:

> Congratulations on your decision to attend our upcoming real estate workshop.
> You now have access to our incredible resources **and professional assistance**.
> We look forward to fulfilling everything you were promised. [Emphasis added]

936. The express promises made by Defendants' agents of providing expert advice for a fee prior to attending any of these workshops created a fiduciary duty in Defendants to Plaintiff Thode and the other attendees and they owed a duty to Plaintiff Thode to make a full disclosure to her of the entire contents of the documents he was about to sign with the Defendants including the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

937.  The purported expert consultants at Defendants' local workshops informed Plaintiff Thode and the other the attendees that:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b)  Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the staff at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

938.  Ms. Thode also relied upon a promotional flyer in making her decision to attend the Buying Summit wherein Defendant Income Property USA, LLC expressly represented and promised:

> Rent Ready.
> We find low cost and distressed properties in great neighborhoods.  We then perform any repairs or rehabbing needed. By the time we sell them to our clients they are either tenanted or rent ready.  Our clients are then able to get great prices without the hassle of doing repairs themselves.  Exhibit H

939.  No Plaintiff is subject to an arbitration or forum selection clause with Defendant Income Property USA, LLC.

940.  While attending the aforementioned local 3-Day Real Estate Workshop Package, Plaintiff Thode was induced by the express promises of the purported expert consultants to purchase a "Diamond Package" from Defendant Yancey LLC for $29,997.00 which included admittance to the "Buying Summit 3 Day Asset Buying Retreat" held there in March 2015.

941.  Simultaneously with her execution of the Buying Summit contract.  Plaintiff Thode checked the box to purchase an "asset protection" package for $595.00 from Defendant Veil Corporate which is described *infra*.

942.  There is no arbitration or forum selection clause associated with the agreement of Plaintiff Thode to purchase this "Asset Protection" package from Defendant Veil Corporate.

943.  Defendants' purported expert consultants also informed the attendees at the local workshops including Plaintiff Thode that attendees of the Buying Summit needed to set up a limited liability company ("LLC") prior to attending the Buying Summit so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

944.  Plaintiff Thode purchased such a package for the set-up of an LLC entity prior to attending the Buying Summit and had direct interaction with purported professionals employed by Defendants Veil Corporate and Guardian Law who provided legal advice to her in this regard.

945. Having purchased the "Asset Protection" plan of Defendant Veil Corporate and relying upon the purported expert advice of Defendant Veil Corporate and Guardian Law, Plaintiff Thode set up a limited liability company in Utah so that there would exist an entity into which properties and other purchases made at the Buying Summit could be conveyed.  This would prove completely unnecessary because Plaintiff Thode conveyed all purchases she made at and through the Buying Summit to her self-directed IRA.

946.  Despite providing professional services for a fee to Plaintiff Thode, Defendants Veil Corporate and Guardian Law both continued to represent the Defendants both before and during their simultaneous representation of Plaintiff Thode regarding the same transactions and occurrences throughout the perpetuation of the Buying Summit Fraudulent Scheme and failed to disclose such representation to either Plaintiff Thode or the other attendees of the workshops, the Buying Summit or to persons who purchased professional services from them in relation to the Buying Summit.

947.  As the result of providing Plaintiff Thode with expert legal advice for a fee, Veil Corporate and Guardian Law each owed a fiduciary duty to Plaintiff Thode to disclose their dual representation and to make a full disclosure to her of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were pre-existing duties of Defendants in any event.

948.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by Plaintiff Thode with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

949.  Plaintiff Thode attended The Buying Summit in Las Vegas in March 2015 where the attendees, including Plaintiff Thode, were expressly told that the properties offered for sale there by Defendants were already rehabbed, tenanted, under the care of a property management company and that they were available to purchase at well below market value.

950.  Plaintiff Thode relied to her detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

951.  Plaintiff Thode relied to her detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

952.  Plaintiff Thode relied to her detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the properties they offered for sale had been fully rehabbed and had paying tenants.

953.  Plaintiff Thode relied to her detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the purported "hard money loans" offered at the Buying Summit by Defendants Insider's Cash, LLC and American Cash Fund, LLC were for no more than 66% of the value of the property which secured such loan.

954.  Based upon the representations of the purported expert consultants prior to purchasing the Buying Summit package and based upon the express representations of Defendants Kory Thurston, Plaintiff Thode was induced to meet with a person at the Buying Summit represented to be an expert personal consultant working on behalf of Plaintiff Thode in the selection and purchase of properties at and through the Buying Summit.

955.  After making purchases of property at the Buying Summit based upon the purported expert advice of an expert consultant, Plaintiff Thode and the other Buying Summit attendees were presented with a four to five hour-long lecture from Defendant Bud Lethbridge, owner of Defendant Veil Corporate, LLC.

956.  Mr. Lethbridge informed the attendees that they needed to purchase from Defendant Veil Corporate a more elaborate "asset protection" package for the price of $6,495.00 which included the setting up of an unlimited number of corporate or LLC entities to which the property

purchases of the attendees would be conveyed.  Mr. Lethbridge stated that the "asset protection" package included personal one-to-one legal advice from an attorney from Guardian Law regarding setting up those entities to which the Buying Summit property purchases would be conveyed.  A more detailed description of the representations of Defendant Lethbridge are found *supra.*

957.   Relying upon the false and fraudulent statements and representations of Bud Lethbridge at the Buying Summit, Plaintiff Thode purchased the Veil Corporate plan for $6,495.00.

958.   As the result of purchasing the Veil Corporate "Asset Protection Plan", Plaintiff Thode did indeed receive what was purported to be one-on one expert legal advice from Defendants Veil Corporate and Guardian Law.

959.   Based upon this purported expert advice from Defendant Guardian Law, another limited liability company was set up by Defendant Veil for Plaintiff Thode in the State of Wyoming.  This additional limited liability company was also unnecessary because all properties purchased by Plaintiff Thode at or through the Buying Summit were conveyed to her self-directed IRA.

960.   As the result of providing Plaintiff Thode with expert legal advice for a fee, Veil Corporate and Guardian Law each again owed a fiduciary duty to Plaintiff Thode to disclose their dual representation and to make a full disclosure to him of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents he was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to his at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.  Further, they

had a duty to disclose Defendants' practice of obtaining purported full releases from naïve Buying

Summit victims in exchange for minimal reimbursements for rehab and missing rents, which were

pre-existing duties of Defendants in any event.

961.  Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts

which were signed by Plaintiff Thode with Defendants are void, including any arbitration or forum

selection clauses contained therein and any and all purported releases.

962.  As the direct and proximate result of the false and fraudulent statements, promises

and inducements of Defendants, described *supra*, Plaintiff Thode was induced to attend a sales

session with a purported expert consultant at the Buying Summit.

963.  At a sales session attended by Plaintiff Thode with a purported expert consultant at

the Buying Summit an internet monitor displayed various homes for sale.

964.  Relying upon the aforementioned false and fraudulent statements, promises and

inducements of the purported expert consultant and the express promises of Defendant Kory

Thurston who described the purported bargains to be purchased at the Buying Summit, Ms. Thode

agreed to purchase 1058 Garfield, Lincoln Park, Michigan from Defendant Green Apple Homes,

LLC for $66,350.00.  However, with various add-ons, including a $3,662.20 "loan origination fee"

and "closing costs" which included a fee of $2,250.00 paid to Defendant Guardian Law, the actual

sales price was $74,817.00 and a deed purporting to convey the property to American Estate and

Trust f/b/o Eva Thode was executed May 5, 2015 and recorded May 26, 2015.

965.  Defendant Kory Thurston at the Buying Summit had announced to the attendees that

36 month interest-only 12% purchase-money loans and which were described as "bridge loans"

were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash,

LLC in amounts described as 50% to 66% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the homes she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

966.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $16,009.00 regarding her purchase of the Garfield (Lincoln Park) property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $50,800.00 with interest-only payments of $508.00 per month for 36 months and the balance of $50,800.00 being due at the end of said 36 month period.

967.  Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Garfield (Lincoln Park) property had been available for sale at the distressed sale price of $36,000.00 and was purchased by Defendants' agent, Defendant John Graham, Inc. on August 22, 2014 for $36,000.00.

968.  Defendant John Graham, Inc. soon thereafter conveyed the Garfield (Lincoln Park) property directly to Defendant Green Apple Homes, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on October 3, 2014 for a purported $55,500.00. Defendant Green Apple Homes, LLC then sold the Garfield (Lincoln Park) property to Ms. Thode on May 5, 2015 for the aforementioned effective price of $74,817.00.

969.  Defendants had a contractual and fiduciary duty owing to Plaintiff Thode to locate the Garfield (Lincoln Park) property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

970.  Further, each Defendant had created a fiduciary duty with Plaintiff Thode to make full disclosure of the nature of the Buying Summit Fraudulent Scheme and of the various provisions of the written contracts Plaintiff Thode was fraudulently induced to execute.

971.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Garfield (Lincoln Park) property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

972.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

973.  As described *supra*, Defendants Insider's Cash, LLC and Green Apple Homes, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

974.  Also at said sales session attended by Ms. Thode with purported expert consultant at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 19229 Garfield, Redford, MI 48240 from Defendant 5 Choices, LLC for $75.750.00.  However, with various add-ons, including a $4,301.20 "loan origination fee" and "closing costs" which include a fee of $2,050.00

paid to Defendant Guardian Law,  the actual sales price was $85,208.00 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 30, 2015 and recorded May 26, 2015.

975.  Defendants' agents at the Buying Summit had announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% to 66% "loan to purchase  price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

976.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $18,654.00 regarding her purchase of the Garfield (Redford) property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $57,900.00 with interest-only payments of $579.00 per month for 36 months and the balance of $57,900.00 being due at the end of said 36 month period.

977.  Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Garfield (Redford) property had been available for sale at the distressed sale price of $31,696.00 and was purchased by Defendants' agent, GWH Properties, LLC from Fannie Mae on August 28, 2014 for $31,696.00.

978.  GWH Properties, LLC soon thereafter conveyed the Garfield (Redford) property directly to Defendant 5 Choices, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on October 31, 2014 for a purported $58,500.00.  Defendant 5 Choices, LLC then sold the Garfield (Redford) property to Ms. Thode on April 30, 2015 for the aforementioned effective price of $85,208.00.

979.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Garfield (Redford) property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

980.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Garfield (Redford) property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

981..  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

982.  As described *supra*, Defendants Insider's Cash, LLC and 5 Choices, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

983.  Also at said sales session attended by Plaintiff Thode with a purported expert consultant at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 21541

Jean Ave., Eastpointe, MI 48021 from Defendant Green Apple Homes, LLC for $72,450.00. However, with various add-ons, including a $4,096.90 "loan origination fee" and "closing costs" which included a fee of  $2,050.00  paid to Guardian Law, the actual sales price was $81,856.00 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 30, 2015 and recorded June 25, 2015.

984.  Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as from 50% to 66% "loan to purchase  price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

985.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $16,128.00 regarding her purchase of the Jean property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $55,600.00 with interest-only payments of $556.00 per month for 36 months and the balance of $55,600.00 being due at the end of said 36 month period.

986.  Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Jean property had been available for sale at the distressed sale price of $31,000.00 and was purchased by Defendants' agent, Defendant John Graham, Inc. on July 22, 2014 for $31,000.

987.  Defendant John Graham, Inc. soon thereafter conveyed the Jean property directly to Defendant Green Apple Homes, LLC by Warranty Deed prepared by Defendant Guardian Law on October 3, 2014 for a purported $63,500.00.  Defendant Green Apple Homes, LLC then sold the Jean property to Ms. Thode on April 30, 2015 for the aforementioned effective price of $81,856.00.

988.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Jean property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

989.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Jean property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

990.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

991.  As described *supra,* Defendants Insider's Cash, LLC and Green Apple Homes, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

992.  Also at said sales session attended by Plaintiff Thode with a purported expert consultant at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 23050 Majestic St., Oak Park, Michigan from Defendant Expansion Properties, LLC for $79,550.00.

However, with various add-ons, including a $4,592.40 "loan origination fee" and "closing costs" including a $2,250.00 fee paid to Guardian Law, the actual sales price was $89,908.00 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 30, 2015 and recorded July 23, 2015.

993.   Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

994.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $18,404.00 regarding her purchase of the Majestic property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $61,100.00 with interest-only payments of $611.00 per month for 36 months and the balance of $41,100.00 being due at the end of said 36 month period.

995.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Majestic St. home had been available for sale at the distressed sale price of $55,000.00 and was purchased by Defendants' agent, John Graham, Inc. on January 22, 2015 for $55,000.

996.  Defendant John Graham, Inc. soon thereafter conveyed the Majestic property directly to Defendant Expansion Properties, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on March 27, 2015 for a purported $69,500.00.  Defendant Expansion Properties, LLC then sold the Majestic property to Ms. Thode on April 30, 2015 for the aforementioned effective price of $89,908.00

997.  The City of Oak Park, Michigan assessed value of the Majestic at an S.E.V. of $24,700.00 for 2012 and $26,900.00 for 2015.

998.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Majestic property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

999.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Majestic property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

1000.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

1001.  As described *supra,* Defendants Insider's Cash, LLC and Expansion Properties, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

247

1002.   Also at said sales session attended by Plaintiff Thode with a purported expert consultant at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 20427 Wakenden, Redford, Michigan 48240 from Defendant 5 Choices, LLC for $63.700.00  However, with various add-ons, including a $3,478.10 "loan origination fee" and "closing costs" including a fee of $2,050.00  paid to Defendant Guardian Law, the actual sales price was $71,888.90 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 27, 2015 and recorded June 4, 2015.

1003.   Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% to 66% "loan to purchase  price" ("LPT").   This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

1004.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $16,535.00 regarding her purchase of the Wakenden property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $48,800.00 with interest-only payments of $488.00 per month for 36 months and the balance of 48,800.00 being due at the end of said 36 month period.

1005.  Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Wakenden property had been available for sale at the distressed sale price of $28,500.00 and was purchased by Defendants' agent, GWH Properties, LLC on May 23, 2014 for $28,500.00.

1006.  GWH Properties, LLC soon thereafter conveyed the Wakenden property directly to Defendant 5 Choices, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on October 31, 2014 for a purported $55,250.00.  Defendant 5 Choices, LLC then sold the Wakenden property to Ms. Thode on April 27, 2015 for the aforementioned effective price of $71,888.90.

1007.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Wakenden property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

1008.   Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Wakenden property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

1009.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

1010.  As described *supra*, Defendants Insider's Cash, LLC and 5 Choices, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

1011.  Also at said sales session attended by Ms. Thode with a purported expert consultant at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 11 167th Street, Calumet City, Illinois from Defendant Improvement Homes, LLC for $85,150.00.  However, with various add-ons, including a $3,537.60 "loan origination fee" and "closing costs" of $2,250.00 (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $95,679.51 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed

1012.  Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% to 66% "loan to purchase  price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

1013.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $15,428.00 and paid an additional $29,948.00 from her IRA regarding her purchase of the Wakenden property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the loan balance of $49,500.00 with interest-only

payments of $495.00 per month for 36 months and the balance of 49,500.00 being due at the end of said 36 month period.

1014.  Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the 167th Street property had been available for sale at the distressed sale price of $33,000.00 and was purchased by Defendants' agent, Defendant John Graham Inc. on February 2, 2015 for $33,000.00.

1015.  Defendant John Graham Inc. soon thereafter conveyed the 167th Street property directly to Defendant Improvement Homes, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on May 5, 2015 (which was subsequent to the "Settlement date" for the purchase by Ms. Thode) for a purported $65,500.00.  Defendant Improvement Homes, LLC had agreed to sell the property to Ms. Thode on April 21, 2015 for the aforementioned effective price of $95,679.51.

1016.  The city of Calumet City, Illinois has a local ordinance that requires a home that has been sold to pass a city inspection before the deed evidencing said sale can be recorded.

1017.  The property located at 11 167th Street, Calumet City, Illinois and purchased by Ms. Thode did not pass the aforementioned city inspection due to physical defects.

1018.  Because the purchased property cannot pass the mandatory city inspection, the deed cannot be recorded and the property cannot be leased to a tenant.

1019.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the 167th Street property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

1020.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the 167th Street property at a discounted price and then

purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value.

1021.   In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

1022.   As described *supra*, Defendants Insider's Cash, LLC and Improvement Homes, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

1023.   Also at said sales session attended by Ms. Thode with an a purported expert consultant at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 2849 225th St., Sauk Village, Illinois from Defendant Improvement Homes, LLC for $84,550.00. However, with various add-ons, including "closing costs" including a fee of $2,000.00  paid to Defendant Guardian Law, the actual sales price was $90,516.66 which Ms. Thode paid in full with funds from her IRA and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed May 7, 2015.

1024.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the 225th St Street property had been available for sale at the distressed sale price of $21,000.00 and was purchased by Defendants' agent, Defendant John Graham Inc. from Fannie Mae, a/k/a Federal National Mortgage Association by special Warranty Deed dated January 8, 2015.

1025.  Defendant John Graham Inc. soon thereafter conveyed the 225th Street property directly to Defendant Improvement Homes, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on May 12, 2015 (which was subsequent to the "Settlement date" and "proration date" for the purchase by Ms. Thode) for a purported $65,500.00.   Defendant Improvement Homes, LLC had agreed to sell the property to Ms. Thode on April 21, 2015 for the aforementioned effective price of $90,516.66.

1026.  Defendants had a contractual and fiduciary duty owing to Plaintiff Thode to locate the 225th Street property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

1027.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the 225th Street property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

1028.  Also at said sales session attended by Ms. Thode with a purported expert consultant at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 31 164th Pl., Calumet City, Illinois 60409 from Defendant Improvement Homes, LLC for $82,750.00. However, with various add-ons, including a $4,837.70 "loan origination fee" and "closing costs" of $2,250.00 (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $95,358.95.  Ms. Thode has never received a deed for this property.

1029.  Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as

available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

1030.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $19,037.00 and paid an additional $11,036.00 from her IRA regarding her purchase of the 164th Pl. property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the loan balance of $63,800.00 with interest-only payments of $638.00 per month for 36 months and the balance of 63,800.00 being due at the end of said 36 month period.

1031.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the 164th Pl. property had been available for sale at the distressed sale price of $31,000.00 and was purchased by Defendants' agent, Defendant John Graham Inc. on December 11, 2015 for $31,000.00.   Defendant Improvement Homes, LLC had agreed to sell the property to Ms. Thode as of April 21, 2015 for the aforementioned effective price of $95,679.51.   No deed regarding the subject property from Defendant John Graham Inc. to Defendant Improvement Homes, LLC has been recorded.   No deed regarding the subject property from Defendant Improvement Homes, LLC to Eva Thode has been either delivered or recorded.

1032.  The city of Calumet City, Illinois has a local ordinance that requires a home that has been sold to pass a city inspection before the deed evidencing said sale can be recorded.

1033.  The property located at 31 164th Pl., Calumet City, Illinois and purchased by Ms. Thode did not pass the aforementioned city inspection due to physical defects.

1034.  Because the purchased property cannot pass the mandatory city inspection, the deed cannot be recorded and the property cannot be leased to a tenant.

1035.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the 164th Pl. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

1036.   Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the 164th Pl. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value.

1037.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

1038.  As described *supra*, Defendants Insider's Cash, LLC and Improvement Homes, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

1039.  Ms. Thode was also induced by the fraudulent representations of the Defendants to purchase ten undeveloped lots in Florida from Defendants, all at prices significantly above fair

market value.  She is entitled to rescission of said fraudulent sales and a refund of the purchase prices as damages.

1040.  Ms. Thode also purchased two loans with mortgages secured by properties located in suburban Detroit relying the false representations of the purported expert consultants and Defendant Kory Thurston.

.   1041.  Both properties which secured the aforementioned loans had previously been sold to a victim of the Buying Summit Fraudulent Scheme who had borrowed the purchase money from Defendant Insider's Cash, LLC and thus, the balance on each loan was in excess of the fair market value of the property.

1042.  Each of the two loans is an interest-only loan with a balloon payment of the full balance due after 36 months.

1043.  Further, in both cases, the borrower of each of these loans was a self-directed IRA so that each loan is a non-recourse loan.  Therefore, Ms. Thode cannot enforce either loan and can only collect on each loan by way of foreclosure.

1044.  Ms. Thode paid cash from her IRA to Defendant Income Property USA, LLC in the amount $43,100.00 (the amount of the principle balance due) for an assignment of a loan secured by 6768 Republic, Warren, Michigan immediately after it had been assigned to Income Property USA, LLC by Insider's Cash, LLC.

1045.  Ms. Thode has never received either the original assignments nor the note and mortgage for either property.

1046.  Defendants John Graham Inc., Insider's Cash, LLC and Income Property USA, LLC were well aware that the property at 6768 Republic was not worth the aforementioned note balance and that the loan agreement was non-recourse.

1047.  On April 11, 2014, Defendant John Graham Inc. had purchased the subject property for $24,000.00 from Fannie Mae, the Federal National Mortgage Association.  On July 15, 2014, Defendant John Graham Inc. sold the property to Defendant Green Apple Homes, LLC for a purported $49,500.00.  On February 3, 2015, Defendant Green Apple Homes sold the property to its Buying Summit victim, the Annamarie Butterworth IRA of Colonial Heights, Virginia for $56,350.00 plus the usual "closing costs".

1048.  For 2016, the S.E.V. for the property is $17,030 with True Cash Value being $34,060.00 which is less than the balance due on said loan or the original purchase price paid by the borrower.

1049.  Ms. Thode also paid cash from her IRA to Defendant Income Property USA, LLC in the amount $45,800.00 (the amount of the principle balance due) for an assignment of a loan secured by 20049 Elkhart St., Harper Woods, Michigan immediately after it had been assigned to Income Property USA, LLC by Insider's Cash, LLC.

1050.  Ms. Thode has never received either the original assignments nor the note and mortgage for either property.

1051.  Defendants Insider's Cash, LLC and Income Property USA, LLC were well aware that the property at 20049 Elkhart St. was not worth the aforementioned note balance and that the loan agreement was non-recourse and failed to disclose this to Plaintiff Thode.

1052.  On September 15, 2014, GWH Properties LLC had purchased the subject property for $33,850.  On September 25, 2014 , GWH Properties LLC sold the property to Defendant Green Apple Homes, LLC for a purported $50,000.00.  On February 6, 2015, Defendant Green Apple Homes sold the property to its Buying Summit victim, the Richard Rounsborg IRA of Minden, NE for $58,650.00 plus the usual "closing costs".

1053.  For 2016, the S.E.V. for the property is $20,100, True Cash Value being $40,200.00 which is less than the balance due on said loan or the original purchase price paid by the borrower.

1054.  None of the applicable assignment documents has a "forum selection" clause and venue in this judicial district against Insider's Cash, LLC, Income Property USA, LLC and all of the other Defendants is proper.

1055.  Plaintiff Eva Thode has expended thousands of dollars to repair the properties she has purchased from these Defendants due to significant structural defects existing at the time of contracting.

1056.  Plaintiff Eva Thode expended over $6,000.00 to the Defendants' associate Veil Corporate, LLC for the creation of a limited liability company and limited liability company services although her properties were conveyed to her Self Directed IRA and not to a limited liability company due to the fraudulent inducements of Defendants' agents.

1058.  Due to the aforementioned fraud of these Defendants, Plaintiff Eva Thode is entitled to rescission and revocation of all agreements made with any and all of the Defendants and restitution of all amounts previously paid to them.

1059.  As a direct and proximate result of the conduct of these Defendants as set forth herein, including the conduct of the affairs of and investment in the Buying Summit Fraudulent

Enterprise by the Defendants identified in this Complaint, Plaintiff Eva Thode was injured in her business and property and continues to suffer injuries, including the amounts of their investments and legal expenses.

1060.  Pursuant to 18 US.C. §1964(c), Plaintiff Eva Thode is entitled to recover from each of the Defendants identified in this Complaint (and from other members of the fraudulent scheme to be identified) treble damages, her costs and reasonable attorney fees.

1061.  Relying upon additional misrepresentations of the alleged expert consultants who stated that the values of these properties were far in excess of reality, Plaintiff Thode also purchased the following lots at or through the Buying Summit for amounts in excess of their true cash value and for which she incurred damages:

    1.  Lot 10 block 33 Nervia St., North Port, FL  34287 – from Level Field Spread, LLC (751 E. Quality Dr. Ste 102, American Fork, UT 84003

    2.  6634 Flintwood St. (also known as Lot 8 Block 61 Holley by the Sea), Navarre, FL 84043 – from Rock It Homes, LLC (751 E. Quality Dr. Ste 102, American Fork, UT  84003)

    3.  Lot 4 Tropicaire Blvd, North Port, FL  34291 – from IvyVest Properties, LLC (751 E. Quality Dr. Ste 102, American Fork, UT  84003)

    4.  Lot 13 So Haberland Blvd, North Port, FL  34288 - Rock It Homes, LLC (751 E.Quality Dr. Ste 102, American Fork, UT 84003)

    5. Lot 22 Adelaide Avd., North Port, FL  34288 – from Rock It Homes, LLC (751 E. Quality Dr. Ste 102, American Fork, UT 84003)

    6. Lot 1 Block 2469 San Mateo Dr., North Port, FL  34288 – from IvyVest Properties, LLC (751 E .Quality Dr. Ste 102, American Fork, UT 84003)

    7. 118 NW 2nd Pl. (Block 2487 lots 37 + 38), Cape Coral, FL  33993 – from Rock It Homes, LLC (751 E.Quality Dr. Ste 102, American Fork, UT 84003)

8. Lot 3 Block 1753 Aliceville Rd., North Port, FL 34288 – from Rock It Homes, LLC (751 E. Quality Dr., Ste 102, American Fork, UT 84003)

9. Lot 29 Block 1322 Battalla Rd., North Port, FL 34291 - from Rock It Homes, LLC (751 E. Quality Dr., Ste 102, American Fork, UT 84003

10. 15 Skipper Lane, Placida, FL 33946 - IvyVest Properties, LLC (751 E. Quality Dr., Ste 102, American Fork, UT 84003)

1062. Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiff Eva Thode for her damages. Plaintiff Thode incurred and is entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated by each Defendant herein through conducting and participating in the affairs of the Buying Summit Fraudulent Enterprise and conspiracy.

## COUNT XI -
## THE CLAIMS OF LAYNE LUNDSTROM, AUDREY LUNDSTROM AND INVICTA LEGATO INVESTMENTS, LLC

The allegations of paragraphs 1 – 1062 are incorporated by reference as if fully set forth herein.

1063. In March or April 2014 while living in Cedar Park, Texas, Plaintiffs Layne Lundstrom and Audrey Lundstrom received in the United States Mail a promotional flyer featuring Spike TV celebrity Doug Clark of the TV show "Flip Men" inviting them to a attend a free seminar concerning real estate investing and promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

1064.  The aforementioned promotional flyer was an incidence of mail fraud pursuant 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme and conspiracy.

1065.  In response to the aforementioned promotional flyer, Layne Lundstrom called the advertised telephone number and spoke with an agent of the Defendants during which his attendance along with Audrey Lundstrom at such a free seminar was scheduled for April 16, 2014 at a nearby hotel in Round Rock, Texas.

1066.  At the free seminar held on April 16, 2014, Plaintiffs Lundstrom were induced by agents of Defendants to purchase the "Yancey 3-Day Real Estate Workshop Package" for $1,997.00 based upon express promises and inducements that by taking these courses, they would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

1067.  The "Yancey Real Estate 3-Day Real Estate Workshop" was held October 17, 18 and 19, 2014 at a hotel in Dallas, Texas.  At this "workshop", the attendees, including Plaintiffs Lundstrom, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.  Plaintiffs Lundstrom declined to do so.

1068.  At the aforementioned "Yancey 3-Day Real Estate Workshop", Plaintiffs Lundstrom were induced by the fraudulent statements of the purported expert consultants on October 19, 2014 to purchase the "Yancey Continuing Education Diamond Lifetime Membership" for $27,000.00

which included unlimited lifetime attendance at all Buying Summits specifically relying upon the following representations:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b) Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the purported expert consultants at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes at prices far below those available to the general public.

1069.  Simultaneously with their execution of the Buying Summit contract, the Lundstroms checked the box to purchase an "asset protection" package for $595.00 from Defendant Veil Corporate which is described *infra*.

1070  There is no arbitration or forum selection clause associated with the agreement of the Lundstroms  to purchase this "Asset Protection" package from Defendant Veil Corporate.

1071.  Defendants' purported expert consultants also informed the attendees at the local workshops including the Lundstroms that attendees of the Buying Summit needed to set up a limited liability company ("LLC") prior to attending the Buying Summit so that there would exist an entity to which properties and other purchases made at the Buying Summit could be conveyed.

1072.  The Lundstroms purchased such a package for the set-up of an LLC entity prior to attending the Buying Summit and had direct interaction with purported professionals employed by

Defendants Veil Corporate and Guardian Law who provided legal advice to Mr. Lundstrom in this regard.

1073.   Having purchased the "Asset Protection" plan of Defendant Veil Corporate and relying upon the purported expert advice of Defendant Veil Corporate and Guardian Law, the Lundstroms  set up a limited liability company in Utah so that there would exist an entity into which properties and other purchases made at the Buying Summit could be conveyed.

1074.   Despite providing professional services for a fee to the Lundstroms , Defendants Veil Corporate and Guardian Law both continued to represent the Defendants both before and during their simultaneous representation of The Lundstroms regarding the same transactions and occurrences throughout the perpetuation of the Buying Summit Fraudulent Scheme and failed to disclose such representation to either The Lundstroms  or the other attendees of the workshops, the Buying Summit or to persons who purchased professional services from them in relation to the Buying Summit.

1075.   As the result of providing The Lundstroms  with expert legal advice for a fee, Veil Corporate and Guardian Law each owed a fiduciary duty to the Lundstroms  to disclose their dual representation and to make a full disclosure to her of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents she was about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

1076.   Absent such full disclosure by Veil Corporate and/or Guardian Law, all such contracts which were signed by the Lundstroms with Defendants are void, including any arbitration or forum selection clauses contained therein and any and all purported releases.

1077.   While at home at the end of November 2014, Plaintiffs Lundstrom received a telephone call from agents of Defendants, Van Beere and Justin Labrum who identified themselves as members of "Dean's Inner Circle".   They forcefully and relentlessly inquired about the Lundstroms' financial status.   During this "hard sell" telephone call, the Lundstroms were promised, *inter alia*, the opportunity to become a member of the "Inner Circle" personal mentorship two-year program for $18,000.  The Lundstroms declined this offer.

1078.   Nevertheless, Plaintiffs Lundstrom received two more rounds of "hard sell" telephone calls from Defendants' agents urging them to purchase an "Inner Circle" mentorship membership program while continuously lowering the price.  Plaintiffs Lundstrom finally agreed to purchase the membership for $2,795.00 on January 22, 2015.

1079.  Each of these telephone calls made Defendants' agents to Plaintiffs Lundstrom and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1080.  The aforementioned "training" and Buying Summit packages were purchased by Plaintiffs Lundstrom from an entity entitled "Yancey, LLC".

1081.  The written contractual agreements between Plaintiffs Lundstrom and "Yancey, LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association which is unenforceable for the reasons stated *supra*.

1082.  Plaintiffs Lundstrom attended a Buying Summit in Las Vegas January 8-10, 2015.

1083.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiffs Lundstrom were induced to attend a sales session with a purported expert consultant at the Buying Summit.

1084.  Plaintiffs Lundstrom were also induced to make a property purchase from Defendants based upon this fraudulent representation set forth in a BuyPD brochure:

> Our specialized team works closely with a legal team to ensure that all purchases and properties are bought, renovated, obtained, and sold following the highest compliance principles and ethics.

1085.  The Lundstroms relied to their detriment upon the Defendants' and especially Defendant Kory Thurston's repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

1086.  The Lundstroms relied to their detriment upon the Defendants' and especially Defendant Kory Thurston's repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

1087.  The Lundstroms relied to their detriment upon the Defendants' and especially Defendant Kory Thurston's repeated material misrepresentations that the properties they offered for sale had been fully rehabbed and had paying tenants.

1088.  The Lundstroms relied to their detriment upon the Defendants' and especially Kory Thurston's repeated material misrepresentations that the purported "hard money loans" offered at the Buying Summit by Defendants Insider's Cash, LLC and American Cash Fund, LLC were for no more than 66% of the value of the property which secured such loan.

1089.   At a sales session attended by Plaintiffs Lundstrom with a purported expert consultant at the Buying Summit identified as Taylor Warburton of Defendant BuyPD, an internet monitor displayed various homes for sale.  For one such home located at 2016 Salu St., Alton, IL 62002, Defendants' internet monitor displayed a suggested retail price of $55,000.00.   The purported bargain contract price offered by Defendants for this home was $54,450.00

1090.  Defendants' internet screen display of the fraudulent suggested retail price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1091.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Salu St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Plaintiffs Lundstrom agreed to purchase the property from Defendant Interactive Homes, LLC.  However, with various add-ons, including a $3,321.30 "loan origination fee" and "closing costs" which included a fee of $2,050.00 paid to Defendant Guardian Law, the actual sales price was in excess of $61,000.00 and a deed drafted by Defendant Guardian Law purporting to convey the property from Interactive Homes, LLC to Plaintiff Invicta Legato Investments, LLC was executed and dated February 24, 2015 by Defendant Interactive Homes, LLC by it Managers Rob Lewis or Steve Liechty.

1092.  The city of Alton, Illinois has a local ordinance that requires a home that has been sold to pass a city inspection before the deed evidencing said sale can be recorded.

1093. The property located at 2016 Salu St., Alton, IL 62002 and purchased by Plaintiff Invicta Legato Investments, Inc. has not passed the aforementioned city inspection.

1094. Because the purchased property has not passed the mandatory city inspection, the deed cannot be recorded and the property cannot be leased to a tenant.

1095. Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Plaintiffs Lundstrom, the false impression that the home they were purchasing was worth in excess of the amount of his "bridge loan" from Defendants when, in fact, the home he purchased was worth less than the amount of his "bridge loan" and thus could not be refinanced or sold.

1096. Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Plaintiffs Lundstrom made a down payment of $19,685.00 regarding their purchase of the Salu St. home and a signed a loan agreement on behalf of Invicta Legato Investments, LLC with Defendant Insiders Cash, LLC to pay the loan balance of $42,100.00 with interest-only payments of $421.00 per month for 36 months and the balance of $42,100.00 being due at the end of said 36 months.

1097. As described *supra*, Defendants Insider's Cash, LLC and Interactive Homes, LLC are owned and controlled by the same persons making the alleged purchase money "loan" illusory.

1098. Unbeknownst to the Lundstroms and as the result of Defendants' successful attempts to engender their unqualified trust, Mr. and Mrs. Lundstrom executed a Limited Power of Attorney

granting to Sandra D. Davis, an employee of Blair Jackson, attorney for Defendants, the authority to execute documents on their behalf. Without notice or permission, Ms. Davis executed both the loan and mortage associated with the purchase of the Salu property and a purported Personal Guaranty by the Lundstroms of said loan agreement. See Exhibit WW

1099. Attorney Blair Jackson is professionally associated with Guardian Law, American Legal and Escrow and Invictus Law, PLLC and has represented the various Defendants throughout their perpetuation of the Buying Summit Fraudulent Scheme.

1100. The Lundstroms' loan agreement and the Personal Guaranty were both drafted by Defendant Guardian Law.

1101. The contractual agreement between Defendant Blair Jackson and the Lundstroms created a fiduciary duty on the part of Blair Jackson owing to the Lundstroms to disclose his dual representation and to make a full disclosure to them of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents they had and were about to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to them at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale by Defendants. See Exhibt OO

1102. Unbeknownst to the Lundstroms but known to Defendants at the time of purchase, the Salu St. home had been available for sale at the distressed sale price of $22,500.00 and was purchased by CR Investments, LLC on December 23, 2014 for $22,500.00.

1103. CR Investments, LLC soon thereafter conveyed the Salu St. property directly to Defendant Interactive Homes, LLC by Warranty Deed prepared by Defendants' attorneys

Guardian Law on January 8, 2015 for a purported $39.000.00.  Defendant Interactive Homes, LLC

then sold the Salu St. property to Invicta Legato Investments, LLC on February 24, 2015 for the

aforementioned effective price of in excess of $61,000.00.

1104.  Defendants had a contractual and fiduciary duty owing to the Lundstrom to locate

the Salu St. property at such a discounted price, inform them of its existence and availability and

to facilitate its purchase by the Lundstroms and/or his company at such a discounted price.

1105.  Instead, Defendants breached fiduciary their duties as described *supra*, and

absconded with the opportunity to purchase the Salu St. property at a discounted price and then

purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the

property to the Lundstroms and their company at a price greatly in excess of its fair market value

or true cash value

1106.  In further breach of their contractual and fiduciary duties, Defendants

induced the Lundstroms to execute the aforementioned loan agreement for a principle amount

which exceeded the fair market value or true cash value of the subject property knowing that

therefore the loan could not be refinanced within six months (or at all) as Mr. Lundstrom had been

informed by Defendants at the Buying Summit.

1107.  Due to the aforementioned fraud of these Defendants, Plaintiffs Layne Lundstrom,

Audrey Lundstrom and Invicta Legato Investments, LLC are entitled to rescission and vacation of

all agreements made with any and all of the Defendants and restitution of all amounts they have

previously paid to them.

1108.  As a direct and proximate result of the conduct of these Defendants as set forth

herein, including the conduct of the affairs of and investment in the Buying Summit Fraudulent

Enterprise by the Defendants identified in this Complaint, Plaintiffs Layne Lundstrom, Audrey Lundstrom and Invicta Legato Investments, LLC were injured in their business and property and continues to suffer injuries, including the amounts of their investments and legal expenses.

1109. Pursuant to 18 US.C. §1964(c), Plaintiffs Layne Lundstrom, Audrey Lundstrom and Invicta Legato Investments, LLC are entitled to recover from each of the Defendants identified in this Complaint (and from other members of the fraudulent scheme to be identified) treble damages, their costs and reasonable attorney fees.

1110.   Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Plaintiffs Layne Lundstrom, Audrey Lundstrom and Invicta Legato Investments, LLC for their damages.

### COUNT XII - THE CLAIMS OF PAUL VALENTI, SHERRY VALENTI, RE ININVESTOR 702, LLC

The allegations of paragraphs 1 – 1110 are incorporated by reference as if fully set forth herein.

1111.   Plaintiffs Paul Valenti and Sherry Valenti (the "Valentis") received a mailer via the United States mails advertising an event which claimed that attendees would receive expert advice that would provide them with information to enable them to successfully invest in real estate. This mailer touted having an HGTV Star giving a speech, a free lunch, a chance to win a laptop, a free mini iPod for all attending and a chance to become a savvy investor.  The Valentis signed up online for the event that was being held in the Denver Tech Center at the Sheraton Hotel in Denver, Colorado on May 31, 2014.

1112.  At this initial event, the presentation was managed and conducted by agents of the Defendants but it is unknown for certain with which entity each such person was actually employed.  The Valentis were encouraged by these agents to sign up for a 3-day investment seminar which would allegedly provide them with the knowledge "to invest in real estate with confidence". There was a good deal of pressure to be one of the first 30 to sign up as there were allegedly only a limited number of slots available. The cost for this was $1,997.00.  The Valentis executed a contract with Defendant Property Education, LLC to this effect dated May 31, 2014.

1113. The three-day seminar was held at the downtown Denver Weston in Denver, Colorado on June 6-8, 2014. A person identified as Bryan Deucher was the speaker and there were a few counselors that would meet with small groups to ask questions. These counselors were not actually there to provide training but to convince people to spend more money to join another educational program and to push the attendees to try to increase their credit card account amounts so that they could allegedly use that for investment purposes. If anyone was dissenting, they were made to feel like they were negative people and they should look at the positive side of things. It was even stated that some people might want to talk you out of this "opportunity" but that the attendees should not listen to their negative attitudes.

1114.  The primary purpose of these workshops was for the presenters to present themselves to the attendees as experts in the field of purchasing rental real estate for investment purposes at discounted prices so that the attendees would then purchase both A) a Buying Summit Package and B) a purported "Asset Protection Package" from a Utah entity identified as "Veil Corporate, LLC".

1115.  The presenters at the Valentis' local workshop informed the attendees that:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b)  Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the staff at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

1116.   Further, the presenters and purported expert consultants at the Valentis' local workshops provided what appeared to the Plaintiffs and other attendees to be expert legal advice and insisted that prior to attending the Buying Summit that they needed to create a limited liability company into which the properties and assets they would purchase at the Buying Summit would be conveyed.  Defendants' presenters recommended that this be performed through Defendant Veil Corporate, LLC ("Veil").

1117.  The Valentis decided that they wanted to really make a go of this so they signed up for the Diamond Package with Defendant Property Education, LLC costing $39,997.00 which included the right to attend and participate in a Buying Summit held in Las Vegas, Nevada.

1118.  Prior to executing the Buying Summit contract, the Valentis were informed by Defendants' agents that they should retained Defendant Veil Corporation to create a limited liability company for them so that an entity would exist to which they could convey properties they would purchase at the Buying Summit.  Their experience and interaction with Guardian Law and Veil Corporate in this regard is virtually identical to that described in Paragraphs 150-160 CHECK, *supra.*

1119.  Based upon the legal advice provided to them by Guardian Law, a Utah limited liability company was created on June 24, 2014 called Re Investor 702, LLC with Paul and Sherry Valenti as managers.  Guardian Law never provided any advice regarding creating such an entity in the State of Michigan where most of the Valentis' properties where to be purchased.

1120.  The Valentis only agreed to execute the contract in Paragraph 1119 *supra* based upon the express representations of the agents of the Defendants that:

a) Attending the Buying Summit was the only way one could gain access to purchase the rental housing for investment purposes at steeply discounted prices that Defendants had allegedly located, identified and purchased through their special methods for specialized resale to Buying Summit attendees that are "vetted and rehabbed and rented and ready to go"; and

b)  Attending the Buying Summit was the only way one could receive specialized, individualized and personal advice, guidance and expertise from the purported expert consultants at the Buying Summit in selecting and purchasing those discounted rental properties for investment purposes.

1121.  The aforementioned expert "training" and Buying Summit packages were purchased by the Valentis from a purported entity entitled "Property Education, LLC".

1122.  The written contractual agreements between The Valentis and "Property Education, LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

1123.  Because the fiduciary relationship created by Defendants with the Valentis, Defendants had a duty to make a full disclosure to them of the true and complete nature of the Buying Summit Fraudulent Scheme including the entire contents of the documents they were about

to sign with the Defendants and full disclosure of the multiple fora for dispute resolution and the contractual terms which contradicted the express promises made to her at the workshops, at the Buying Summit and otherwise regarding the true nature of the properties for sale.

1124. During August 14-16, 2014, the Valenti attended the Buying Summit in Las Vegas. As with the other Plaintiffs, Kory Thurston was the primary speaking and apparent leader of the event.

1124.  As with the other Plaintiffs, each person or couple had assigned times to meet with their personal investment advisor.

1125.  The investment advisor for the Valentis was Lars Johnson. At their personal session, the Valentis were shown pictures of houses on the internet on a computer and strongly encouraged to pick out properties to purchase because they were told that these were great bargains as they had been rehabbed and were well below market value. There were allegedly only so many houses available and if they did not purchase soon, there might not be any remaining.

1126.  Upon arriving at the Buying Summit, the Valentis were provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook".

1127.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to The Valentis and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

**15.   What resources to you use to complete the due-diligence?**  We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

1128.   The Valentis relied to her detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

1129.   At the Buying Summit the attendees, including Plaintiff Valenti, were expressly told that the properties offered for sale there by Defendants were already rehabbed, tenanted, under the care of a property management company and that they were available to purchase at well below market value.

1130.   The Valentis relied to their detriment upon the Defendants' and especially Defendant Kory Thurston's repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

1131.   The Valentis relied to their detriment upon the Defendants' and especially Defendant Kory Thurston's repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

1132.   At this time, the Valentis also paid to have an LLC set up by Veil Corp. so that an entity would exist to which properties purchased at the Buying Summit could be conveyed.

1133.   The Valentis attended a 3-day event called "Boots on the Ground" at the Springhill Suites near Denver International Airport from June 26-28, 2014. The instructor's name was given as "Andrea" and she claimed to be from the Denver area. She had been through the educational program and she assured us that it worked very well for her, that it got her family out

of debt and they were enjoying the good life. She often mentioned the person that started this program, Dean Graziosi, and she made him sound like a saint that wanted the attendees to all to have this great knowledge.

1134. The Valentis were on vacation in Michigan when they received a call from someone at BuyPD or another related entity about becoming a member of the "Inner Circle". It was stated that they would have a personal consultant that would help them through the process of learning how to become successful at real estate investing. The consultant would help them through their first successful real estate transaction.  The cost to the Valentis to become an inner circle member was $17,495.00 and Roy Voeks was assigned to them as their consultant. They had weekly telephone conferences with Roy and he had several lessons online that they listened to.  From September 11-12, 2014, they attended the Inner Circle Camp in Utah. They had the opportunity to meet with their counselor.  Mr. Voeks was to stay with them until they had completed their first successful transaction.  However, before this could occur, Mr. Voeks announced that he felt that the Valentis were ready to go it alone. No transaction ever happened and yet another material breach of contract was made by Income Property USA, Buy PD or whatever name they were calling themselves that week.  The Valentis are entitled to recission and a refund of the amounts paid for these unperformed service due to their material breach of contract as an alternative remedy to treble damages pursuant to RICO.

1135. In September, 2014 the Valentis met with Defendants' agent Adam Leffler as part of the original Education package for $39,997.00 and got to spend a weekend with a "one on one" counselor who would tour properties with them and make sure we were moving in the right direction. Virtually no useful information came out of the weekend which was a material breach

of the contractual obligation of this "education defendant".  The Valentis are entitled to recission and a refund of the amounts paid to Defendant Property Education, LLC and the other entities due to their material breach of contract as an alternative remedy to treble damages pursuant to RICO.

1136.  The Valentis also purchased the Veil Corp Asset Protection for $6095 which was a material breach of contract as described *supra*. . The also Safegard Financial financial planning and Tax Support for $3,795.00 which was worthless and a material breach of contractual promises. . The Valentis are entitled to recission and a refund of the amounts paid for these "services" due to the Defendants' material breach of contract as an alternative remedy to treble damages pursuant to RICO.

1137.  Each of the telephone calls made Defendants' agents to the Valentis and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1138.  During a sales session at the Buying Summit attended by The Valentis with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 21044 Blackmar, Warren, Ml, 48091 the purported bargain contract price offered by Defendants for this home was $70,200.00 as displayed on this internet monitor.

1139.  Defendants' internet screen display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate

act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1140.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Paul Valenti purchased the Blackmar property from Defendant Green Apple, LLC for $70,200.00.   However, with various add-ons, including a $3,926.00 "loan origination fee" and "closing costs" which included a fee of $2,050.00 paid to Defendants Guardian Law, the actual sales price was $79,300.00 and the property was conveyed by Defendant Green Apple Homes, LLC to American Estate and Trust FBO Paul Valenti IRA by Warranty Deed drafted by Defendant Guardian Law dated October 2, 2014 and signed by Rob Lewis, Manager.

1141.  Mr. Valenti through his new IRA made of down payment of $25,374.00 was given a credit in the amount of $226.98 and borrowed $53,700.00 from Defendant Insider's Cash, LLC to finance the purchase pursuant to a non-recourse loan agreement and mortgage identical to the other non-recourse loan agreements and mortgages with defendant Insider's Cash, LLC in this action.

1142.  As described *supra*, Defendants Insider's Cash, LLC and Green Apple Homes, LLC are owned and controlled by the same persons.  Whereas a loan from an independent lender would reflect such lender's good faith assessment of the true value of the property, the instant "loan" from a related entity did nothing but provide the fraudulent impression to the borrower that the property was worth far in excess of the loan proceeds.

1143.   Unbeknownst to Mr. Valenti but known to Defendants at the time of purchase, the Blackmar home had been available for sale at the distressed sale price of $32,000.00 in July, 2014  and was purchased on behalf of Defendants own account by Defendants' agent GWH Properties LLC for the sum of $32,000.00 on July 11, 2014.

1144.   GWH Properties LLC. soon thereafter conveyed the Blackmar property directly to Defendant Green Apple Homes, LLC for $53,530.00  by Warranty Deed prepared by Defendant Guardian Law on August 29, 2014.  Defendant Green Apple Homes, LLC then sold the Blackmar property to American Estate and Trust FBO Paul Valenti, IRA on October 2, 2014 for the aforementioned effective price of $79,300.00.

1145.   Defendants had a contractual and fiduciary duty owing to Paul Valenti to locate the Blackmar property at a discounted price, inform him of its existence and availability and to facilitate its purchase at such a discounted price.

1146.   Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Blackmar property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Valenti at a price greatly in excess of its fair market value or true cash value

1147.   In further breach of their contractual and fiduciary duties, Defendants induced Mr. Valenti to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced as Paul Valenti had been informed by Defendants at the Buying Summit.

1148.   For the year 2014, the assessor for Redford Twp., Michigan determined that the property had a fair market value of $41,900.00 which back in 2018 $51,160

1149.  Paul Valenti had been unable to sell the Blackmar property because the property is not worth what is owed on said bridge loan.

1150.   On January 26, 2015, Defendant Income Property USA, LLC sold the loan agreement between Insiders Cash, LLC and the Valenti IRA to Jen Mei Chang for the sum of $57,700.00  Once Mr Valenti became aware of the actual value of the Blackmar property and realized that the value of the Blackmar property would never rise to the fraudulent price he paid for it, he determined that it made sense only to quit claim title to the property to the Assignee of the lender, Jen Mei Chang which he did by way of quit claim deed dated August 3, 2018. Subsequently, Jen Mei Chang sold the property to Noble Services, LLC for the sum of $51,000.00 on February 8, 2019.

1151.   During a sales session at the Buying Summit attended by the Valentis with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 20563 Delaware Redford Twp., Michigan, the purported bargain contract price offered by Defendants for this home was $68,300.00 as displayed on this internet monitor.

1152.  Defendants' internet screen display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1153.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the Delaware Ave. property and the express promises of Defendant Kory Thurston who described the purported the bargains

to be purchased at the Buying Summit, Paul Valenti purchased the Delaware property from Defendant Green Apple, LLC for $68,300.00.   However, with various add-ons, including a $3,776.90 "loan origination fee" and "closing costs" which included a fee of $2,050.00 paid to Defendants Guardian Law, the actual sales price was in excess of $76,707.00 and the property was conveyed by Defendant Green Apple Homes, LLC to American Estate and Trust FBO Paul Valenti IRA by Warranty Deed drafted by Defendant Guardian Law dated October 2, 2014 and signed by Rob Lewis, Manager.

1154.   Mr. Valenti through his new IRA made of down payment of $24,607.00 and borrowed $52,100.00 from Defendant Insider's Cash, LLC to finance the purchase pursuant to a non-recourse loan agreement and mortgage identical to the other non-recourse loan agreements and mortgages with defendant Insider's Cash, LLC in this action.

1155.   As described *supra*, Defendants Insider's Cash, LLC and Green Apple Homes, LLC are owned and controlled by the same persons.   Whereas a loan from an independent lender would reflect such lender's good faith assessment of the true value of the property, the instant "loan" from a related entity did nothing but provide the fraudulent impression to the borrower that the property was worth far in excess of the loan proceeds.

1156.   Unbeknownst to The Valentis but known to Defendants at the time of purchase, the Delaware Ave. home had been available for sale at the distressed sale price of $35,000.00 in July, 2014 and was purchased on behalf of Defendants own account by Defendants' agent, John Graham Inc. on July 14, 2014 for $35,000.00.

1157.   John Graham Inc. soon thereafter conveyed the Delaware Ave. property directly to Defendant Green Apple Homes, LLC for $50,000.00 by Warranty Deed prepared by Defendant

Guardian Law on July 15, 2014.  Defendant Green Apple Homes, LLC then sold the Delaware Ave. property to American Estate and Trust FBO Paul Valenti, IRA on October 2, 2014 for the aforementioned effective price of in excess of $68,300.00.

1158.  Defendants had a contractual and fiduciary duty owing to Paul Valenti to locate the Delaware Ave. property at a discounted price, inform him of its existence and availability and to facilitate its purchase at such a discounted price.

1159.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Delaware Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Valenti at a price greatly in excess of its fair market value or true cash value

1160.  In further breach of their contractual and fiduciary duties, Defendants induced Mr. Valenti to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced as Paul Valenti had been informed by Defendants at the Buying Summit.

1161.  For the year 2014, the assessor for Redford Twp., Michigan determined that the property had a fair market value of $30,400.00 which was the actual fair market value of the property at that time.

1162.  Paul Valenti is and has been unable to sell the Delaware Ave. property because the property is not worth what is owed on said bridge loan.

1163.  On May 16, 2018, Defendant Income Property USA, LLC sold the loan agreement between Insiders Cash, LLC and the Valenti IRA to the Jevon McAlister IRA for the sum of $52,100.  Once Mr Valenti became aware of the actual value of the Delaware property and realized

that the value of the Delaware property would never rise to the fraudulent price he paid for it, he determined that it made sense only to quit claim title to the property to the Jevon McAlister IRA which he did by way of quit claim deed dated December 30, 2019.

1164.   During a sales session attended by The Valentis with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.   For one such home located at 21227 Panama, Warren, Michigan, the purported bargain contract price offered by Defendants for this home was $78.700.00 as displayed on this internet monitor.

1165.   Defendants' internet screen display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1166.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Paul Valenti purchased the Delaware property from Defendant Green Apple, LLC for $78.700.00.   However, with various add-ons, including a $4,458.70 "loan origination fee" and "closing costs" which included a fee of $2,250.00 paid to Defendants Guardian Law, the actual sales price was $88,390.00 and the property was conveyed by Defendant Green Apple Homes, LLC to American Estate and Trust FBO Paul Valenti IRA by Warranty Deed drafted by Defendant Guardian Law dated September 23, 2014 and signed by Rob Lewis, Manager.

1167.  Mr. Valenti through his new IRA made of down payment of $28,120.00, was given a credit in the amount of $670.00 and borrowed $59,600.00 from Defendant Insider's Cash, LLC to finance the purchase pursuant to a non-recourse loan agreement and mortgage identical to the other non-recourse loan agreements and mortgages with defendant Insider's Cash, LLC in this action.

1168.  As described *supra*, Defendants Insider's Cash, LLC and Green Apple Homes, LLC are owned and controlled by the same persons.  Whereas a loan from an independent lender would reflect such lender's good faith assessment of the true value of the property, the instant "loan" from a related entity did nothing but provide the fraudulent impression to the borrower that the property was worth far in excess of the loan proceeds.

1169.  Unbeknownst to Mr. Valenti but known to Defendants at the time of purchase, the Panama home had been available for sale at the distressed sale price of $26,342.00 in April, 2014 and was purchased on behalf of Defendants own account by Defendants' agent, this property was purchased by GWH Properties LLC for the sum of $26,342.00 on April 11, 2014.

1170.  GWH Properties LLC. soon thereafter conveyed the Panama property directly to Defendant Green Apple Homes, LLC for $59,590.00. by Warranty Deed prepared by Defendant Guardian Law on August 4, 2014.  Defendant Green Apple Homes, LLC then sold the Panama property to American Estate and Trust FBO Paul Valenti, IRA on October 2, 2014 for the aforementioned effective price of $88,390.80.

1171.  Defendants had a contractual and fiduciary duty owing to Paul Valenti to locate the Panama property at a discounted price, inform him of its existence and availability and to facilitate its purchase at such a discounted price.

1172.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Panama property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Valenti at a price greatly in excess of its fair market value or true cash value

1173.  In further breach of their contractual and fiduciary duties, Defendants induced Mr. Valenti to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced as Paul Valenti had been informed by Defendants at the Buying Summit.

1174.  For the year 2014, the assessor for Redford Twp., Michigan determined that the property had a fair market value of $32,040.00 which was the actual fair market value of the property at that time.

1175.  On October 16, 2014, Defendant Income Property USA, LLC sold the loan agreement between Insiders Cash, LLC and the Valenti IRA to the Margaret Buckley IRA for the sum of $59,600.  Once Mr Valenti became aware of the actual value of the Panama property and realized that the value of the Panama property would never rise to the fraudulent price he paid for it, he determined that it made sense only to quit claim title to the property to the Margaret Buckley IRA which he did by way of quit claim deed dated October 5, 2017.

WILMOT

1176.  During a sales session attended by the Valentis with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 24907 Wilmot Ave, Eastpointe, MI.  The purported bargain contract price offered by Defendants for this home was $74,500.00 as displayed on this internet monitor.

1177.   Defendants' internet screen display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1178.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Paul Valenti purchased the Wilmot property from Defendant Green Apple, LLC for $74,500.00  .  However, with various add-ons, including a $4,181.70 "loan origination fee" and "closing costs" which included a fee of $2,250.00 paid to Defendants Guardian Law, the actual sales price was $83,912.69 and the property was conveyed by Defendant Green Apple Homes, LLC to American Estate and Trust FBO Paul Valenti IRA by Warranty Deed drafted by Defendant Guardian Law dated September 26, 2014 and signed by Rob Lewis, Manager.

1179.   Mr. Valenti through his new IRA made of down payment of $26,693.00 was given a credit in the amount of $719.69 and borrowed $56,500.00  from Defendant Insider's Cash, LLC to finance the purchase pursuant to a non-recourse loan agreement and mortgage identical to the other non-recourse loan agreements and mortgages with defendant Insider's Cash, LLC in this action.

1180.   As described *supra*, Defendants Insider's Cash, LLC and Green Apple Homes, LLC are owned and controlled by the same persons.  Whereas a loan from an independent lender would reflect such lender's good faith assessment of the true value of the property, the instant "loan"

from a related entity did nothing but provide the fraudulent impression to the borrower that the property was worth far in excess of the loan proceeds.

1181.  Unbeknownst to Mr. Valentis but known to Defendants at the time of purchase, the Wilmot home had been available for sale at the distressed sale price of $36,000.00 in July, 2014  and was purchased on behalf of Defendants own account by Defendants' agent, this property was purchased by GWH Properties LLC for the sum of $36,000.00 on July 21, 2014.

1182.  GWH Properties LLC. soon thereafter conveyed the Wilmot property directly to Defendant Green Apple Homes, LLC for $56,560.00 by Warranty Deed prepared by Defendant Guardian Law on August 29, 2014.  Defendant Green Apple Homes, LLC then sold the Wilmot property to American Estate and Trust FBO Paul Valenti, IRA on October 7, 2014 for the aforementioned effective price of $83,912.69.

1183.  Defendants had a contractual and fiduciary duty owing to Paul Valenti to locate the Wilmot property at a discounted price, inform him of its existence and availability and to facilitate its purchase at such a discounted price.

1184.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Wilmot property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Valenti at a price greatly in excess of its fair market value or true cash value

1185.  In further breach of their contractual and fiduciary duties, Defendants induced Mr. Valenti to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced as Paul Valenti had been informed by Defendants at the Buying Summit.

1186.  For the year 2014, the assessor for Eastpointe., Michigan determined that the property had a fair market value of $37,260 which was the actual fair market value of the property at that time.

1187.  For the year 2017, (year of the give back) the assessor for the City of Eastpointe, Michigan determined that the property had a fair market value of $45,420.00.

1188.  For the year 2017, the assessor for Eastpointe., Michigan determined that the property had a fair market value of $45,420.00 which was the actual fair market value of the property at that time.

1189.  Paul Valenti is and has been unable to sell the Wilmot property because the property is not worth what is owed on said bridge loan.

1190.  Defendant Insider's Cash, LLC via Defendant Income Property USA, LLC sold the loan agreement between Insiders Cash, LLC and the Valenti IRA to the Mary Therese Spieckerman IRA.  Once Mr Valenti became aware of the actual value of the Wilmot property and realized that the value of the Wilmot property would never rise to the fraudulent price he paid for it, he determined that it made sense only to quit claim title to the property to the Spieckerman IRA which he did by way of quit claim deed dated November 21, 2017.

1191.  During a sales session attended by The Valentis with a purported expert consultant at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 18992 Woodside Ave, Harper Woods, MI.  The purported bargain contract price offered by Defendants for this home was $76,700.00 as displayed on this internet monitor.

1192.  Defendants' internet screen display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

1193.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, the purported expert consultant regarding the property and the express promises of Defendant Kory Thurston who described the purported the bargains to be purchased at the Buying Summit, Paul Valenti purchased the Woodside property from Defendant Green Apple, LLC for $76,700.00.   However, with various add-ons, including a $4,352.60 "loan origination fee" and "closing costs" which included a fee of $2,250.00 paid to Defendants Guardian Law, the actual sales price was $86,051.36 and the property was conveyed by Defendant Green Apple Homes, LLC to American Estate and Trust FBO Paul Valenti IRA by Warranty Deed drafted by Defendant Guardian Law dated October 6, 2014 and signed by Rob Lewis, Manager.

1194.  Mr. Valenti through his new IRA made of down payment of $27,574.00, was given a credit in the amount of $77.36 and borrowed $58,400.00 from Defendant Insider's Cash, LLC to finance the purchase pursuant to a non-recourse loan agreement and mortgage identical to the other non-recourse loan agreements and mortgages with defendant Insider's Cash, LLC in this action.

1195.  As described *supra*, Defendants Insider's Cash, LLC and Green Apple Homes, LLC are owned and controlled by the same persons.  Whereas a loan from an independent lender would reflect such lender's good faith assessment of the true value of the property, the instant "loan"

from a related entity did nothing but provide the fraudulent impression to the borrower that the property was worth far in excess of the loan proceeds.

1196.  Unbeknownst to Mr. Valentis but known to Defendants at the time of purchase, the Woodside home had been available for sale at the distressed sale price of $34,500.00 in June, 2014  and was purchased on behalf of Defendants own account by Defendants' agent, this property was purchased by GWH Properties LLC for the sum of $34,500.00 on June 10, 2014.

1197.  GWH Properties LLC. soon thereafter conveyed the Woodside property directly to Defendant Green Apple Homes, LLC for $58,000.00 by Warranty Deed prepared by Defendant Guardian Law on July 16, 2014.  Defendant Green Apple Homes, LLC then sold the Woodside property to American Estate and Trust FBO Paul Valenti, IRA on October 6, 2014 for the aforementioned effective price of $86,051.36.

1198.  Defendants had a contractual and fiduciary duty owing to Paul Valenti to locate the Woodside property at a discounted price, inform him of its existence and availability and to facilitate its purchase at such a discounted price.

1199.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Woodside property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Valenti at a price greatly in excess of its fair market value or true cash value

1200.  In further breach of their contractual and fiduciary duties, Defendants induced Mr. Valenti to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced as Paul Valenti had been informed by Defendants at the Buying Summit.

1201.  For the year 2014, the assessor for Harper Woods., Michigan determined that the property had a fair market value of $38,800.00 which was the actual fair market value of the property at that time.

1202.  For the year 2018, the assessor for Harper Woods., Michigan determined that the property had a fair market value of $45,800 which was the actual fair market value of the property at that time.

1203.  On May 16, 2018, Defendant Income Property USA, LLC sold the loan agreement between Insiders Cash, LLC and the Valenti IRA to the Rosemary Sloan IRA for the sum of $58,400.00.  Once Mr Valenti became aware of the actual value of the Woodside property and realized that the value of the Woodside property would never rise to the fraudulent price he paid for it, he determined that it made sense only to quit claim title to the property to the Sloan IRA which he did by way of quit claim deed dated August 22, 2017.

1204.  On September 12, 2018, The Sloan IRA sold the Woodside property to Level Field Spread, LLC for the sum of $25,000.00.  Level Field Spread, LLC is just another of the many so called "property defendants" owned and control by the owners of the fraudulent scheme.

1205.  Please refer to Paragraphs 217-227 for additional allegations about the activities of Defendant Invictus Law in the Prevost transaction and their participation in the Buying Summit Fraudulent Scheme and conspiracy.

1206.  Plaintiffs Paul Valenti, Sherry Valenti and Re Investor 702, LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated by each Defendant herein through conducting and participating in the

affairs of the Buying Summit Fraudulent Enterprise and conspiracy and including all funds expended to repair delapidated properties that were marketed as "turn key".

## COUNT XIII -

### PLANTIFFS CANNOT VINDICATE THEIR RIGHTS UNDER RICO IF SINGLE CLAIM COMMITTED BY DIFFERENT AFFILIATED ENTITIES MUST BE LITIGATE BOTH IN ARBITRATION AND IN THIS COURT.

The allegations of paragraphs 1 – 1206 are incorporated by reference as if fully set forth herein.

1207.  As described, *supra*, Defendants have cleverly arranged their RICO enterprise and conspiracy to employ a series of distinct but related entities to carry out distinct duties and aspects of their contractual agreements with each victim of their fraudulent scheme.  In the instant case, the Plaintiffs CANNOT vindicate their statutory RICO or state contract claims where, for example, resolution of each individual sales transaction requires (according to Defendants) the filing of at least THREE separate cases, an arbitration case for breach of the Buying Summit contract, a lawsuit in the courts of Utah for the sales contracts and a lawsuit in the Utah courts OR an arbitration case regarding the loan agreements.  But the breach of the Buying Summit contract was the direct result of the sales contract and loan agreement and the three separate entities with whom each Plaintiff is in contractual privity for each sales transaction are both related entities AND members of the RICO enterprise and conspiracy.

1208. Defendants could have easily inserted into their agreements language requiring that all disputes must all be resolved in Utah courts OR all in arbitration with a full list of the Defendants' affiliates. They did not do that precisely because they wanted to make it impossible

to litigate any of these disputes by requiring that each distinct individual property transaction be litigated in multiple fora.

1209.  Most importantly, there must be identical awards made against each participant Defendant in the fraudulent scheme and conspiracy because each is jointly and severally liable for all of the damages incurred by each Plaintiff.  Similarly, there must be a single determination that each entity was such a participant in the scheme.  Such a single determination would be impossible if multiple fora were required for each partial claim based upon the arbitration or forum selection clauses. The determination of the existence of a RICO enterprise or conspiracy in this regard can only be accomplished in a single forum and that forum should be the United States District Court for the District of Utah.

1210.  The 6th Circuit in their opinion noted that Plaintiffs analysis may have some validity but that such a determination was up to the Utah court:

> Next, Plaintiffs' objection that enforcement of this arbitration clause would prevent them from vindicating their rights under RICO because it would necessitate multiple fora, as discussed above, may have some validity. Accordingly, Plaintiffs are free to bring their claims in Utah courts, which may decide in the first instance whether or not to enforce the arbitration clauses due to the concerns of litigating these claims in multiple fora.

1211.  As such, because enforcement of these arbitration clauses would prevent Plaintiffs from vindicating their rights under RICO and  state contract law, Plaintiffs submit that they should not be enforced.

## COUNT XIV
## VIOLATIONS OF 18 US.C. §1962(A), (C) AND (D) IN CONNECTION WITH THE BUYING SUMMIT FRAUDULENT ENTERPRISE

The allegations of paragraphs 1 - 1211 are incorporated by reference as if fully set forth herein.

1212.  At all times relevant to the Complaint, all of the defendants and various agents of those companies constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 US.C. §1961(4) and used in 18 US.C. §1962 (hereinafter the "Buying Summit Fraudulent Enterprise").  The Buying Summit Fraudulent Enterprise was created and has existed as an ongoing association engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this Complaint.

1213. Each of the defendants identified in this Complaint was associated with or employed by the Buying Summit Fraudulent Enterprise and each conspired to and did as part of that employment or association conduct or participate in the conduct of the affairs of the Buying Summit Fraudulent Enterprise through engaging in a pattern of racketeering activity.  Such conduct constituted a violation of 18 US.C. §1962(c) and (d).

1214.  All Defendants have all committed predicate acts of wire and/or mail fraud in furtherance and to facilitate the fraudulent scheme.  All Defendants conspired and agreed to further and facilitate the fraudulent scheme by agreeing that those Defendants and co-conspirators would commit those predicate acts.

1215.  Each of the defendants identified in this Complaint conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate the Buying Summit Fraudulent Enterprise, enabling the Buying Summit Fraudulent Enterprise to defraud plaintiffs as set forth herein.  Such conduct constituted a violation of 18 US.C. §1962(a) and (d).

1216.  As a whole, the defendants identified in this Complaint acted in concert, with specific, well-defined roles in the Buying Summit Fraudulent Enterprise, as described in the

preceding allegations, to achieve the common goal of defrauding participants such as the Plaintiffs into making payments for the misrepresented "training" and residential property purchase programs.  Further, these defendants consensually engaged in decision making relating to the programs, through the roles described herein. Further detail about their specific roles in perpetuating the fraudulent scheme will be disclosed through discovery.

1217.  These acts, including the conduct of the affairs of the Buying Summit Fraudulent Enterprise through a pattern of racketeering activity, took place over a period of at least three years and included multiple acts of mail and wire fraud.

1218.  The defendants identified in this Complaint have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme and as a regular part of the conduct of the business of the enterprise for at least three years and will continue indefinitely unless prevented as evidenced by their past and continued activities.

1219. This pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 US.C. §1961(5).

1220.  Through their conduct of the Buying Summit Fraudulent Enterprise, the defendants identified in this Complaint have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding their training and sales programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations.   Examples of such communications and transfers in furtherance of the fraudulent schemes are described throughout the preceding paragraphs.

1221.  By virtue of these and similar communications occurring over at least the past three years, the defendants identified in this Complaint have engaged in, and are continuing to engage

an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

1222.  As a direct and proximate result of these defendants' conduct as set forth herein, including the conduct of the affairs of and investment in the Buying Summit Fraudulent Enterprise by the defendants identified in this Complaint, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

1223. Pursuant to 18 US.C. §1964(c), Plaintiffs are entitled to recover from the defendants identified in this Complaint treble damages, their costs and reasonable attorney fees.

WHEREAS, Plaintiffs respectfully demand as follows:

1. Judgment upon their complaint against all defendants jointly and severally;

2. Compensatory damages;

3. Rescission and revocation of all agreements between Plaintiffs and Defendants and restitution to Plaintiffs of all benefits paid by Plaintiffs to Defendants;

4. Punitive damages;

5. Treble damages and attorney fees where authorized;

6. Injunctive relief;

7. A constructive trust of assets traceable to payment by Plaintiffs for benefit of Plaintiffs;

8. A determination that all claims be adjudicated in this court and not in arbitration;

9. Trial by jury on all issues so triable; and

10. Any and all other relief to which Plaintiffs appear entitled.

/s/ Robert W. Roddis (16936)
424 Madison
Grosse Pointe Farms, MI 48236
(313) 319-5045
bobroddis@gmail.com

August 2, 2020